# Exhibit A



# COLLECTIVE BARGAINING AGREEMENT

## October 25, 2021



Article 1.      Definitions.............................................................................. 1

Article 2.      Preamble ................................................................................ 8

Article 3.      Recognition ............................................................................ 9

Article 4.      Duration of Agreement ........................................................ 10

Article 5.      Non-Discrimination .............................................................. 11

Article 6.      Management Rights .............................................................. 12

Article 7.      Dues Checkoff ..................................................................... 16

Article 8.      Standard Player Agreement ................................................ 19

Article 9.      No Strike or Lockout ............................................................ 27

Article 10.     Medical Information and Fitness .......................................... 28

Article 11.     Player Obligations ............................................................... 36

Article 12.     Appearances ....................................................................... 37

Article 13.     Roster .................................................................................. 40

Article 14.     Player Movement ................................................................ 42

Article 15.     Group Licensing, Marketing, and Apparel .......................... 45

Article 16.     Rules and Discipline ........................................................... 49

Article 17.     Prohibited Activities ............................................................ 54

Article 18.     Benefit Spend ...................................................................... 55

Article 19.     Per Diem; Parking ............................................................... 60

Article 20.     Workers' Compensation ...................................................... 62

Article 21.     Circumvention...................................................................... 64

Article 22.     Vacation and Time Off ........................................................ 65

Article 23.     Schedules and Calendar ..................................................... 66

Article 24.     Grievance and Arbitration Procedure .................................. 68

Article 25.     System Arbitration .............................................................. 73

Version: October 25, 2021

Article 26.   Savings Clause ............................................................................ 75

Article 27.   Interpretation; Choice of Law ......................................................... 76

Article 28.   Limitation of Liability .................................................................... 77

Article 29.   Other ........................................................................................... 78

Article 30.   Notices ........................................................................................ 79

Article 31.   All-Star Game; National Team Matches ........................................... 80

Article 32.   Soccer Camps .............................................................................. 81

Article 33.   Force Majeure ............................................................................... 82

**EXHIBITS:**

| | |
|---|---|
| Exhibit A | Standard Player Agreement |
| Exhibit B | Medical Information Release |
| Exhibit C | Benefit Confirmation Form |
| Exhibit D | USLPA Check-Off Authorization Form |
| Exhibit E | Contract Modification Examples |
| Exhibit F | Form of Club Certification – Player Base Compensation |

1

| | |
|---|---|
| 1 | **Article 1.**      **Definitions** |
| 2 | Capitalized terms used in this Agreement have the meanings set forth below. |
| 3 | "**25-Day Contract**" has the meaning ascribed to it in Article 8.H. |
| 4 | "**Agreement**" – *see* CBA. |
| 5<br>6<br>7<br>8<br>9<br>10<br>11 | "**Appearance**" means either (i) a physical appearance in connection with an external organization at a location other than the Club's home stadium or other Club-controlled facility or (ii) an interactive web-based videoconferencing or so-called "ask me anything" session with the public and/or a Club corporate sponsor. By way of examples, neither an appearance on social media (unless meeting the criteria in (ii) above), nor an internal photo shoot, nor an autograph session at the Club's home stadium would be considered an "Appearance". |
| 12 | "**Base Compensation**" has the meaning ascribed to it in Article 18.C.1 |
| 13<br>14<br>15 | "**Benefit Confirmation Form**" means the form attached hereto as Exhibit C, as it may be amended, modified or supplemented from time to time in USL's sole discretion after consultation with the USLPA. |
| 16 | "**Benefit Spend**" has the meaning ascribed to it in Article 18.A.1. |
| 17 | "**Buyout Right**" has the meaning ascribed to it in Article 8.P.1 |
| 18 | "**Carrier**" has the meaning ascribed to it in Article 20.D. |
| 19 | "**CBA**" or "**Agreement**" has the meaning ascribed to it in Article 2. |
| 20 | "**Claim Notice**" has the meaning ascribed to it in Article 7.D.2. |
| 21<br>22<br>23<br>24 | "**Club**" or "**USL Club**" means a Person authorized to operate a team in the League, but only once such club is permitted by USL to enter into Standard Player Agreements. Where appropriate, such term shall be deemed to include a reference to the team operated by such Club. |
| 25 | "**Club-Related Entity**" means: |
| 26<br>27<br>28 | (1) any Person who directly or indirectly controls, is controlled by, or is under common control with either (i) the Club or (ii) a Person described in paragraphs (2) through (4) below; |
| 29<br>30 | (2) any Person who is an officer, partner, member or trustee of, or serves in a similar capacity with respect to, the Club; |
| 31<br>32 | (3) any Person who, directly or indirectly, is the beneficial owner of ten percent (10%) or more of the equity interests of the Club (an "**Owner**"), and |

Case 3:23-cv-00017   Document 1-1   Filed 01/11/23   Page 5 of 136

33       (4) any member of the close family (which shall include, for the purposes of this
34           paragraph (4), an individual's current spouse, parents, parents-in-law,
35           grandparents, children, children-in-law, siblings, and grandchildren, or a trust or
36           estate, all of the beneficiaries of which consist of such individual or such related
37           persons) of an Owner.

38       "**Club Medical Staff**" has the meaning ascribed to it in Article 10.B.2(a).

39       "**Commercial Affiliates**" means all League or Club sponsors, product/service
40       companies, suppliers, licensees or other entities granted by the League or a Club a license
41       to use League or Club trademarks or other commercial identification rights in connection
42       with the League or Club.

43       "**Commercial Appearance**" has the meaning ascribed to it in Article 12.D

44       "**Competition Manual**" means the League's Competitional Manual for the 2021 season,
45       as it may be amended from time to time in USL's sole discretion in accordance with
46       Article 6.

47       "**Compulsory Match**" or "**Compulsory Tournament**" means a match or tournament in
48       which CONCACAF, FIFA or USSF requires the League (or a Club in the League) to
49       participate.

50       "**CONCACAF**" means the Confederation of North, Central American and Caribbean
51       Association Football.

52       "**Contract Guarantee Date**" means, for each Season, the date determined by the League
53       in its sole but reasonable discretion, after good faith consultation with the USLPA, on or
54       after which a Performance-Based SPA may not be terminated other than for cause.  As a
55       general rule, however, the Contract Guarantee Date shall be close in time to the mid-point
56       of a Season (currently, on or about July 15), taking into account relevant FIFA dates and
57       the release dates of other domestic leagues.

58       "**Contract Year**" means that period of time during which an SPA is in effect with respect
59       to any given Season.

60       "**Covered Injury**" has the meaning ascribed to it in Article 20.D.

61       "**CPI**" means the Consumer Price Index, All Urban Consumers, United States, All Items
62       (1982 - 1984 = 100), as published by the Bureau of Labor Statistics of the United States
63       Department of Labor or, if such index is not available, such other index as the parties
64       may agree most closely resembles such index

65       "**CSA**" means the Canadian Soccer Association.

66       "**Discovery Deadline**" has the meaning ascribed to it in Article 24.D.3(b).

67       "**Effective Date**" has the meaning ascribed to it in Article 2.A.

68      "**Endorsement**" has the meaning ascribed to it in Article 15.E.

69      "**FIFA**" means the Federation Internationale de Football Association.

70      "**FIFA RSTP**" means the Regulations on the Status and Transfer of Players adopted by
71      FIFA, effective January 2021, as those Regulations may be amended, supplemented, or
72      interpreted by FIFA from time to time.

73      "**Fit**" or "**Fitness**" means, with respect to a Player, that his medical and physical
74      condition is sufficient to perform as a skilled soccer player in the League.

75      "**Fitness Determination**" has the meaning ascribed to it in Article 10.C.2.

76      "**Force Majeure Event**" has the meaning ascribed to it in Article 33.A.

77      "**Grievance**" has the meaning ascribed to it in Article 24.A.1.

78      "**Grievance Committee**" has the meaning ascribed to it in Article 24.D.2.

79      "**Grievance Hearing", or "Hearing**" shall have the meaning ascribed to them in Article
80      24.D.3.

81      "**Group License Agreement**" has the meaning ascribed to it in Article 15.D.

82      "**Group Licensing Program**" has the meaning ascribed to it in Article 15.D.

83      "**Guaranteed**," "**Guaranteed Contracts**" or "**Guaranteed SPAs**" have the meanings
84      ascribed to them in Article 8.F.1.

85      "**Guaranteed Years**" means the Contract Years covered by an SPA, <u>excluding</u> any
86      option years.

87      "**Hiatus Pay**" has the meaning ascribed to it in Article 33.C.2.

88      "**Hiatus Period**" has the meaning ascribed to it in Article 33.C.1.

89      "**IDP**" has the meaning ascribed to it in Article 16.C.1(c).

90      "**Immediate Family Member**" means, with respect to a Player, his spouse, children,
91      parents, siblings, grandparents and in-laws (in each case, including through adoption).

92      "**Impartial Arbitrator**" has the meaning ascribed to it in Article 24.E.

93      "**JAMS**" means Judicial Arbitration and Mediation Services, Inc..

94      "**Last Six Months**" has the meaning ascribed to it in Article 14.G.

95      "**Law**" means, as to any Person, any law (including common law), statute, ordinance,
96      treaty, rule, regulation, order, decree, judgment, writ, injunction or determination of an

97  arbitrator or a court or other Governmental Authority, in each case applicable to or
98  binding upon such Person.  As used herein, "**Governmental Authority**" means the
99  government of the United States or any political subdivision thereof, whether at the
100  national, state, municipal or any other level, and any agency, authority, instrumentality,
101  regulatory body, court or other entity exercising executive, legislative, judicial, taxing,
102  regulatory or administrative powers or functions of, or pertaining to, government.

103  "**League**" means the league currently known as the "USL Championship" (and not USL
104  League One or any other league or organization administered by USL or its affiliates)
105  Where appropriate, such term shall be deemed to include a reference to USL.

106  "**League Competitions**" means any match, tournament, or competition in which the Club
107  or League participate, including (a) any Pre-Season, Regular Season and Post-Season
108  matches; (b) Compulsory Matches; (c) matches in a League-operated tournament; (d)
109  All-Star or similar matches; and (e) exhibition matches in which the Club participates.

110  "**League One**" has the meaning ascribed to it in Article 27.B.1.

111  "**League One Agreements**" has the meaning ascribed to it in Article 27.B.2.

112  "**League Parties**" means, collectively, USL and the Clubs (and each of USL and the
113  Clubs, individually, a "**League Party**").

114  "**League Season**" or "**Season**" means the period in any year commencing on the date of
115  the League's first Regular Season match and ending on the date of the League's
116  championship match.

117  "**Likeness**" means, collectively, a Player's name, nickname, initials, autograph/signature
118  (including facsimiles), voice, picture, photograph, animation, image, likeness, persona,
119  jersey number, statistics, copyrights and/or biographical data (but expressly excluding
120  any of a Player's physiological data).

121  "**Loaned Player**" means a professional player who is registered with the League but
122  whose Parent Club is not a Club in the League.  By way of example, a player on loan to
123  Phoenix Rising FC from Cruz Azul (of Liga MX), Seattle Sounders (of MLS) or
124  Greenville Triumph SC (of League One) would be considered a Loaned Player, whereas
125  a player on loan to Phoenix Rising FC from the Tampa Bay Rowdies would <u>not</u> be
126  considered a Loaned Player.

127  "**Loaned Player Salary Allocation**" has the meaning ascribed to it in Article 18.A.2(b).

128  "**Losses**" has the meaning ascribed to it in Article 7.D.1.

129  "**Marketing Materials**" means any and all (i) general promotional, advertising,
130  packaging, collateral or other display materials, (ii) Media, (iii) promotions, (iv)
131  advertising and promotional concepts (including but not limited to slogans, campaigns or
132  programs) or (v) any other creative or product that bears any or all League or Club
133  names, logos, trademarks, trade dress, uniforms or other forms of League or Club

134     intellectual property and is intended to publicize and promote the League, a Club or the
135     sport of soccer.

136     **"Maximum Benefit Spend"** has the meaning ascribed to it in Article 18.B.1.

137     "**Media**" means, collectively, any or all media, formats or forms of exhibition and
138     distribution, whether analog, digital or other, now known or hereafter developed,
139     including, but not limited to, print, tape, disc, computer file, radio, television, motion
140     pictures, other audio-visual and audio works, Internet, broadband platforms, mobile
141     platforms, applications, and other distributions platforms.

142     "**Medical Deadline**" has the meaning ascribed to it in Article 10.C.3(a).

143     "**Medical Examination**" has the meaning ascribed to it in Article 10.A.1.

144     "**Medical File**" has the meaning ascribed to it in Article 10.B.1

145     "**Medical Information**" means all medical and/or health information about a Player including,
146     but not limited to, all past, present or future: health, medical or surgical records; medical or health
147     questionnaire(s); information relating to any injury, sickness, disease, condition, medical history,
148     or medical, mental, or clinical status, or diagnosis, treatment or prognosis; clinical or treatment
149     notes or reports; fitness to play determinations; test results (including, but not limited to, the
150     results of neuropsychological testing); laboratory reports, x-rays or diagnosis imaging results; and
151     data relating to any testing or medical study.

152     "**Medical Information Forms**" has the meaning ascribed to it in Article 10.A.3.

153     "**Medical Information Release**" has the meaning ascribed to it in Article 10.B.2.

154     "**Minimum Base Compensation**" has the meaning ascribed to it in Article 18.D.1

155     "**Modification Deadline**" has the meaning ascribed to it in Section Article 8.R.3

156     "**Official Equipment Supplier**" means a supplier of athletic equipment to the League or
157     the Club, as applicable. The number of Official Equipment Suppliers may increase or
158     decrease during the term. A list of current Official Equipment Suppliers will be provided
159     to the USLPA upon request and updated as needed.

160     "**Official Matches**" means Regular Season matches, Post-Season matches, Compulsory
161     Matches, and any matches included in a League-run tournament (and does not include,
162     for example, exhibition or Pre-Season matches).

163     "**Off-Season**" means the time period from the later of a Player's Club's final Regular
164     Season or final Post-Season match until the Pre-Season Training Camp Start Date.

165     "**Parent Club**" means the club ultimately owning an individual's professional playing
166     contract. By way of example, if an individual is signed to a professional contract with
167     Team A, Team A subsequently loans the individual to Team B, and Team B then loans
168     the individual to a USL Club, Team A would be considered the individual's Parent Club.

169     "**Party**" or "**Parties**" has the meaning ascribed to it in Article 2.A.

170     "**Performance-Based**," "**Performance-Based Contracts**" or "**Performance-Based**
171     **SPAs**" have the meanings ascribed to them in Article 8.G.1.

172     "**Person**" means an individual or a corporation, partnership, sole proprietorship,
173     company, firm, limited liability company, joint venture, trust, business association,
174     organization, joint stock company, unincorporated organization, group acting in concert,
175     Governmental Authority or other entity.

176     "**Players**" means professional players employed by Clubs through Standard Player
177     Agreements and those who may become so employed during the Term.  For the
178     avoidance of doubt, this definition excludes all (a) amateur players signed to a playing
179     contract with a USL Club and (b) professional players with a Parent Club other than a
180     USL Club (i.e., Loaned Players).

181     "**Post-Season**" means that part of the League Season following the conclusion of the
182     Regular Season that includes the League's playoffs, including, without limitation, any
183     play-in match, division match, conference championship and championship match.

184     "**Pre-Season**" means the time period from the Pre-Season Training Camp Start Date to
185     the start of the Regular Season.

186     "**Pre-Season Training Camp Start Date**" has the meaning ascribed to it in Article
187     23.B.2.

188     "**Professional Player**" means either a professional player on an SPA or a Loaned Player.

189     "**Prohibited Substances**" means (a) those substances included on the World Anti-
190     Doping Agency (WADA) Prohibited List, as such may be modified, updated, or
191     interpreted by WADA from time to time; (b) any illegal substances; and (c) such other
192     substances as may be added (or removed) by USL from time to time upon mutual
193     agreement with the USLPA.

194     "**Promotional Appearance**" has the meaning ascribed to it in Article 12.C.1

195     "**Publicity Rights**" has the meaning ascribed to it in Article 15.B.

196     "**Qualifying Shoe or Glove Deal**" means an exclusive, written agreement between a
197     Player and an on-field shoe or goalkeeper glove manufacturer that (a) has been disclosed
198     in the Player's SPA or (b) is entered into during a period of time in which the Club has
199     not committed to providing the Player with on-field shoes or goalkeeper gloves (as
200     applicable), without cost to the Player, consistent with the terms of Article 15.G.3 hereof.
201     The Player agrees to provide a copy of the duration/term provision and signature page of
202     such Qualifying Shoe or Glove Deal, to be filed with the USL, upon request of a League
203     Party.  Any subsequent exclusive, written agreement between the Player and a shoe or
204     glove manufacturer shall also be considered a "Qualifying Shoe or Glove Deal", <u>provided</u>
205     <u>that</u> it was entered into within thirty (30) days of the expiration or termination of the

206  Player's previous Qualifying Shoe or Glove Deal.

207  "**Recordings**" has the meaning ascribed to it in Article 15.A.

208  "**Regular Season**" means that portion of the Season prior to the start of the Post-Season.

209  "**Salary**" means the weekly, monthly, or annual cash compensation to be paid regularly
210  to a Player, as indicated in the Player's SPA.

211  "**Season**" – *see* "League Season".

212  "**Soccer Camp**" has the meaning ascribed to it in Article 32.B.1.

213  "**Standard Compensation Period**" has the meaning ascribed to it in Article 8.J.1.

214  "**Standard Player Agreement**" or "**SPA**" means the League's standard form of written
215  agreement (including any addenda thereto) between an individual and a Club, pursuant to
216  which such individual is employed by such Club as a professional soccer player.

217  "**Step**" has the meaning ascribed to it in Article 24.C.

218  "**System Arbitration**" has the meaning ascribed to it in Article 25.A.

219  "**System Arbitrator**" has the meaning ascribed to it in Article 25.D.

220  "**Term**" has the meaning ascribed to it in Article 4.

221  "**Union**" **–** *see USLPA*.

222  "**USL**" means USL Pro, LLC.

223  "**USLPA**" or "**Union**" means the USL Players Association.

224  "**USSF**" means the United States Soccer Federation.

225  "**Year**" means the twelve-month period running from January 1 through December 31.

226 **Article 2.    Preamble**

227    A.    This Collective Bargaining Agreement, together with all Exhibits hereto (this
228    "<u>CBA</u>" or "<u>Agreement</u>"), which is the product of bona fide, arm's length collective
229    bargaining, is effective as of October 25, 2021 (the "<u>Effective Date</u>"), by and between
230    USL, in its capacity as bargaining representative for the Clubs, and the USLPA.
231    Hereinafter, the USL and the USLPA may each be referred to as a "<u>Party</u>" and may
232    collectively be referred to as the "<u>Parties.</u>"

233    B.    It is the intent and purpose of the Parties, through this Agreement, to: promote the
234    mutual interests of the Players, the Clubs, and the League; avoid interruptions to the
235    operations and competition of the League; and set forth herein their agreement covering
236    various conditions of employment.

237    C.    This Agreement shall be binding upon and inure to the benefit of USL, the Clubs,
238    the USLPA, the Players, and their respective successors or assigns.

239 **Article 3.      Recognition**

240 A.      <u>Recognition of USLPA</u>.  The USL recognizes the USLPA as the sole and
241 exclusive bargaining representative of the Players.  The USLPA warrants that it is duly
242 empowered to enter into this Agreement for and on behalf of such Players.

243 B.      <u>Recognition of USL.</u>  The USLPA recognizes the USL as the sole and exclusive
244 bargaining representative of present and future employer Clubs.  The USL warrants that it
245 is duly empowered to enter into this Agreement for and on behalf of such Clubs.

246 C.      <u>USLPA Meetings</u>.  The USLPA may hold meetings at Club facilities with the
247 Players of each Club during Pre-Season and League Season, provided that: (i) the
248 arrangements for each meeting have been cleared in advance through the president of the
249 Club involved (or his designee); (ii) such facilities are available to the Club at the time
250 requested; and (iii) no such meeting shall interfere with the training, practice or operation
251 of the Club. Clearance shall not be unreasonably withheld.

252 **Article 4.    Duration of Agreement**

253    This CBA is effective as of the Effective Date and shall remain in full force and effect
254    until midnight on the 31st day of December, 2025 and shall remain in effect from year to
255    year thereafter unless either Party notifies the other in writing by April 1, 2025 (or April
256    1 of any renewal year thereafter) of its intention to terminate or modify the CBA (the
257    "Term").

258 **Article 5.** **Non-Discrimination**

259     This CBA will be applied to all Players without discrimination on the basis of
260 race, religion, color, national origin, age, disability, marital status or sexual orientation.
261 No Club will: (i) interfere with, restrain, or coerce a Player because of his USLPA
262 membership or his lawful activities on behalf of the USLPA (provided such activities
263 comply with any applicable terms and conditions imposed upon such Player by or in
264 accordance with this Agreement), or (ii) discriminate against a Player in regard to hire,
265 tenure, employment, or any term or condition of employment because of his USLPA
266 membership or his lawful activities on behalf of the USLPA (provided such activities
267 comply with any applicable terms and conditions imposed upon such Player by or in
268 accordance with this Agreement).

269 **Article 6.** **Management Rights**

270 A.      Except as limited elsewhere by an express written provision of this CBA, the
271 League Parties, in the exercise of their functions of management, shall in addition to their
272 other inherent and legal rights to manage their respective businesses, including the
273 direction and control of the teams, have the exclusive right at any time and from time to
274 time to take any action they deem appropriate in the management of their businesses,
275 including but not limited to the exclusive right to determine when, where, how and under
276 what circumstances they wish to operate, suspend, discontinue, sell, or move and to
277 determine the manner and the rules by which their teams shall play soccer.

278 B.      All of the rights which were inherent in League Parties, as owners and operators
279 of their businesses, including the teams, or incident to the management thereof, which
280 existed prior to the selection of the USLPA as exclusive bargaining representative by the
281 Players and which are not directly and expressly curtailed or contracted away by a
282 specific provision of this Agreement or by an SPA are retained solely by the League
283 Parties.  Except as such rights are directly and expressly curtailed or contracted away by a
284 specific provision of this Agreement or by an SPA, these rights include (without
285 limitation) the right of the respective League Parties to:

286   1.    Plan, direct and control operations of the Clubs and the League, including
287         the establishment and administration of policies and procedures relating
288         thereto;

289   2.    Make and change rules, regulations, policies and practices not in conflict
290         with the terms of this Agreement;

291   3.    Select and change benefit plan carriers, insurers, administrators,
292         fiduciaries, and trustees;

293   4.    Cease operating a team in the League for any reason whatsoever;

294   5.    Hire and terminate Players (and any other personnel, including coaches
295         and other technical staff);

296   6.    Ensure the security of its facilities and property including, without
297         limitation, the rights of inspection and search;

298   7.    Direct and schedule the Players (and any other personnel);

299   8.    Take any action, notwithstanding any other provision of this Agreement,
300         that the League Party deems necessary or appropriate to comply with any
301         applicable Laws;

302   9.    Determine what procedures and equipment shall be used in its operations,
303         and to establish practices and procedures for the use, care and maintenance
304         of such equipment;

305      10.      Decide on the nature and type of materials, services, supplies, equipment,
306                 or machinery to be purchased or used, the price to be paid and to select the
307                 vendors, manufacturers, sellers, suppliers, or lessors or same;

308      11.      Change, alter, or modify any policy, practice, or decision with respect to
309                 any of the rights reserved, retained, or enumerated herein, or with respect
310                 to any other rights reserved to League Parties;

311      12.      Take whatever actions the applicable League Party deems necessary or
312                 desirable, subject to applicable Laws, to maintain and improve the safety
313                 and health of the Players and the integrity of the competition;

314      13.      Determine practice, match, and other work schedules, including the right
315                 to require Players to work on Saturdays, Sundays, holidays, and scheduled
316                 days off; and

317      14.      Determine the method for the Players' performance of their duties,
318                 including the introduction of improved methods, equipment or facilities.

319      C.      The Parties recognize that FIFA and the USSF have rights affecting the conduct
320 of League Party business, and that League Parties may implement mandatory dictates of
321 FIFA and/or requirements of the USSF without bargaining over the decision to
322 implement such mandatory dictates. If such a mandatory dictate would result in (a) a
323 change in a Player benefit under an existing rule or regulation; or (b) the adoption of a
324 rule or regulation which would change a Player benefit under an existing rule or
325 regulation or impose an obligation upon the Players which had not previously existed, the
326 Parties shall bargain in good faith over the effects of the implementation of such a
327 mandatory dictate.

328      D.      Except as such subjects are addressed elsewhere by this CBA, and without
329 determining whether such subjects are mandatory or permissive subjects of bargaining
330 under the National Labor Relations Act, during the term of this CBA, the USLPA
331 expressly waives its statutory right to bargain over the subjects set forth in this Article 6.
332 However, before deciding either to implement a new rule or policy or to change an
333 existing rule or policy regarding the subjects covered by this Article 6.D, USL shall (a)
334 give the USLPA reasonable notice of the proposed change; (b) upon request, provide the
335 USLPA with information reasonably necessary to engage in a meaningful dialogue
336 concerning the proposed change, and (c) engage in such a dialogue with the USLPA;
337 provided however, that without needing to reach impasse, USL may at any time
338 implement the proposed change after giving the USLPA at least seven (7) days' notice of
339 its intent to do so, notwithstanding and without any legal consequence attaching to the
340 status of, or delay resulting from, an information request made by the USLPA. The
341 subjects over which the USLPA expressly waives its right to bargain (except as otherwise
342 set forth in this CBA, as aforesaid) are:

343      1.      Competition Manual provisions (except as otherwise provided in this
344                 CBA), including but not limited to the establishment, termination, and

definitions of and amendments to Player classifications and categories; provided, however, that such classifications and categories are only mechanisms intended to provide Clubs with relief from any Maximum Benefit Spend regulations (e.g., a "homegrown player" rule in which such Player's Base Compensation would not be attributable toward any Maximum Benefit Spend calculation);

2.    roster size;

3.    roster composition, including but not limited to the number of Players or Professional Players on a Club's roster;

4.    season length, competition calendar dates (including but not limited to the waiver and roster freeze dates), and scheduling (including but not limited to the number and timing of regular season, post-season, All-Star or other showcase matches (if any), U.S. Open Cup, exhibition, and other domestic or international matches and tournaments);

5.    Player registration and Player movement rules, restrictions, regulations, and procedures (including as they relate to trades, transfers, and loans);

6.    Off-Season competitions, and tours;

7.    rules, regulations and procedures relating to the Maximum Benefit Spend (including any limitations, restrictions, or penalties on amounts exceeding the Maximum Benefit Spend);

8.    Match format and playing rules;

9.    Post-Season format, including but not limited to the number of matches, the number and identity of participating Clubs, eligibility for Post-Season participation, Post-Season competition rules, match format and rosters of All-Star or other showcase matches (if any);

10.    Player statistics and League or Club awards created, maintained, revised, disseminated, deleted or discontinued;

11.    Expansion or contraction of the League, including any related draft rules, regulations or procedures;

12.    Location of play or practice facilities and their respective setups, including but not limited to the field surfaces and other aspects of the facilities and access thereto; and

13.    On-field equipment and uniforms and regulations relating thereto.

Notwithstanding the above, the following subjects shall not be subject to the provisions above regarding meaningful dialogue: (a) League expansion or contraction and (b)

380 location of play or practice facilities; and (c) Play-off format, including but not limited to
381 the number of matches, the number and identity of participating Clubs, eligibility for
382 Post-Season participation, Post-Season competition rules, and All-Star match format (if
383 any).  Nothing herein shall prohibit the League Parties from engaging in dialogue with
384 the USLPA on any matter impacting the Players.

385 **Article 7.    Dues Checkoff**

386    A.    Membership.  Every Player has the option of joining or not joining the USLPA;
387    provided, however, that as a condition of employment for the duration of this CBA and
388    wherever and whenever legal:

389        1.    any Player who is or later becomes a member in good standing of the
390            USLPA must maintain his membership in good standing in the USLPA;

391        2.    any Player who is not a member in good standing of the USLPA must, on
392            the later of the 30th day following the ratification of this CBA or the
393            beginning of his employment with any League Club, pay service fees in
394            the same amount as the periodic dues; and

395        3.    solely during the duration of this CBA (or any extension thereof) but not
396            during any period thereafter, the League and the Clubs shall take a neutral
397            position toward each Player's choice to join or not join the USLPA and no
398            representative of the League or of any Club shall discourage Players from
399            joining the USLPA or from otherwise financially contributing to the
400            USLPA.

401    B.    Check-Off.

402        1.    The USLPA shall be responsible for obtaining from Players such written
403            check-off authorizations as they may sign.  Copies of such authorizations
404            will be provided to the respective Clubs.  Each check-off authorization by
405            a Player shall be in writing in the form prescribed in Exhibit D and
406            attached to the SPA and shall be governed by the provisions hereof.  Any
407            changes to the form of check-off authorization must be approved in
408            writing by the League, such approval not to be unreasonably withheld,
409            conditioned or delayed.

410        2.    The Club will deduct from the Salary of each Player who voluntarily
411            authorizes and directs such deduction in accordance with this Article, an
412            amount equal to the periodic dues and any assessments of the USLPA in
413            accordance with such authorization.  Each Club shall remit the check-off
414            monies to the USLPA by electronic transfer, with a ledger identifying the
415            sources of the monies, within ten (10) business days of each deduction.

416        3.    The USLPA shall advise the Clubs and the League in writing as to any
417            changes to the amount of periodic dues at least thirty (30) days in advance
418            of the effective date of such changes in the amount to be deducted.

419        4.    Once the funds are remitted to the USLPA, their disposition thereafter
420            shall be the sole and exclusive obligation and responsibility of the
421            USLPA.

422    C.    Enforcement.

1. Upon written notification to the League and the Club by the USLPA that a Player has missed two (or more) consecutive periodic payments (whether they be, as the case may be, periodic dues or equivalent service fees), in violation of Article 7.A, for which he has received written notice from the USLPA and a reasonable period of time in which to cure, the League will raise the matter for discussion with the Player. Within ten (10) days of receiving written notice from the USLPA, the Player may file a Grievance disputing the missed payments. If there is no resolution of the matter within seven (7) days thereafter (or the matter is decided against the Player), then the Club will, upon written request of the USLPA, suspend the Player without pay, wherever legal. Such suspension will continue until the USLPA has notified the Club and the League in writing that the suspended Player has satisfied his obligation as contained in Section A above. The parties hereby agree that suspension without pay is adopted as a substitute for and in lieu of discharge as the penalty for failing to pay dues, fees or an agency service fee. Should such suspension continue during the League Season for more than forty-five (45) days, the Club may, at its option, toll the Player's SPA for the entire League Season, such that the Player shall owe an additional year of service under his SPA. During any such suspension or tolling of the Player's SPA under this Section C, neither the Club nor the League shall be under any obligation to release (or otherwise permit the transfer of) the Player's registration.

2. The provisions of this Article 7.C shall not apply to (or against) any Player whose predominant job situs is in a state which prohibits enforcement of any such provision.

D. <u>Indemnification</u>.

1. *Indemnification.* It is specifically understood and agreed that neither the League nor the Clubs assume any direct financial obligation arising out of the provisions of this Article 7 (except for the obligation to remit to the USLPA any dues collected in accordance with subsection B.2 above), and the USLPA will defend, indemnify and hold League Parties harmless against any and all claims, grievances, demands, awards, attachments, judgments, suits, or other forms of liability, including arbitrator fees, court costs, or attorney's fees ("<u>Losses</u>"), brought or issued against a League Party because of any action taken or not taken by League Parties consistent and in accordance with the terms of this Article 7, the written check-off authorizations (as described in Article 7.B above), and any associated written instructions from the USLPA.

2. *Notice of Third-party Claims.* League Parties shall give notice to the USLPA (a "<u>Claim Notice</u>") within fourteen (14) days after obtaining knowledge of any Losses or discovery of facts on which the League Parties otherwise intend to base a request for indemnification under Section paragraph 1 above. The League Parties' failure to timely provide a Claim Notice to the USLPA under this paragraph 2 does not relieve the USLPA of any liability or other responsibilities that the USLPA may have to the League Parties, but in no event shall the USLPA be liable for any Losses that result

466      directly from a delay in providing a Claim Notice to the extent that such delay materially
467      prejudices the defense of the related claim. The USLPA's duty to defend applies
468      immediately, regardless of whether the League Parties have paid any sums or incurred
469      any detriment arising out of or relating, directly or indirectly, to any claim.

470          3.     *Control of Defense*.

471             (a)     League Parties shall allow the USLPA, to undertake, through
472                   reputable independent counsel of its own choosing, the defense,
473                   appeal or settlement of any third-party claim that is reasonably
474                   likely to give rise to an indemnification claim under paragraph 1
475                   above. In such event, the League Parties shall immediately deliver
476                   to the USLPA all notices and documents (including court papers)
477                   received by the League Parties in connection with the Losses.
478                   League Parties shall reasonably cooperate with the USLPA in the
479                   defense of any such claim or liability and any related settlement
480                   negotiations.

481             (b)     Notwithstanding anything to the contrary in this Article 7.D,
482                   League Parties may employ, at any time, separate counsel to
483                   represent their interests; provided, that (i) the League Parties shall
484                   be solely responsible for the costs and expenses of any such
485                   separate counsel and (ii) the USLPA shall otherwise remain
486                   responsible to the League Parties for any Losses indemnified under
487                   this Article 7.D.

488         4.     *Settlement of Indemnified Claims by the USLPA*. The USLPA shall give
489      prompt written notice to the League Office of any proposed settlement of a claim that is
490      indemnifiable under Article 7.D.1. The USLPA may not, without the USL's and the
491      applicable League Party's prior written consent (which consent will not be unreasonably
492      withheld), settle or compromise any claim or consent to the entry of any judgment
493      regarding which indemnification is being sought hereunder.

494 **Article 8.** **Standard Player Agreement**

495 A.  Form of Agreement. All Players will execute a Standard Player Agreement
496 (although, for clarification, an individual does not need to be party to an SPA in order to
497 attend and participate in Club or League-organized tryouts; provided, however, that such
498 individual shall, under no circumstances, be compensated in excess of the actual and
499 necessary expenses incurred in connection with attending and participating in such
500 tryouts). The form of the Standard Player Agreement between a Club and a Player is
501 attached hereto as Exhibit A, which is incorporated herein by reference and made a part
502 hereof. During the Term, no other form of SPA will be utilized. However, the USL and
503 USLPA may, from time to time, agree in writing to make changes to the Standard Player
504 Agreement.

505 B.  Status of Prior Standard Player Agreements. Subject to Section C below, all
506 Standard Player Agreements and/or other agreements that were entered into by and
507 between any Club and any Player prior to the Effective Date shall remain in full force and
508 effect for their stated duration and any option years.

509 C.  Conformity; Subservience to CBA. Each SPA (including those SPAs entered into
510 prior to the Effective Date) shall be deemed amended in such a manner as to require the
511 parties to comply with all terms of this CBA (including the form of SPA included in
512 Exhibit 1) and any other agreement collectively bargained between the League and the
513 USLPA (each, as amended, supplemented, or otherwise modified from time to time). In
514 the event of any inconsistency between the terms of an SPA and the terms of the CBA or
515 any other collectively bargained agreement, the provisions of the CBA or collectively
516 bargained agreement shall control.

517 D.  Validity of SPA. No compensation of any kind shall be owed to any Player
518 (whether under a Guaranteed or other type of contract) with respect to the period of any
519 strike or lockout, but a strike or lockout will not void or otherwise affect the validity or
520 enforceability of an SPA. During a lockout (but not a strike), a Player may obtain
521 employment as a professional soccer player outside the League, solely through a loan
522 from his Club. While a Club's acceptance of such a loan arrangement shall not be
523 unreasonably withheld, conditioned, or delayed, a Club may condition its acceptance of
524 any loan agreement upon its ability to recall the Player immediately upon conclusion of
525 the work stoppage if his SPA's term has not expired. The parties also expressly
526 acknowledge that it would be reasonable for a Club to decline to approve such a loan
527 arrangement if the club receiving the Player on loan is not wholly responsible for any
528 medical or related costs associated with any injury sustained (in whole or in part) during
529 the Player's time on loan. The League Parties shall have no remedy against the USLPA
530 for a Player's breach of this provision.

531 E.  General.

532       1.  Any oral or written agreement between a player and a Club concerning
533            terms and conditions of employment shall be reduced to writing in the
534            form of a Standard Player Agreement as soon as practicable. However, no

535            such agreement is binding upon the Player or the Club until an SPA
536            embodying such terms and conditions has been duly executed by the
537            Player and the Club.  Immediately upon the consummation of an SPA, the
538            Club shall notify the USL by e-mail, attaching a copy of an executed SPA
539            and any other required information.  Once the Player has been registered
540            with the League, the League shall provide the USLPA with a copy of the
541            executed SPA.

542            2.      A Player or prospective Player who knowingly falsifies a Medical
543            Information Form (as may be required under Article 10.A.3) prior to
544            entering into an SPA by failing to disclose an injury, illness, or condition
545            that renders, or will likely render, him physically or mentally unable to
546            perform the playing services required under an SPA, may have his SPA
547            deemed invalid.  Prior disclosure of such injury, illness, or condition to the
548            Team, if requested on a Medical Information Form, is required.

549      F.     <u>Guaranteed Contracts</u>.

550            1.      Where a Player's SPA is denoted as Guaranteed (via a check box in said
551      SPA), the status of any such SPA shall be referred to herein as "Guaranteed" and the
552      SPAs themselves shall be referred to herein as "Guaranteed Contracts" or "Guaranteed
553      SPAs".

554            2.      Where the SPA is Guaranteed, a Club may only terminate such Player's
555      SPA on grounds that are expressly set forth in this Agreement (including the form of
556      Standard Player Agreement included in Exhibit A).  Accordingly, a Club may not
557      unilaterally terminate a Player's SPA solely by virtue of his on-field performance or the
558      fact that the Player may have sustained an injury (including one leading to death or
559      disability) during the course or scope of his employment.

560      G.     <u>Performance-Based Contracts</u>.

561            1.      Where a Player's SPA is denoted as Performance-Based (via a check box
562      in said SPA), the status of any such SPA shall be referred to herein as "Performance-
563      Based" and the SPAs themselves shall be referred to herein as "Performance-Based
564      Contracts" or "Performance-Based SPAs".

565            2.      Beginning in 2022 and thereafter, where the SPA is Performance-Based, a
566      Club may unilaterally terminate such Player's SPA at any time, in its sole and absolute
567      discretion, between the effective date of the SPA and the Contract Guarantee Date of that
568      Contract Year.  Any such termination shall be made effective only upon the conclusion of
569      the waiver-wire period described in paragraph 4 below.  If a Player signed to a
570      Performance-Based SPA is terminated other than for cause, his Base Salary shall be
571      provided by the Club (a) for a minimum of forty-five (45) days and (b) for fourteen (14)
572      days following the notice of termination.  Thereafter, neither party shall have any further
573      obligation to the other (except as are otherwise designated either in this CBA or an SPA
574      as surviving such termination).

3.     All Performance-Based Contracts must meet the minimum Base Compensation requirements set forth in Article 18.D.3.

4.     For a period of three (3) full days following the termination of a Performance-Based SPA, other Clubs in the League shall have the exclusive right to assume the Player's SPA; provided, however, that if a Club assumes the SPA, the SPA shall be considered Guaranteed for the remainder of its term. After the lapse of the 3-day waiver-wire period (i.e., 5:00 PM EST of the third day following the date of the waiver), the Player's right to sign with other teams shall be unrestricted.

5.     The initial term of a Performance-Based SPA may not exceed one (1) Contract Year (for avoidance of doubt, the initial Contract Year for which the SPA is entered into) and, if any option terms are exercised, such SPA shall be considered Guaranteed during such option terms.

6.     Clubs may not add language to an SPA (in an addendum or otherwise) which changes or has the effect of changing the SPA from a Guaranteed Contract to a Performance-Based Contract.

H.     <u>25-Day Contracts</u>.

     1.     During the Regular Season, a Club may enter into an SPA with a Player for twenty-five (25) days (a "<u>25-Day Contract</u>").

     2.     No Club may enter into a 25-Day Contract with the same player more than once during the course of any one Season. No Club may be a party at any one time to more than two (2) 25-Day Contracts.

     3.     Notwithstanding anything to the contrary contained in an SPA, a 25-Day Contract may be terminated prior to its expiration simply by providing written notice to the Player and paying in full such sums as are set forth in the SPA as if the Player had completed the entirety of the 25-Day Contract.

     4.     Players on 25-Day Contracts may not be eligible to participate in the Post-Season.

I.     <u>SPA Length</u>.

1.     Subject to any termination rights that may be set forth in this Agreement (including, for clarification, in the form of SPA), a Player's SPA (other than a 25-Day Contract) will expire no sooner than November 30 of the Player's final Contract Year.

2.     The term of an SPA (i.e., including any option years) shall not exceed six (6) Contract Years (regardless of any limitations that may have otherwise been applicable pursuant to the FIFA RSTP).

J.     <u>Compensation Period</u>.

611            1.     Beginning in 2022 and thereafter, the compensation period for a
612 Guaranteed or Performance-Based Contract shall:

613                      (a)     commence on (i) February 1 for a Player who has entered into an
614 SPA by that date; or (ii) for a Player who enters into an SPA after
615 February 1, the date on which such Player reports to the Club for
616 work; and

617                      (b)     continue through November 30 (the "<u>Standard Compensation</u>
618 <u>Period</u>").

The Standard Compensation Period shall be extended to encompass any
620 period of time during which the Player is actually required by the Club to
621 report for work (to include Pre-Season Training Camp, Team workouts,
622 film sessions, Appearances, and/or other required Team activities, but not
623 to include any off-season fitness or training regimens (provided the exact
624 time and place of such regimens are not actively organized or mandated by
625 the Club)). By way of example, if a Player was required to work for six
626 (6) days in January in connection with an exhibition match or Non-
627 Compulsory Tournament, the Player would be provided with his Base
628 Compensation for those six (6) days as if they took place during the
629 Standard Compensation Period.

630            2.     The Club and Player may also agree (in Addendum C of the SPA) for
631 compensation to be provided outside of the Standard Compensation Period. Any period
632 of time during which a Player is being compensated by his Club pursuant to his SPA shall
633 be referred to as the "<u>Compensation Period</u>."

634            3.     The Club may continue to require Players to abide by certain standards of
635 conduct during the Off-Season, regardless of whether such Players are compensated
636 during such period of time.

637       K.     <u>Termination of SPA</u>

638            1.     *By Club.* In addition to any other grounds for termination that are
639 expressly set forth in this Agreement or the Standard Player Agreement, a
640 Player's SPA may be terminated by a Club at any time without further
641 obligation on the part of either party, upon written notice to the Player
642 (with a copy to the USL and the USLPA), if the Player at any time
643 engages in a material breach of this Agreement or his SPA. Any such
644 termination shall be subject to the Player's rights under the grievance
645 procedures set forth in Article 24 of this Agreement.

646            2.     *By player.* The Player may terminate his SPA upon ten (10) business
647 days' written notice of default to his Club (with a copy to the USL and the
648 USLPA) if (i) his Club defaults in its obligation to pay the Salary set forth
649 in Addendum C of the SPA or fails to perform any other material
650 obligation agreed to be performed by the Club under the SPA and (ii) the

Club fails to remedy such default within the ten (10) business days, or to give notice of intent to arbitrate within seven (7) business days, of the Player giving notice of such default in writing to the Club, USL, and to the USLPA.  The Player shall have no right to terminate his SPA prior to the conclusion of its term (including any option periods) other than as expressly set forth in this CBA or by mutual written agreement with his Club (and regardless of whether the Player may otherwise have had such right under FIFA's RSTP).  In the event the Club disputes an assertion by the Player that it is in default of its obligations set forth in Section C of the SPA or that it has otherwise failed to perform any other material obligation under the SPA, and it is subsequently determined pursuant to the Grievance procedures set forth in  Article 24 of this CBA that a default has occurred, the Club shall have five (5) business days from the date of such finding to remedy such default.  During the pendency of any Grievance concerning the existence of a default, the Player's SPA shall remain in full force and effect, and all amounts shall continue to be paid in accordance with its terms.

L.    Effect of Termination of SPA. Except as otherwise set forth herein, upon termination of an SPA by either a Player or his Club, all obligations of the Club to the Player and the Player to the Club, including without limitation any obligation to pay any amounts to the Player, shall cease on the effective date of termination, except that the Club and the Player shall remain responsible for any and all obligations incurred (a) prior to the effective date of termination or (b) arising out of such termination (including in connection with any associated grievance or arbitration process and any outcome produced therefrom). Upon such termination, and except as otherwise provided in this CBA, the League and Club shall comply with FIFA's regulations regarding the Player's registration and playing rights.

M.    Terminations Resulting from Contraction.

1.    Unless otherwise included in an SPA addendum and subject to paragraph 2 below, in the event that a Club ceases to field a team in the League, the SPAs of such Club shall automatically be amended such that their term expires as of November 30 following the last Season in which the Club fielded a team.  For clarification, however, if a Player is traded or transferred to another USL Club prior to November 30, the Player's SPA shall remain in effect with his new USL Club (in accordance with Article 14.A).  For any SPAs which were otherwise set to continue through the upcoming season (but for the amendment described in the first sentence of this subsection), the Club shall also pay to such Player an amount equal to two (2) month's base Salary, which amount shall be payable by December 31 or within thirty days of notification to the Players, whichever is later.

2.    Unless otherwise included in an SPA addendum, if a Club ceases to field a team in the League but nonetheless fields a team in another professional league operated by USL (or its affiliate) the following season, the

694                following provisions shall apply with respect to any Player with
695                Guaranteed Contract Years remaining on his SPA:

696           (a)    The Club may, in its discretion, offer the Player the opportunity to
697                      continue playing with the Club on the same terms and conditions
698                      as set forth in his SPA.  If the Player accepts the offer (or the Club
699                      and Player agree on modified terms or conditions), the Club and
700                      Player shall execute a new contract reflecting same.  If the Player
701                      declines (or does not accept the offer within seven (7) days), his
702                      SPA shall be deemed amended such that its term expires as of
703                      November 30 following the Club's last Season in the League.

704           (b)    If the Club does not offer the Player the opportunity to continue
705                      playing with the Club on the same terms and conditions as set forth
706                      in his SPA, or the Club and Player do not otherwise agree on
707                      modified terms and conditions, such Club shall pay the Player an
708                      amount equal to three (3) months' base Salary by the later of (i)
709                      January 31 and (ii) thirty (30) days following the date the Club
710                      formally moves to the other professional league operated by USL
711                      (or its affiliate).

712         3.    For the avoidance of doubt, however, neither the League nor any of the
713                other Clubs may be held responsible for an exiting Club's failure to make
714                any payments required by paragraph 1 or 2 above.

715    N.    <u>Options</u>.

716         1.    A Club may not include more than two (2) unilateral Club options in the
717                Player's SPA and such options, in the aggregate, may extend the SPA for
718                no more than three (3) years.   The term of any exercised option shall be
719                considered Guaranteed.

720         2.    A Player's compensation during each option term must be set forth in the
721                SPA (i.e., it cannot be left blank or subject to an "agreement to agree").
722               This provision is solely applicable to SPAs entered into after the Effective
723               Date.

724    O.    <u>Option Exercise Date</u>.  The deadline for a Club to exercise its options for the
725    upcoming Contract Year may be no later than November 30.

726    P.    <u>Buyout Right</u>.

727         1.    Subject to the limitations set forth in Article 8.P.2 below, each Club may
728                unilaterally terminate Players on Guaranteed SPAs for the remaining
729                Season(s), for any reason or for no reason, provided that the Club: (i)
730                satisfied any obligations to the Player for the prior Season and (ii) pays the
731                Player an amount equal to 50% of his base Salary for each Guaranteed
732                Contract Year remaining in his SPA (i.e., excluding any option terms),

with at least half payable within fourteen (14) days of the exercising of such right and the remainder payable within sixty (60) days thereafter (the "Buyout Right"). The Club shall pay any reasonable costs of collection actually incurred by the Player. Upon the exercise of such Buyout Right, the Player's registration shall be promptly processed and released by the Club and/or the League (as the case may be), and the League shall promptly notify the USLPA that the Buyout Right has been exercised.

2. The Buyout Right set forth in Article 8.P.1 above is subject to the following limitations:

(a) the Buyout Right must be exercised prior to November 30;

(b) the Buyout Right may not be exercised by a Club on more than three SPAs over two (2) Years;

(c) the Buyout Right may not be exercised by a Club on more than two (2) SPAs in any Year;

(d) the Buyout Right may not be exercised to terminate the SPA of a Player who, as of November 30 of such Year, is (or will be) under the age of 20; and

(e) the Buyout Right may not be exercised to terminate an SPA executed prior to the Effective Date.

Q. <u>Player Registration</u>. Players' registration procedures shall be in accordance with the policies and guidelines of the USSF or, if applicable, the CSA.

R. <u>Pre-2022 Contracts</u>. The following provisions relate to the treatment of SPAs initially entered into for the 2021 (or any prior) Season.

1. Such SPAs shall be considered Guaranteed SPAs.

2. With respect to the 2021 Season, the Salary or other compensation (and the start and end dates associated therewith) set forth in a Player's SPA shall be as set forth in such SPA (and unmodified by the terms set forth in this CBA).

3. To the extent an SPA extends beyond the 2021 Season and either (a) the compensation period set forth in such SPA does not have a fixed start date on or before February 1; (b) the compensation period set forth in such SPA does not have a fixed end date on or after November 30; or (c) the Base Compensation during the Standard Compensation Period is less than the Minimum Base Compensation, the Club and Player shall negotiate in good faith over the modification of any payment terms for such season so that the total Base Compensation that would have been payable by the Club over the course of the year (assuming an ordinary season unaffected by any Force Majeure Events) remains unchanged (except as necessary to comply with Minimum Base

769 Compensation requirements). Club and Player shall use good faith efforts to conclude
770 such negotiations on or before the following (as applicable, the <u>Modification Deadline</u>"):

771         (a)    Within thirty (30) days following the ratification of this CBA (but
772                 in no event later than the Option Exercise Date set forth in Article
773                 8.O.), with respect to an SPA which naturally extend beyond 2021
774                 (i.e., which would extend beyond 2021 in the absence of an
775                 option); or

776         (b)    Within thirty (30) days of November 30, with respect to an SPA
777                 that is extended beyond 2021 through the exercise of an option.

778     4.    If the Player and Club are unable to reach an agreement by the
779 Modification Deadline, any obligation to compensate such Player outside of the Standard
780 Compensation Period would be removed and such Player's Base Compensation during
781 the Standard Compensation Period would be modified in accordance with the following:

782         (a)    Estimating the total Base Compensation in accordance with the
783                 terms of the original SPA, using (where applicable) February 15 as
784                 the "Required Report Date" and October 15 as the date for the
785                 Club's "Last Game"; then

786         (b)    Dividing that number by 10 months to determine the revised
787                 monthly Base Compensation; then

788         (c)    If applicable, adding such additional Salary as may be necessary to
789                 meet any applicable Minimum Base Compensation requirements.

790     5.    For the avoidance of any confusion, examples have been included in
791 Exhibit E describing how the SPAs contemplated by paragraphs 3 and 4 above should be
792 modified.

**Article 9.     No Strike or Lockout**

A.     <u>No Strike</u>.  Neither the ULSPA nor any Player, in concert with any other Player(s), shall authorize, encourage, or engage in any strike, work stoppage, slowdown or other interference with the activities of any Club or of the League (specifically including by declining to play or practice) during the term of this Agreement.  The USLPA shall not support or condone any action of any Player which is not in accordance with this Section and the USLPA shall exert best efforts to induce compliance therewith.

B.     <u>No Objection Letters</u>.  The USLPA agrees to promptly issue "no objection" letters at the request of a Club in connection with any Player's (or prospective Player's) P1 visa application during the term of this Agreement.  Any such Club request must include the Player's full name, date of birth, email address and country of origin.

C.     <u>Remedies for Breach</u>.  To the extent otherwise consistent with this Agreement, in the event that a Player violates Article 9.A, the Player shall forfeit his Salary for the period of such violation.  Should such conduct continue for more than two (2) weeks following written notice to the Player and the USLPA from USL or the Club of such breach, the Club may, at its option, toll the Player's SPA for the entire Season, such that the Player shall owe an additional Season to the Club under his SPA. During any period of non-performance, the Player shall be prohibited from playing professional soccer for any other club (including a club outside of the USL Championship).  The Club shall also retain the right to terminate the SPA of a Player who violates the provisions of this Article 9.

D.     <u>No Lockout</u>.  Neither USL nor any Club shall engage in a lockout during the term of this Agreement.

Case 3:23-cv-00017   Document 1-1   Filed 01/11/23   Page 31 of 136

816 **Article 10.    Medical Information and Fitness**

817    A.    Medical Examinations and Medical Information.

818    1.    Each Club may, at its own cost, arrange for a Club-designated physician to
819    conduct a medical examination of each of its Players or prospective
820    Players (a "Medical Examination") at such times as it reasonably deems
821    advisable.  Such Medical Examinations may include, without limitation,
822    blood tests (including vial blood tests) which shall be subject to the
823    limitations in Article 10.A.2 below.  Each Player shall participate in and
824    cooperate with any Medical Examination and provide complete and
825    truthful information in connection therewith.

826    2.    Blood tests (including vial blood tests) (whether during Pre-Season or at
827    other times) may be conducted for the purposes of: (1) analyzing the
828    nutritional needs of the Player, (2) ensuring the Player's health and safety,
829    (3) implementing a fitness related regime, or (4) implementing any
830    Prohibited Substances testing protocol (which protocols must be agreed
831    upon by the Parties).  The results of a Player's blood tests shall be shared
832    with and explained to the Player by the Club medical staff, kept in the
833    Player's Medical File (as defined below), and shared only in accordance
834    with Article 10.B.2.

835    3.    In addition, each Club may, from time to time, require that each of its
836    Players or prospective Players complete certain forms or questionnaires
837    relating to the Player's medical history ("Medical Information Forms").
838    Each Player agrees to complete such Medical Information Forms
839    truthfully and without material omissions and acknowledges that doing so
840    is a material condition of his SPA.

841    4.    Each Player agrees to promptly (i) notify the Club's coach, athletic trainer,
842    or physician of any injury, illness, or medical condition which (a) may
843    impair or otherwise affect, either immediately or over the course of his
844    SPA, his Fitness or (b) was otherwise incurred (or aggravated) during the
845    scope and course of the Player's employment with the Club including, but
846    not limited to, travel with his team or on business requested by the Club
847    and (ii) in the case of an injury, provide any additional information about
848    the circumstances leading to the injury requested by the Club.  The
849    obligations of this paragraph depend on the Player's knowledge of the
850    condition or injury and, with respect to clause (i)(a), its effect on his
851    Fitness.

852    5.    Injuries, illnesses or conditions reported by a Player to the Club Medical
853    Staff and/or observed by the Club Medical Staff shall be documented in
854    the Player's Medical File (as defined below).

855    B.    Medical File.

856      1.      The Club shall keep any Medical Information collected by the Club from
857          or about the Player in a confidential medical file, to be maintained,
858          transmitted, and disposed of in accordance with applicable Law ("<u>Medical</u>
859          <u>File</u>").

860      2.      Each Player may be required to execute during Pre-Season each year or
861          upon joining a Club during the Season a medical information release in the
862          form attached as Exhibit B and such other documents as may be required
863          to release all of his medical records (the "<u>Medical Information Release</u>"),
864          including through a centralized repository, as follows:

865          (a)      to Club doctors, athletic trainers, or other medical staff who have a
866               formal relationship with the Club (collectively, the "<u>Club Medical</u>
867               <u>Staff</u>");

868          (b)      to the Club Medical Staffs of other Clubs in the League in
869               connection with a contemplated player acquisition (whether via
870               signing, trade, loan or transfer);

871          (c)      to his Club's workers' compensation insurance carrier and to Club-
872               personnel as needed to process workers' compensation claims or
873               otherwise assess or offer benefits;

874          (d)      to allow the following individuals to view (but not receive) the
875               Player's Medical File, but only to the extent it might affect the
876               Player's on-field performance: the Club's coaching staff, technical
877               director, and senior Club officials who have a reasonable need to
878               be made aware of such information;

879          (e)      to other relevant Club, League, and Governing Body personnel as
880               may reasonably require such information in connection with any
881               dispute resolution process (including as set forth in Article 24);

882          (f)      to such other Persons as reasonably required to effectuate any
883               purposes or provisions of this Agreement or the SPA (provided
884               such Persons agree to keep such information confidential); and

885          (g)      to such other Persons as may be reasonably required to comply
886               with applicable Law.

887      3.      The Medical Information Release would also permit a Club, the League,
888          and/or the USLPA to disclose the following information for public
889          relations purposes:

Case 3:23-cv-00017    Document 1-1    Filed 01/11/23    Page 33 of 136

890          (a)      for injuries sustained during the course of a Player's employment
891                      as a skilled soccer Player with the Club, including, but not limited
892                      to, travel with his team or on business requested by the Club:

893                 (i)      the nature of a Player's injury,

894                 (ii)      the prognosis and the anticipated length of recovery from
895                         the injury, and

896                 (iii)     the treatment and surgical procedures undertaken or
897                         anticipated in regard to the injury; and

898          (b)      for any other medical and/or health condition that prevents a Player
899                      from rendering services to his Club:

900                 (i)      the fact that a medical and/or health condition is preventing
901                         the Player from rendering services to the Club, and

902                 (ii)      the anticipated length of the Player's absence from the
903                         Club.

904      4.      Notwithstanding paragraph 3 above, the League and USLPA shall
905            negotiate in good faith for a series of general injury descriptions and/or
906            classifications to be used (such as, for example, "Upper Body" or "Lower
907            Body" injuries, as the case may be) in the case of any routine disclosures
908            relating to Player injuries or unavailability.

909      5.      Except with respect to uses, disclosures and redisclosures of Medical
910            Information that are permitted under this CBA (including the form of
911            SPA) and the Medical Information Releases, the Clubs, the USLPA and
912            the League shall not use, disclose or redisclose any Medical Information
913            relating to a Player (unless stripped of all individual Player-identifying
914            information) without the express, prior, written consent of the Player or as
915            required by Law.

916      6.      When a Player is transferred or loaned from one USL Club to another
917            USL Club, his medical records, including athletic trainers' notes, shall be
918            forwarded to the team physician of his new Club. When a Player is
919            transferred to a club outside of the League, his medical records will be
920            forwarded only upon, and in accordance with, the request of the Player.

921      7.      Upon reasonable advance notice to a Club (no less than five (5) business
922            days), the Club shall provide the requesting Player (or former Player, as
923            the case may be) with a copy of his Medical File.

924    C.      <u>Fitness to Play</u>.

925      1.      *Fitness Obligation.*

(a) Each Player agrees to use his best efforts to keep himself Fit. If a Player is not Fit, in the reasonable discretion of the Club's physician, the Club may require the Player to complete any rehabilitation or training activities that the Club's personnel (including the Club-designated physician) may specify.

(b) If the Player, in the judgment of the Club's physician, is disabled or is not in good physical condition at the commencement of the season or at any subsequent time during the season (unless such condition is the direct result of any injury sustained during the course of his employment as a Player with the Club, including but not limited to travel with his team or on business requested by the Club), and such disability or other lack of Fitness was within the Player's reasonable control, then it is mutually agreed that the Club shall have the right to suspend the Player for such period of disability or lack of Fitness, and the Club may, at its option, reduce the Player's Salary by up to twenty-five percent (25%) during such period. However, if the Player's disability or lack of Fitness was not within the Player's reasonable control, then the Club may, at its option, reduce the Player's Salary by up to twenty-five percent (25%) during such period, *but only* once such disability or lack of Fitness has existed for ninety (90) days.

2. *Fitness Determination.* The following procedures shall be used to resolve any dispute over whether a Player is Fit and whether any lack of Fitness is the direct result of an injury sustained during the scope and course of his employment with his Club (the "Fitness Determination"):

(a) The initial Fitness Determination shall be made by a Club-designated physician. The Player may contest a Fitness Determination by being examined by his own physician (at Player's sole cost and expense) as expeditiously as practicable after receiving the determination of the Club-designated physician.

(b) Should the Player-designated physician disagree with the Club-designated physician as to the Fitness Determination, the Player-designated physician shall notify the Club-designated physician of his Fitness Determination within 48 hours of the examination of the Player, which determination the League may require to be in a specific form or format. The two physicians shall then consult as expeditiously as possible and no later than 72 hours thereafter (or later upon a showing of extraordinary circumstances) regarding the Fitness Determination. If the Player-designated physician and the Club-designated physician agree as to the Fitness Determination, such determination shall be binding (and the parties shall have no rights to grieve the determination under Article 24).

968         (c)        In the event that the Player-designated physician and the Club-
969                 designated physician do not reach agreement as a result of the
970                 consultation, they shall (within the seventy-two (72) hour period in
971                 subpart 2b above) agree upon an independent physician who shall
972                 make a binding determination as expeditiously as practicable (and
973                 the parties shall have no rights to grieve the determination under
974                 Article 24).  If the Fitness Determination of the independent
975                 physician is that the Player has passed, the Club would then
976                 promptly make up any missed payments to the Player and
977                 compensate the Player for the costs of any medical examination.  If
978                 the Player-designated physician and the Club-designated physician
979                 are unable to agree upon an independent physician, the
980                 independent physician shall be designated by the President of the
981                 state medical society (or his or her designee) in the state in which
982                 the Club is located.

983     3.      *Fitness as Condition Precedent*.  If so designated by mutual agreement in
984           Addendum E to an SPA, establishing that the Player must report for and
985           submit to a Medical Examination (to be performed by one or more
986           physicians designated by the Club), the following provisions shall apply; it
987           being understood and for the avoidance of doubt, except as set forth in this
988           Section 3, the validity of an SPA may not be conditioned upon passing a
989           Medical Examination:

990         (a)        The Player must report for such Medical Examination at such
991                 times as follows: (i) for Players under contract with another team
992                 at the time the SPA is signed, no later than the tenth (10th) business
993                 day following the championship game of each team's respective
994                 league; (ii) for Players not under contract with another team at the
995                 time the SPA is signed, no later than the tenth (10th) business day
996                 following the execution of the SPA; (iii) for Players outside the
997                 country at the time the SPA is executed for whom a visa is
998                 necessary to enter the country, no later than two (2) business days
999                 following the Player's entry into the Club's market on such visa
1000                 (collectively, the "Medical Deadline")) and, upon reporting, supply
1001                 all information reasonably requested of him, provide complete and
1002                 truthful answers to all questions posed to him, and submit to all
1003                 examinations and tests reasonably requested of him. However,
1004                 with respect to (i) above, to the extent that the Player's current and
1005                 prospective teams are both in the USL Championship, the Player
1006                 and the new team will engage in best efforts to conduct the
1007                 Medical Examination within ten (10) business days from the last
1008                 day of the regular season or the date that both teams have been
1009                 eliminated from the playoffs (whichever is later).  All costs and
1010                 expenses relating to the Medical Examination, including travel and
1011                 lodging, shall be borne by the Club.

1012        (b)   The determination of whether the Player has passed the Medical
1013            Examination shall be made by the Club in its sole discretion,
1014            exercised in good faith, in consultation with one or more of the
1015            Club's physicians; and a Club shall have the right to determine in
1016            good faith that a Player has failed to pass the Medical Examination
1017            due to the risk of a future injury, illness or other health condition
1018            notwithstanding that the Player is currently able to perform as a
1019            skilled soccer player in the League. If the Player does not pass the
1020            physical examination, the Club shall promptly notify the Player (in
1021            any case, no later than two (2) business days following the Medical
1022            Deadline).  Furthermore, the Club shall pay to the Player an
1023            amount equal to two (2) weeks Base Compensation.

1024        (c)   The Club's determination that the Player has passed the Medical
1025            Examination (or the failure of the Club to notify the Player of the
1026            contrary within two (2) business days following the Medical
1027            Deadline) shall be a condition precedent to the validity of the
1028            Contract.  Accordingly, and without limiting the generality of the
1029            preceding sentence, until such time as a Player has passed the
1030            Medical Examination (or the two (2) business days have passed
1031            without notification to the contrary), he may not attend any regular
1032            training camp of the Club or participate in matches or organized
1033            practices with the Club.

1034        (d)   Clubs shall not use these Fitness as Condition Precedent provisions
1035            to renegotiate the terms and conditions of an SPA.

1036        (e)   There shall be no public disclosure of SPA signings subject to
1037            Medical Examinations unless and until the Player has either passed
1038            (or is deemed to have passed) the Medical Examination. There
1039            shall be no public disclosure of the results of Medical
1040            Examinations subject to these Condition Precedent provisions.

1041   D.   <u>Duty of Club-Designated Health Care Professionals</u>.  The Parties acknowledge
1042   the principles that:

1043        1.   the primary professional duty of all individual health care professionals
1044            (such as Club-designated physicians, athletic trainers, physical therapists,
1045            chiropractors, dentists and neuropsychologists) providing health care to a
1046            Player, shall be to the Player-patient regardless of the fact that the health
1047            care professional or his/her hospital, clinic, or medical group is retained by
1048            the Club; and

1049        2.   health care professionals, such as Club-designated physicians, who are
1050            examining and evaluating a Player shall be obligated to perform objective
1051            examinations and evaluations and shall do so on behalf of the Club,
1052            subject to all professional and legal obligations to the Player-patient.

| 1053 | The Club shall remind applicable Club Medical Staff on an annual basis of the |
| 1054 | obligations of this section D. |

1055      E.      Physiological Monitoring/Testing.

1056          1.      Club medical staff may conduct physiological testing in connection with
1057                  training and matches. Such physiological testing may include, without
1058                  limitation: heart rate, body fat, VO2 max, omega wave and urine hydration
1059                  testing.  Clubs may share the results of such physiological testing with the
1060                  coaching staff, technical director and other relevant Club and League
1061                  personnel. The Club shall share the results of such physiological testing
1062                  with the Player.  Except as permitted by paragraph 2 below, the results of
1063                  the physiological testing shall not be publicly disseminated unless
1064                  consented to by the USLPA.  The League or Club may require a Player to
1065                  wear any physiological monitoring device during or in connection with
1066                  training or matches. A Player shall not be required to wear any
1067                  physiological monitoring device in a match unless the device in question
1068                  does not, in the reasonable judgment of the League after having consulted
1069                  with the Union, impede Players' performance.

1070          2.      Performance measures or metrics (such as distanced covered or number of
1071                  sprints) that are independent of physiological response may be publicly
1072                  disseminated provided that, before doing so, the League conducts a
1073                  dialogue with the USLPA in a manner consistent with Article 6.D for
1074                  subjects on which the Union waived its right to bargain.  The League and
1075                  the USLPA shall bargain over the public dissemination of any other
1076                  physiological information (including performance measures or metrics
1077                  that are based on, but do not disclose, heart rate or another physiological
1078                  response (e.g., "exertion rate," heart rate percentage above baseline, etc.)).

1079      F.      Athletic Trainers.  Each Club shall make a minimum of one (1) fully certified
1080      athletic trainer available to Players during all official Club practices, workouts, and
1081      matches.  Any trainers hired or retained after the effective date of this Agreement shall be
1082      certified by the National Athletic Trainers Association.  Trainers may be provided by a
1083      third-party organization. In addition, each Club will utilize its reasonable best efforts to
1084      ensure that its athletic trainers have, available in the Club's locker room, the supplies
1085      necessary to provide appropriate care for professional athletes.

1086      G.      Concussion Protocol.

1087          1.      Professional soccer, like all professional team sports, involves inherent
1088                  risk of injury.  Therefore, the League and USLPA shall convene on a
1089                  regular basis (but no less than once per year) to address the assessment
1090                  and management of suspected and actual concussions sustained by

1091             Players, any potential new or revised concussion protocols, and (if
1092             applicable) the implementation thereof.

1093      2.      The USLPA acknowledges that, as of the Effective Date, each Club is
1094             required to establish and implement its own set of concussion protocols
1095             (and accordingly, such protocols may vary by Club). Any set of
1096             concussion protocols which would be equally applicable across the
1097             League will first be discussed with the USLPA; provided, however, that
1098             the League may ultimately implement any set of concussion protocols
1099             which it determines, in its reasonable discretion, will promote the safety of
1100             the Players.

1101                                     **Article 11.**       **Player Obligations**

1102          During the term of his employment under a Standard Player Agreement, a Player
1103 shall perform all of the duties that may be required of and from him pursuant to the terms
1104 of this Agreement and his Standard Player Agreement, including that he be available and
1105 promptly report for and, to the best of his ability, fully participate in all of the Club's
1106 training and practice sessions, workouts, meetings, matches, and all other activities
1107 required under the SPA, unless excused by the Club or League, as applicable.

| 1108 | **Article 12.    Appearances** |

1109    A.    <u>General</u>.  The Players agree and recognize their duty to assist, upon the reasonable
1110    request of the League or Club (as applicable) in the promotion and marketing of the
1111    League, its Clubs, and the sport of soccer, including as set forth in this Article 12 (it
1112    being acknowledged, however, that this obligation is subject to the terms of Sections B-F
1113    of this Article 12, and more specifically that this duty does not include any obligation of
1114    the Player to promote the League, its Clubs, or the sport of soccer through any personal
1115    social media channels).

1116    B.    <u>Media Appearances</u>.  A Player shall cooperate with reasonable requests of
1117    television, radio, newspaper, magazine and other news media representatives and agrees
1118    to cooperate with the League and the Club, either separately or together, to be available
1119    for and participate in such news media photo sessions and interviews and other media
1120    Appearances as may reasonably be required. Locker rooms, however, shall be closed to
1121    the media for a minimum of fifteen (15) minutes after the match. The notice and
1122    scheduling restrictions of Article 12.F below shall not apply to media Appearances.

1123    C.    <u>Promotional and Charitable Appearances</u>.

1124        1.    Upon request by his Club or the League, a Player shall be required to
1125            make Appearances for the primary purpose of promoting or marketing (a)
1126            the League, his Club and/or the sport of soccer and (b) charities, public
1127            services or other community services or events (each, a "<u>Promotional</u>
1128            <u>Appearance</u>"), in each instance subject to the terms set forth by Article
1129            12.F below.

1130        2.    For the avoidance of doubt, while a Promotional Appearance may be
1131            associated with a Commercial Affiliate, any Appearance whose primary
1132            purpose is to promote the Commercial Affiliate or a commercial enterprise
1133            other than the League or his Club shall be described and governed by
1134            Article 12.D.

1135        3.    Promotional Appearances may include (without limitation), youth
1136            organizational visits, award shows, projects and programs, skills shows,
1137            talks, speeches, autograph signings, post-match meet-and-greets, clinics,
1138            or hospitality or promotional events.  For the avoidance of doubt,
1139            however, no such Appearance shall require a Player to endorse or to give a
1140            testimonial for any product or service.

1141    D.    <u>Commercial Appearances</u>.  Subject to the limitations imposed by Article 12.F
1142    below, Players may be required to make Appearances for the primary purpose of
1143    promoting Commercial Affiliates or a commercial enterprise other than the League or
1144    their Club without additional compensation (each, a "<u>Commercial Appearance</u>").

1145    E.    <u>Bulk Autograph Signing</u>. Players may be required to participate in internal bulk
1146    autograph signing of items mandated by their Club or the League, provided that Players
1147    receive a minimum of twenty-four (24) hours' notice of any such bulk autograph signing.

Case 3:23-cv-00017   Document 1-1   Filed 01/11/23   Page 41 of 136

F.   Appearance Guidelines.

1.   Anything contained in this Article 12 to the contrary notwithstanding, no Player shall be required to make more than ten (10) Appearances in the aggregate in any given Contract Year, through any combination of Promotional Appearances (including any Promotional Appearances at Soccer Camp, as described in Article 32.B.1) and Commercial Appearances. Through 2022, every additional Promotional or Commercial Appearance shall be compensated at a minimum of $100. After 2022, each additional Promotional or Commercial Appearance shall be compensated at a minimum of $125. Notwithstanding the foregoing, Appearances in which all (or substantially all) Players on the Team are required to attend do not count toward the limitations set forth in the previous sentence.

2.   Appearances outside of a twenty-five (25) mile drive from the Club's home stadium shall last no more than three (3) hours in length, (including reasonably expected travel time).

3.   Appearances taking place within a twenty-five (25) mile drive from the Club's home stadium shall last no more than two hours (not including travel time).

4.   No Appearance shall be scheduled by a Club or the League for a time period which exceeds that set forth in paragraph 2 or 3 above (as applicable) without first consulting with the applicable Player(s). Any Appearance which ends up exceeding the time limitations set forth in said paragraph 2 or 3 shall be deemed hereunder as two (2) Appearances.

5.   For any Appearance under this Article 12, other than media Appearances or bulk autograph signings, Clubs must notify a Player in writing (which may be via email) of an Appearance at least seven (7) days in advance of such Appearance. The notice shall outline the nature, location, duration, expected Player role, and point of contact for the Appearance. An Appearance request not made at least seven (7) days in advance shall be considered optional to the Player.

6.   Players shall be given a reasonable amount of time between the end of training or a match and commencement of an Appearance. If an Appearance is scheduled within two hours after the end of training or a match, a meal must be provided by the Club. Such meal shall be reasonable under the circumstances. Players shall also be given a reasonable amount of time between the end of an Appearance and the commencement of training or a match.

7.   Appearances shall not be scheduled during a Player's day off, and Clubs shall use reasonable efforts to distribute individual Appearances amongst

1188              its Players.

1189       8.       Subject to submission of expense reports (within thirty (30) days of when
1190              such expenses are incurred), the Club or League, as applicable, shall
1191              reimburse the Player within thirty (30) days thereafter for all reasonable
1192              and necessary out-of-pocket expenses (e.g., mileage, parking) that the
1193              Player incurs in connection with any Appearances which are requested by
1194              the Club or League.  For transportation that is not provided by the League
1195              or a Club, mileage reimbursement shall be at the then-current Internal
1196              Revenue Service rate.

1197 **Article 13.     Roster**

1198    A.   <u>Professional Players</u>.  From the date that is two (2) weeks prior to the
1199 commencement of the Regular Season through the conclusion of a Club's Season, each
1200 Club shall have, on its master roster, at least the minimum number of (x) Professional
1201 Players and (y) Players signed to Guaranteed SPAs set forth in the chart below.  In so
1202 calculating, Loaned Players may count toward the minimum number of Professional
1203 Players; provided, however, that (i) the Parent Club has no right to recall such Loaned
1204 Players and (ii) no more than two (2) Loaned Players may be applied towards such
1205 minimum at any given time.

| Year | Professional Players | Guaranteed SPAs |
|------|----------------------|-----------------|
| 2021 | 12 | 10 |
| 2022 | 14 | 11 |
| 2023 | 15 | 12 |
| 2024 | 16 | 12 |
| 2025 | 16 | 12 |

1206    B.   <u>Academy Players</u>.

1207    1.   A Club may register up to five (5) Academy Players which do not count
1208 towards the maximum number of players allowed on the Club's master
1209 roster and are allowed to participate in League Competitions. After the
1210 first five Academy Players rostered, Academy Players will count against
1211 the master roster.  A Club may not include more than five (5) Academy
1212 Players on its gameday roster.

1213    2.   A Club may also include no more than seven (7) of the following (in the
1214 aggregate) on its gameday roster:

1215    (a)   Academy Players; and

1216    (b)   Players who are unemancipated minors as of the January 1
1217 preceding a Season, throughout such Season: (i) will have
1218 housing provided by their families; (ii) will have health insurance
1219 provided by their families or their Clubs; and (iii) will receive Base
1220 Compensation less than the Minimum Base Compensation (as
1221 permitted by Article 18.D.5).

1222    3.   Each of the maximums in paragraphs B.1 and B.2 above may be reduced
1223 at the sole discretion of the League.

1224       4.      For purposes of this Article 13.B, the following criteria must be met in
1225              order for an individual to be considered an "Academy Player":

1226           (a)     The player is under the age of 21 as of the official start date of that
1227                     Regular Season; and

1228           (b)     The player has never been signed or registered as a professional
1229                     soccer player, as recognized by FIFA.

1230           Additional (non-conflicting) criteria respecting Academy Players may be
1231           added at the sole discretion of the League.

Case 3:23-cv-00017   Document 1-1   Filed 01/11/23   Page 45 of 136

| 1232 | | | **Article 14.** | **Player Movement** |

1233     A.     <u>Loans and Transfers Not Requiring Consent.</u>

1234        1.     Subject to any limitations included in Addendum G of a Player's SPA, a
1235               Club may loan, trade or transfer a Player to another USL Club without the
1236               Player's consent; provided that (i) the Player's Salary remains the same
1237               and (ii) the Player's other benefits are materially similar (as verified by the
1238               Clubs through filling out and executing a Benefit Confirmation Form).
1239               For clarification, the Player's benefits need not be identical to be
1240               materially similar (e.g., if the transferring Club provided health insurance,
1241               the new Club could instead provide the Player with a stipend towards the
1242               purchase of health insurance which would result in him having reasonably
1243               similar out of pocket costs as those he had at the transferring Club).
1244               Notwithstanding the foregoing, if the Player is provided a housing stipend
1245               pursuant to his SPA, the stipend shall be reasonably increased or
1246               decreased based upon the market to which the Player is being relocated.

1247        2.     A Player who is loaned, traded or transferred from one USL Club to
1248               another without his consent or who joins a new Club pursuant to the terms
1249               of Article 8.G.3 shall be reimbursed:

1250           (a)     By his new USL Club for all reasonable and necessary,
1251                  documented expenses associated with relocating to his new USL
1252                  Club, not to exceed $4,500;

1253           (b)     By his old USL Club, upon conclusion or recall of a loan, for
1254                  reasonable and necessary, documented relocation expenses
1255                  associated with relocating back to his old USL Club, not to exceed
1256                  $4,500;

1257           (c)     By his new USL Club, for reasonable and necessary, documented
1258                  expenses associated with the termination or settlement of his lease
1259                  obligations on his residence in the city from which he was
1260                  assigned, such expenses not to exceed the lesser of (a) four
1261                  months' rent and (b) $4,500. The reimbursement must be based
1262                  upon verifiable receipts for payments made by the player for his
1263                  accommodation and is limited to only the player's share of shared
1264                  accommodation.

1265        3.     A Club may withhold authorization for relocation expenses under Article
1266               1.H.2(a) and Article 1.H.2(b) only if such expenses are unreasonable or if
1267               the Club provides a reputable moving company to accomplish the Player's
1268               move. For clarity, the Club has the right to require a Player to use a Club-
1269               designated moving company; it being understood that in such event the
1270               Club shall be responsible for all reasonable relocation expenses, even if
1271               such expenses exceed the reimbursement amounts set forth in Article

| | | |
|---|---|---|
| 1272 | | 14.A.2. The Player shall submit his receipts for reimbursement of |
| 1273 | | relocation expenses within sixty (60) days of the expenditure(s), and Club |
| 1274 | | shall reimburse the Player for such expenses within thirty (30) days of |
| 1275 | | receiving such receipts. |

| | | |
|---|---|---|
| 1276 | 4. | The new Club shall promptly coordinate (and pay for) Player's travel from |
| 1277 | | his old Club to his new Club, and Player may be required to report to his |
| 1278 | | new Club within twenty-four (24) hours of arrival in the new Club's |
| 1279 | | market. |

| | | |
|---|---|---|
| 1280 | 5. | Within two (2) weeks after reporting to his new Club, the Player will be |
| 1281 | | allowed three (3) consecutive days off to organize his affairs. Permission |
| 1282 | | to a Player to take one or more of these three (3) days prior to reporting to |
| 1283 | | his new Club shall not be unreasonably withheld. If a Player's new Club |
| 1284 | | requires the Player to travel to the new Club's market with forty-eight (48) |
| 1285 | | hours' notice or less the Club shall pay for travel arrangements back to the |
| 1286 | | old Club's market. |

| | | |
|---|---|---|
| 1287 | B. | <u>Loans and Transfers Requiring Consent</u>. |

| | | |
|---|---|---|
| 1288 | 1. | Clubs have the right during the term of a Player's SPA to loan, transfer, |
| 1289 | | assign and/or sell the rights to the Player's services to any professional |
| 1290 | | soccer team or league; provided, however, that except as may be permitted |
| 1291 | | by Article 14.A.1, the Player must consent in writing to any such loan, |
| 1292 | | transfer, assignment or sale.  Except as otherwise agreed in writing |
| 1293 | | between a Player and a Club, the Player shall be solely responsible for any |
| 1294 | | relocation expenses incurred in connection with any such loan, transfer, |
| 1295 | | assignment or sale. |

| | | |
|---|---|---|
| 1296 | 2. | Any SPA entered into prior to the execution date shall be deemed to |
| 1297 | | require the Player's consent to any loan, transfer, assignment or sale |
| 1298 | | (including to another USL Club). |

| | | |
|---|---|---|
| 1299 | C. | <u>FIFA Regulations</u>.  Any loan, transfer, assignment or sale of a Club's rights to the |
| 1300 | | Player's services shall be made in accordance with all applicable rules and regulations of |
| 1301 | | FIFA and any relevant governing body provided such rules and regulations do not |
| 1302 | | conflict with any provisions or remedies set forth in this CBA or applicable Law. |

| | | |
|---|---|---|
| 1303 | D. | <u>Transfer Consideration</u>.  Except as otherwise agreed to in writing between a |
| 1304 | | Player and his Club, a Player is not entitled to receive any portion of the consideration |
| 1305 | | received by a Club or the League for any loan or transfer of the Player's services to |
| 1306 | | another team or league (regardless of whether such loan or transfer is domestic, |
| 1307 | | international, to another USL Club, or to a club in another league). |

| | | |
|---|---|---|
| 1308 | E. | <u>FIFA RSTP</u>.  Unless otherwise prohibited by any other provision of this CBA, the |
| 1309 | | League Parties shall be permitted to act in accordance with (and enforce their rights |
| 1310 | | under) any provisions of the FIFA RSTP, specifically including Article 20 (Training |
| 1311 | | Compensation) and Article 21 (Solidarity). |

F.    Drafts.  USL will consult with the USLPA as to procedures in the event that the League chooses to enact a draft (whether for a traditional expansion, contraction, or other form of draft); provided, however, that the League shall bargain with the USLPA over the parameters relating to the compensation and SPA length for Players (or prospective Players) entering into any such draft.

G.    Respect of Contract.  No Player, without the consent of his Club, shall enter into an agreement (whether written, oral, or otherwise) with another club (whether in the USL Championship or any other league) for his playing services unless his SPA has expired or is due to expire within six months (which, for the purpose of this calculation, shall include any option years exercisable by the Club) (the "Last Six Months").  For avoidance of doubt, any such agreement between a Player and a USL Club shall be in the form of a Standard Player Agreement, in accordance with Article 8.E.1 (but which may not be made effective until after the expiration of the Player's current SPA).

H.    Anti-Tampering.  Beginning in 2022, notwithstanding any FIFA RSTP provision to the contrary, for a period of time determined by the League in advance of each Season (but which period may start no earlier than the Sunday prior to the last week of the regular season and end no later than the championship match), neither a Player nor his agents or representatives may engage in any contract negotiations or discussions with any Club in the League other than the Player's current Club with respect to a future contract. If a Club or Player violates this provision, the League may prohibit the Club and Player from entering into an SPA for the next season and/or may declare null and void any contract entered into between the Club and Player.

I.    Academy Player Rights.  The USLPA agrees that the League may establish mechanisms for helping to ensure Clubs are able to capitalize on their investment into the development of players in their respective territories.  Such mechanisms may include, for example, giving the training Club certain rights of first negotiation or rights of first refusal or the development of inter-club compensation schemes relating to the development, training, and success of such players, in each instance after first having conducted a dialogue with the USLPA; provided, however, the League will bargain with the USLPA over mechanisms which extend beyond a Player's first SPA (including any option terms included therein).

J.    Relocation Expenses for New Signings.  Except as otherwise agreed between a Club and a Player in an SPA, the Player shall be solely responsible for any relocation expenses incurred in connection with signing such SPA with the Club (and his subsequent relocation to the Club's home city).

1347 **Article 15.    Group Licensing, Marketing, and Apparel**

1348    A.    Recordings.  League Parties may film, photograph, record or otherwise capture a
1349    Player and his Likeness in connection with the performance of his obligations under his
1350    SPA (including without limitation, participation in Pre-Season activities, exhibition
1351    matches, training sessions, Regular Season matches, Playoff matches, and appearances
1352    for or on behalf of his Club) (collectively, the "Recordings").  A Player, if provided
1353    reasonable notice, shall be available to have Recordings created, individually or with
1354    other players in the League, at such times or places as the League or his Club may
1355    reasonably designate.  League Parties are the sole and exclusive owners of any and all
1356    rights in and to the Recordings.

1357    B.    Publicity Rights.

1358        1.    Each Player hereby grants to Club and the League, separately and
1359    together, the right and authority to use, and to authorize others to use solely as described
1360    below, his Likeness (including any Recordings thereof) for any and all uses or purposes
1361    that publicize and promote the League, the Clubs or the sport of soccer in any way in any
1362    and all Marketing Materials (collectively, "Publicity Rights"), without regard to whether
1363    such Marketing Materials include sponsor identification. Without limiting the foregoing,
1364    this grant includes the right to use a Player's Likeness for the purpose of publicizing and
1365    promoting the following aspects of the League and/or any of its Clubs: brands, matches,
1366    ticket sales, match broadcasts and telecasts, programming focused on the League, one or
1367    more Clubs and/or their matches and events (e.g., coaches shows, highlight based shows,
1368    and behind-the-scenes programming), other League or Club-related Media offerings (e.g.,
1369    branded content segments featuring match footage and other programming
1370    enhancements), Media distribution platforms, official events and officially sanctioned
1371    awards programs (e.g., Golden Boot), and public service, charitable, or community
1372    oriented initiatives.  League Parties may use a Player's Likeness individually pursuant to
1373    the foregoing and shall not be required to use the Player's Likeness in a group or as one
1374    of multiple players; provided, however, that such use by League Parties remains subject
1375    to Article 15.E.

1376        2.    For purposes of clarity, the foregoing grant of rights includes the right and
1377    authority to use, and to authorize affiliates or business partners to use, after the Term any
1378    Recordings filmed, photographed, recorded or otherwise captured during the Term solely
1379    for the purposes described herein.  However, Publicity Rights do not include the right to
1380    use a Player's Likeness in licensed consumer products, whether traditional or digital (e.g.,
1381    video games, trading cards, apparel) (all of which are included in Section D below), other
1382    than such products that constitute programming (as described above) or news and
1383    information offerings regardless of medium (e.g., DVDs, digital highlight offerings).

1384    C.    Broadcast Rights.  The Players and USLPA do not and will not contest during or
1385    after the term of this CBA, and this hereby confirms their acknowledgment of, the
1386    exclusive rights of the League and Clubs (i) to telecast, broadcast, or otherwise distribute,
1387    transmit or perform, on a live, delayed, or archived basis, in any and all Media, any
1388    League or Club matches or any excerpts thereof and (ii) to produce, license, offer for

1389  sale, sell, market, or otherwise distribute or perform (or authorize a third party to do any
1390  of the foregoing), on a live, delayed, or archived basis, any League or Club matches or
1391  any excerpts thereof, in any and all Media.

1392  D.    Group Licensing.  The USLPA, on behalf of present and future Players, agrees
1393  that the League, for good and sufficient consideration, has the worldwide right to use or
1394  license in a group of three (3) or more Professional Players the Likenesses of all such
1395  Players in connection with any product, brand, service, product line or other commercial
1396  use and any sponsorship, endorsement or promotion thereof, provided that such use is in
1397  combination with the use of any or all League or Club names, logos, trademarks, trade
1398  dress, uniforms or other form of League intellectual property (a "Group Licensing
1399  Program"), as further set forth in the Group License Agreement between the League (on
1400  behalf of itself and the Clubs) and the USLPA (on behalf of itself and the Players)
1401  executed contemporaneously herewith (as it may be amended, restated, supplemented, or
1402  otherwise modified in accordance with its terms, the "Group License Agreement").  Such
1403  grant includes the right to make individual use, or license the individual use, of a Player's
1404  Likeness in a series, set, collectible or as part of a sequential product (e.g., trading cards,
1405  posters, pins, etc.) with three (3) or more Professional Players, provided that it is not in a
1406  manner that features, highlights or individually promotes such Player to a greater degree
1407  relative to the other Professional Players in any given application.

1408  E.    No Player Endorsement.  Notwithstanding anything to the contrary in Article
1409  15.B or Article 15.D, the foregoing grant does not confer, during or after the term of this
1410  Agreement, any right or authority to use a Player's Likeness in a manner that implies any
1411  endorsement by Player of a third-party brand, product or service ("Endorsement"). For
1412  purposes of clarity, and without limitation, it shall not be an Endorsement for a Club or
1413  the League to use, or authorize others to use, including, without limitation, in a Group
1414  Licensing Program or in third party advertising and promotional materials, footage and
1415  photographs of Player's participation in League or Club matches or events that does not
1416  unduly focus on, feature, or highlight, Player in a manner that leads the reasonable
1417  consumer to believe that Player is a spokesperson for, or promoter of, a third-party
1418  commercial product or service.

1419  F.    Player Marketing Rights.

1420      1.    A Player shall not:

1421          (a)    use the name or logo of the League or the Clubs for any purpose
1422              unless he shall have received the prior written consent and
1423              approval of the League or Club (as applicable, which may be
1424              withheld in their sole and absolute discretion); provided, however,
1425              that the Player shall have the right to use the Club's name for
1426              biographical purposes; or

1427          (b)    unless he shall have received the prior written consent and
1428              approval of the League or Club (as applicable, which may be
1429              withheld in the their sole and absolute discretion), use or make any

endorsements or commercial appearances, sponsor any products, consent to the use by any third party of any name, picture or likeness of the Player (a) in which he appears, either alone or with others, in any official Club uniform, in any attire which closely resembles or is substantially similar (so as to be confusingly similar) to any official Club uniform, or in any attire whatsoever bearing or displaying the marks and/or logos of either the League or any Club, or (b) in which he appears together with two (2) or more other members of the Club or League, regardless of their attire, or (c) in which he is identified as a member of the Club or League.

2.      In the event of any inconsistency between, on the one hand, any provisions of either this Agreement or the Player's SPA and, on the other hand, any sponsorship, endorsement or licensing agreement (including any agreement with regard to footwear) entered into, renewed, or otherwise extended by a Player during the term of his SPA, the provisions of this Agreement and the Player's SPA shall control, and the Player shall be solely responsible for complying with such provisions.

G.      <u>Apparel</u>.

1.      Except as specified in Article 15.G.2 or Article 15.G.3 below, a Player shall wear and/or display only such footwear, clothing, equipment and other personal items as are endorsed by the League or his Club (and shall promptly obey and comply with any and all other reasonable guidelines and directives hereinafter issued by the League or his Club regarding apparel and/or equipment permitted or not permitted to be worn or utilized by members of the Club) at Club matches, practices or training camps, at clinics or other events sponsored or arranged by the Club or the League, at all Player appearances on behalf of the Club or the League, and/or while traveling with the Club. For the purpose of this Article, Players may be required by the League or the Club to wear on-field footwear manufactured by Adidas, Nike, Puma, or another reputable and professionally appropriate manufacturer approved in writing by the USLPA (which approval shall not be unreasonably withheld, conditioned or delayed).

2.      The Player shall not display any logo upon or endorse, or agree to display any logo upon or endorse, any item of on-field equipment which is not produced by the League's or Club's Official Equipment Supplier(s) except, in certain instances, for on-field footwear or goalkeeper glovewear, as set forth in Article 15.G.3 below.

3.      A Player may wear manufacturer-logo-identified shoes or goalkeeper gloves on-field only if such manufacturer has been designated by the League as an authorized footwear or glove supplier, as applicable.  If on-field shoes or goalkeeper gloves are supplied by or on behalf of his Club (without cost to the Player), then the Player shall wear (and display the logo of) only the shoes or gloves supplied by his Club unless (i) he has a Qualifying Shoe or Glove Deal with a different manufacturer or (ii) he has formally completed an opt-out process.  The specific procedure for completion of the opt-out process will be established by the League, in consultation with the USLPA, but is

1472    intended to provide a Player with the opportunity to avoid wearing Club-provided on-
1473    field shoes upon the medical advice of a trainer or doctor.

1474        H.    <u>USLPA Marketing</u>.  The USLPA agrees that it will not engage in or conduct (or
1475    permit or license any third party to engage in or conduct) any form of trade or consumer
1476    promotion, marketing or advertising that uses or refers to League or Club intellectual
1477    property, to any of the Club's stadiums or practice facilities, or that otherwise creates an
1478    association between the League or any USL Clubs and a third party.

1479            **Article 16.     Rules and Discipline**

1480     A.     <u>Club Rules</u>.

1481           1.     Clubs may establish, maintain, modify and enforce rules with which its
1482 players shall comply at all times, whether on or off the field; provided, however, that
1483 such rules are in writing, are reasonable, and do not violate the provisions of this
1484 Agreement or the SPA. A Club may discipline a Player for violation of such Club rules
1485 and otherwise for just cause. The discipline to be imposed, if any, shall be considered
1486 and decided by the Club, who may terminate an SPA or impose other lesser discipline in
1487 lieu of termination at any time without further obligation on either party to the SPA;
1488 provided, however, that: (i) any such discipline is reasonable in relation to the offense (or
1489 series of offenses, if applicable); (ii) if such discipline is monetary (e.g., a fine), such
1490 discipline is also reasonable in relation to the Player's compensation; and (iii) the
1491 schedule of fines (or other discipline) had been distributed or otherwise made available to
1492 the Player prior to the occurrence of the applicable violation.

1493           2.     For the avoidance of doubt (and without limiting any other provisions of
1494                 this Agreement), if a Player does any of the following, such action (or
1495                 inaction, as the case may be) shall be considered a material breach of this
1496                 Agreement or the SPA (regardless of whether such is specified in any
1497                 Club rules):

1498                 (a)     engages in acts of deliberate misconduct or insubordination, after
1499                         prior warning;

1500                 (b)     engages in a single egregious act of misconduct (with or without
1501                         prior warning);

1502                 (c)     fails, refuses or neglects, following notice and an opportunity to
1503                         cure, to submit to medical evaluations or to medical treatment in
1504                         accordance with Article 10 or the SPA; or

1505                 (d)     has received written notice of breach (including via email) on three
1506                         or more occasions, at least one of which was from a front office
1507                         executive such as the President or General Manager, for Club rules
1508                         that resulted in discipline that could have been grieved under
1509                         Article 24 of this Agreement, and without such discipline being set
1510                         aside either by the Impartial Arbitrator or the Grievance
1511                         Committee. For the purposes of this provision, "discipline" means
1512                         either (i) a suspension (for any period of time) or (ii) a fine or
1513                         monetary penalty of at least $100.00 that was deducted from the
1514                         Player's wages in accordance with Article 16.E.

1515           3.     When a Player is disciplined by his Club, he shall be given notice in
1516 writing, stating the amount of the fine, the duration of the suspension, and any other
1517 discipline (in each case, as applicable), and the reasons therefor.

1518    4.  Club discipline is subject to the Dispute Resolution provisions of Article
1519 24, and such rules shall not be stayed pending such Grievance procedures.  The Club
1520 rules shall be equally applicable to each Player, and its current rules must be made
1521 available to any Player or prospective Player upon request.

1522 B. Certain League Discipline: League discipline for off-field misconduct that is not
1523 determined by the USL to be detrimental to the reputation and public image of the
1524 League, the Team and/or the sport of soccer (i.e., within the scope of Article 16.C.2,
1525 below) shall be subject to the "just cause" standard.  Any grievance relating thereto shall
1526 be resolved as provided in the Dispute Resolution provisions of Article 24.

1527 C. Discipline for On-Field Conduct and Detrimental Off-Field Conduct.  It is
1528 understood and agreed that USL may discipline a Player for on-field misconduct and for
1529 off-field misconduct detrimental to the reputation and public image of the League, the
1530 Club and/or the sport of soccer, as more fully described hereafter.

1531    1.  *On-Field Misconduct.*

1532    (a) "On-Field Misconduct" shall include misconduct that occurs in any
1533 stadium or playing facility, in and/or around the stadium or playing
1534 facility (involving any person(s) or property in or around the
1535 stadium or playing facility), including, but not limited to: the
1536 playing field, locker rooms, parking lots, spectator stands or other
1537 spectator facilities, and other back-of-house and underground
1538 areas, including those used by television production and other
1539 media), and which occurs at, during or in connection with any
1540 match or tournament in which the Player competes.

1541    (b) Discipline for on-field misconduct will ordinarily be considered
1542 and imposed by the USL (or an internal committee thereof).
1543 Discipline for on-field misconduct may include a fine and/or
1544 suspension, with or without pay, or other lesser discipline, and may
1545 be imposed regardless of whether a yellow or red card has been
1546 issued.

1547    (i) Any USL-imposed discipline (A) for on-field misconduct
1548 under this Article 16.C.1 that exceeds the standard
1549 minimum fine amount or suspension length or (B) for
1550 "major game misconduct" may be appealed to the IDP (as
1551 defined below), provided such appeal is submitted within
1552 twenty-four (24) hours of the communication of the
1553 suspension or fine.  The IDP may revise any such discipline
1554 in its discretion, provided that any such decision is
1555 unanimous. If the IDP is unable to reach a unanimous
1556 decision, the IDP will be deemed to have decided to uphold
1557 the discipline.  Any such decisions by the IDP constitute
1558 full, final and non-reviewable (in arbitration or otherwise)

| 1559 | | | dispositions of the disputes and will be binding on the |
| 1560 | | | Player(s) involved and the parties to this CBA. |

| 1561 | | (ii) | Any USL-imposed discipline for the standard minimum |
| 1562 | | | fine amount and suspension length is non-reviewable (in |
| 1563 | | | arbitration or otherwise). |

| 1564 | | (iii) | Any Club discipline for on-field misconduct rendered in |
| 1565 | | | addition to the discipline rendered by the League or IDP |
| 1566 | | | may be grieved to the Impartial Arbitrator in accordance |
| 1567 | | | with Article 24, except that the sole issues before the |
| 1568 | | | Impartial Arbitrator shall be whether the Club's decision |
| 1569 | | | was arbitrary and capricious. |

| 1570 | | | Any suspension imposed under this Article 16.C.1 shall not be |
| 1571 | | | stayed pending appeal. |

| 1572 | (c) | | USL will engage in a dialogue with the USLPA in the manner |
| 1573 | | | required by Article 6.D prior to making any substantive |
| 1574 | | | modifications to the review and appeals processes for on-field |
| 1575 | | | misconduct, as set forth in the Competition Manual; provided, |
| 1576 | | | however, that the Independent Disciplinary Panel (the "IDP") shall |
| 1577 | | | be comprised of the following three individuals, in each instance |
| 1578 | | | not affiliated with the League or the USLPA: (1) a former |
| 1579 | | | professional coach, selected by USL; (2) a former professional |
| 1580 | | | referee, selected by USL; and (3) a former professional player, |
| 1581 | | | selected by the USLPA. |

| 1582 | (d) | | If the USL believes that a Player's actions during a match |
| 1583 | | | warranted a red card and either (i) the officials did not see the |
| 1584 | | | incident, and therefore did not have an opportunity to act, or (ii) |
| 1585 | | | the officials did see the incident but no red card was issued at the |
| 1586 | | | time, the USL shall refer such matters to the IDP.  The IDP will be |
| 1587 | | | empowered to issue a red card to any player for such player's |
| 1588 | | | actions during a match, provided that (i) if the officials did not see |
| 1589 | | | the incident, and therefore do not have the opportunity to act, the |
| 1590 | | | IDP unanimously determines such action to have warranted a red |
| 1591 | | | card and (ii) if the officials did see the incident but no red card was |
| 1592 | | | issued at the time, the determination that a red card was warranted |
| 1593 | | | is unanimous.  Any such decision by the IDP is binding and non- |
| 1594 | | | reviewable (in arbitration or otherwise).  In determining whether a |
| 1595 | | | red card was warranted, the IDP will also be empowered to |
| 1596 | | | determine any discipline associated with the player's actions |
| 1597 | | | (which may exceed the standard minimums).  Any such decisions |
| 1598 | | | by the IDP constitute full, final and non-reviewable (in arbitration |
| 1599 | | | or otherwise) dispositions of the matter and will be binding on the |
| 1600 | | | Player(s) involved and the parties to this CBA. |

1601        (e)    Players shall receive suspensions and fines for the accumulation of
1602                yellow cards during a single season under the following schedule:

1603            (i)     Five yellow cards: No suspension, $200 fine.

1604            (ii)    Eight yellow cards: One (1) game suspension, $300.00 fine.

1605            (iii)   Eleven yellow cards: Two (2) game suspension, $400.00
1606                  fine.

1607            (iv)   Fourteen yellow cards: Three (3) game suspension, $500.00
1608                  fine.

1609            The Good Behavior incentive in place as of May 29, 2019, shall
1610            remain in effect.

1611    2.    *Off-Field Misconduct Detrimental to the Reputation of the League.*

1612        (a)    In the event that the USL determines that alleged off-field conduct
1613            is detrimental to the public image and/or reputation of the League,
1614            the Club and/or the sport of soccer, the incident and the discipline
1615            to be imposed, if any, shall be considered and decided by the USL,
1616            which may terminate an SPA (without limitation to Article 16.C.1
1617            above and other provisions of this CBA regarding termination of
1618            an SPA), impose a fine and/or suspension (with or without pay) or
1619            impose other lesser discipline in lieu of termination at any time
1620            without further obligation on either party to the SPA, upon written
1621            notice (which may be via email) to the Player and the USLPA.
1622            Such alleged off-field conduct includes (without limitation):

1623            (i)     if the Player violates any substance abuse policy then in
1624                  effect or is subjected to any penalties for testing positive for
1625                  a Prohibited Substance, for noncompliance, or for refusal to
1626                  submit to a drug test as required under the terms of such
1627                  substance abuse policy;

1628            (ii)    if the Player bets, or has offered or attempted to bet, money
1629                  or anything of value on any match participated in by any
1630                  Club (in the League), or by any Players, or on matches of
1631                  any National Team (including, without limitation,
1632                  participation in any kind of fantasy game);

1633            (iii)   if the Player is involved in any attempt to fix, throw or
1634                  improperly affect any soccer match (including any League
1635                  Competition); or

1636            (iv)   if the Player is involved in the giving or offering of any
1637                  bribe that involves, or gambles on, any League

<table>
<tr><td>1638</td><td>Competition.</td></tr>
</table>

1639        (b)    Any disputes relating to discipline imposed under this Article
1640             16.C.2 shall be decided pursuant to the Grievance procedures set
1641             forth in Article 24, except that the sole issues before the Grievance
1642             Committee (and Impartial Arbitrator, if applicable) shall be (a)
1643             whether the USL exceeded the scope of its authority and (b) if not,
1644             whether the USL's determination was supported by substantial
1645             evidence and was not unreasonable based on the following
1646             considerations: (i) the facts and circumstances surrounding the
1647             conduct at issue; (ii) whether the penalty was proportionate to the
1648             gravity of the offense; and (iii) the legitimate interests of both the
1649             Player and the League.  Any suspension imposed under this Article
1650             16.C.2 shall not be stayed pending appeal.

1651    D.    <u>Non-Duplicative</u>. While both the Club and the USL may have the authority to
1652    discipline a Player for misconduct, in the event that both the Club and the USL impose
1653    any monetary discipline (e.g., fines) for the same conduct, only the USL-imposed
1654    monetary discipline shall be effective.  However, this Article 16.D does not prevent a
1655    Club from imposing its own non-monetary discipline on top of any discipline imposed by
1656    the League (e.g., if the League suspended a Player for 3 matches, there is nothing that
1657    would prevent the Club from extending its own internal suspension of the Player beyond
1658    3 matches).

1659    E.    <u>Deduction of Fines</u>.  A Club shall deduct from any amounts due to the Player per
1660    his SPA any fines or penalties levied against the Player by USL or his Club unless (i) the
1661    fine is under appeal to the League or (ii) the USL's decision in connection with such fine
1662    or penalty is the subject of a Grievance under Article 24; or (iii) if such fine is due to
1663    caution accumulations.

1664    **Article 17.    Prohibited Activities**

1665    During the term of his employment under a Standard Player Agreement, a Player
1666    shall not, without the written consent of his Club, engage in activities involving a
1667    substantial risk of bodily injury, including without limitation: (i) sky-diving, hang gliding,
1668    snow skiing, rock or mountain climbing (as distinguished from hiking), rappelling, and
1669    bungee jumping; (ii) fighting (*i.e.*, mixed martial arts; jujitsu), boxing, or wrestling; (iii)
1670    driving or riding on a motorcycle or moped; (iv) riding in or on any motorized vehicle in
1671    any kind of race or racing contest; (v) operating an aircraft of any kind; (vi) engaging in
1672    any other activity excluded or prohibited by or under any insurance policy which the
1673    Club procures against the injury, illness or disability to or of the Player, or death of the
1674    Player, for which the Player has received written notice from the Club prior to the
1675    execution of his SPA; or (vii) participating in any match or exhibition of soccer,
1676    basketball, American football, hockey, lacrosse, or other contact sport.  Players may,
1677    without written consent of the Club, participate, as amateurs, in golf, running, swimming,
1678    hiking, and other activities that (1) are non-contact and (2) do not involve a substantial
1679    risk of bodily injury, including off-season soccer training or activities consistent with the
1680    Club's off-season training regimen.

1681 **Article 18. Benefit Spend**

1682         In lieu of setting spending minimums and maximums on different categories of
1683 expenses, the following concept is intended to permit Clubs to spend money relating to
1684 Professional Players in the manner in which the Clubs deem best, while also ensuring that
1685 they meet certain aggregate minimum spending obligations relating thereto.

1686     A.    <u>Benefit Spend</u>.

1687        1.    A "<u>Benefit Spend</u>" is the sum of (x) annual spending (or the fair market
1688     value of other benefits provided), on an accrual basis (subject to Article
1689     18.A.2), by or on behalf of a Club or a Club-Related Entity relating
1690     directly to Players and (y) the Club's Loaned Player Salary Allocation.
1691     Spending relating directly to Players includes (without limitation) the
1692     following categories, subject to the rules set forth in Article 18.A.2 below:

1693           (a)    Salary paid to Players;

1694           (b)    Signing (or other guaranteed) bonuses (each, as amortized over the
1695     Guaranteed Years of the respective SPAs);

1696           (c)    Incentive or other bonus payments;

1697           (d)    Amounts paid for services other than as a professional soccer
1698     player;

1699           (e)    The value of any housing or personal transportation (or the amount
1700     of any such stipend, if applicable);

1701           (f)    Health or other insurance contributions (including to or on behalf
1702     of a Professional Player's family);

1703           (g)    Player medical costs (e.g., fees to doctors, hospitals, and other
1704     health care providers, the drugs and other medical supplies
1705     provided to Players, and the cost associated with implementing any
1706     concussion or other player health and safety protocols), but not
1707     including (a) salaries of trainers or other Club personnel, (b) the
1708     cost of Club medical or training equipment, or (c) costs which are
1709     reimbursed by or paid for through workers' compensation or any
1710     other medical insurance);

1711           (h)    workers' compensation premiums, payroll, unemployment
1712     compensation and social security taxes (including payments made
1713     on behalf of a Player released from his SPA that covers that
1714     Contract Year);

1715           (i)    Any relocation costs to or from the Club's home city (or the
1716     amount of any such stipend, if applicable), other than in connection

1717          with a Player's loan or transfer;

1718       (j)     The value of meals provided *other than* during team travel; and

1719       (k)     Any fees payable to Players' agents or representatives.

1720     However, for the avoidance of doubt, spending that is only indirectly
1721     related to Professional Players (or their families, as applicable) is not to be
1722     included in a Club's Benefit Spend. Such indirect spending includes, for
1723     example, spending on (i) uniforms and other equipment provided to
1724     Professional Players; (ii) coaches or other technical staff (or any other
1725     Club personnel); (iii) stadium, practice facilities, and other Club
1726     infrastructure; and (iv) team travel (including *per diems* or meals in lieu
1727     thereof).

1728      2.     <u>Accounting</u>.

1729       (a)     <u>General Rule</u>. Except as set forth in the rules below, all
1730          compensation paid (or otherwise provided) to a Player pursuant to
1731          the terms of an SPA shall be attributable to the Contract Year(s) in
1732          which the Player is required under the SPA to render services to
1733          the Club as a soccer player, regardless of how the compensation is
1734          characterized under the SPA.

1735       (b)     <u>Loaned Player Salary Allocation</u>. A Loaned Player's Salary shall
1736          be equal to the lesser of $100,000 and the greater of:

1737          (i)     the Loaned Player's Salary (as determined in the playing
1738              contract with his Parent Club), multiplied by the number of
1739              Official Matches in which the player appeared, divided by
1740              the number of the Club's Official Matches; and

1741          (ii)     the combined amount paid (x) to the Parent Club for the
1742              right to use the player and (y) the Salary actually paid to the
1743              player by the Club.

1744       (c)     *Signing Bonus*. Any signing or other guaranteed bonus in an SPA
1745          shall be attributed, *pro rata*, over the Guaranteed Years of the
1746          SPA. If an SPA contains only one (or no) Guaranteed Years, the
1747          Signing Bonus shall be attributed in full to the first Contract Year.

1748       (d)     *Performance Bonuses*. Any amounts that are actually earned by a
1749          Player as performance bonuses, or any other bonuses properly
1750          included in an SPA, shall be included as part of the Benefit Spend
1751          in the Contract Year in which the service or performance giving
1752          rise to the Bonus was provided.

1753       (e)     *Player Agent Costs*. Any amounts paid by a Club to a Player's

1754       agents or representatives shall be considered the equivalent of a
1755       signing bonus and, accordingly, shall be attributed, *pro rata*, over
1756       the Guaranteed Years of the player's SPA.

1757  B. <u>Maximum Benefit Spend.</u>

1758    1. The League may establish rules prohibiting, limiting, taxing, or otherwise
1759      regulating any Benefit Spend by any Club in excess of the Maximum
1760      Benefit Spend. As used herein, the Maximum Benefit Spend means, for
1761      each Year, a Benefit Spend of not less than the following amount:

| Year | Maximum Benefit Spend |
|:---:|:---:|
| **2022** | $1,880,000 |
| **2023** | $1,970,000 |
| **2024** | $2,100,000 |
| **2025** | $2,250,000 |

1762      For each Year thereafter, the Maximum Benefit Spend shall be increased
1763      by the lesser of:

1764      (a) the percentage rate of increase for the immediately preceding Year
1765        in the CPI; and

1766      (b) five percent (5%).

1767    2. The League may unilaterally increase the Maximum Benefit Spend or, in
1768      so calculating, may reduce or exclude any type of Benefit Spend in its sole
1769      and absolute discretion. However, in any instance in which the League
1770      increases the Maximum Benefit Spend (or reduces or excludes certain
1771      types of Benefit Spend from its calculation), the revised Maximum Benefit
1772      Spend will not be locked-in as a new Maximum Benefit Spend floor.

1773    3. If the League establishes any rules prohibiting, limiting, taxing, or
1774      otherwise regulating any Benefit Spend in excess of the Maximum Benefit
1775      Spend, the League shall confidentially provide the USLPA with a copy of
1776      such rules (as they may be amended from time to time).

1777    4. Beginning with respect to 2022, the League will provide the USLPA with
1778      a report by April 1 of the succeeding year including each Club's actual
1779      Benefit Spend and the amount of each component spent thereon.

1780  C. <u>Calculation of Minimum Base Compensation.</u>

Case 3:23-cv-00017  Document 1-1  Filed 01/11/23  Page 61 of 136

1781      1.      For purposes hereof, a Player's Base Compensation is equal to:

1782      (a)      his Salary; *plus*

1783      (b)      the value of any housing or personal transportation (or the amount
1784      of any such stipend, if applicable); *plus*

1785      (c)      the value of any health insurance contributions (including to or on
1786      behalf of a Player's family); *plus*

1787      (d)      the applicable portion of any signing (or other guaranteed)
1788      bonuses, but specifically excluding any amounts paid by a Club to
1789      a Player's agents or representatives.

1790      2.      With respect to 1(d) above, the amount of such payments shall be
1791      attributed evenly over the Standard Compensation Period throughout the
1792      term of the SPA (excluding any option years).

1793      D.      <u>Minimum Base Compensation Requirements</u>. Beginning with respect to the 2022
1794 Season, the Parties agree to the Base Compensation requirements set forth below. In
1795 each instance, any Minimum Base Compensation requirements are applicable, for any
1796 given Contract Year, only during the Standard Compensation Period. All amounts set
1797 forth herein are "per month" and any pro-rated amounts are to be based on a 30-day
1798 month.

1799      1.      Each Player's Base Compensation shall be equal to or greater than the
1800      Base Compensation amounts set forth below (as applicable, the
1801      "<u>Minimum Base Compensation</u>").

| Year | Minimum Base Compensation |
|:---:|:---:|
| **2022** | $2,200 |
| **2023** | $2,250 |
| **2024** | $2,400 |
| **2025** | $2,600 |

1802      For each Year thereafter, the Minimum Base Compensation shall be
1803      adjusted by the lesser of (x) the percentage rate of increase for the
1804      immediately preceding Year in the CPI or (y) 4%.

1805      2.      In no event may the reasonably anticipated value of a Player's housing and
1806      health insurance account for greater than half of his Base Compensation.
1807      Each Club shall certify to the League in the form included as Exhibit F (or
1808      such other form as the League and USLPA may subsequently agree), on

an annual basis in connection with each Player's registration, the reasonably anticipated value of such housing and health insurance. The Club shall promptly make such certifications available to the applicable Player and/or the USLPA upon request.

3.    Performance-Based Contracts shall be for no less than the applicable Minimum Base Compensation plus $500. Further, a Club may not, at any one time, be a party to more than four (4) Performance-Based Contracts (in the aggregate). If a Club has more than three Performance-Based Contracts at any one time, the monthly Base Compensation of at least one (1) such contract must be greater than or equal to Minimum Base Compensation plus one thousand eight hundred dollars ($1,800) and the monthly Base Compensation of at least one (1) such contract must be less than Minimum Base Compensation plus one thousand eight hundred dollars ($1,800).

4.    Excluding any Players satisfying the criteria set forth in paragraph 5 below, no Club may have more than six (6) Players on its active roster at any given point whose Base Compensation is less than: (i) Minimum Base Compensation plus (ii) five hundred dollars ($500) (it being understood that the Base Compensation of these six (6) Players must still be for at least the Minimum Base Compensation).

5.    If a Player is an unemancipated minor as of the January 1 preceding a Season and, throughout such Season will have (a) housing provided by his family and (b) health insurance provided by his family or his Club, the Club shall provide the Player with a Salary of no less than $500 below the specified Minimum Base Compensation but shall not otherwise be required to satisfy the Minimum Base Compensation requirements with respect to such Player.

6.    The Players specified in subparagraphs 4 and 5 above must be signed to Guaranteed SPAs (and may not be signed to Performance-Based Contracts or 25-Day Contracts).

E.    Notwithstanding anything to the contrary in this Agreement, Clubs must ensure that each Player's compensation meets or exceeds that required by applicable Law.

F.    To the extent that the Club pays a Player's agents or representatives or provides housing to a Player, such payments (or the value thereof, if applicable) will be included as income to the Player (which is then subject to withholding and other taxes upon the Player's income).

Case 3:23-cv-00017   Document 1-1   Filed 01/11/23   Page 63 of 136

**Article 19.     Per Diem; Parking**

A.     <u>Per Diem Allowance</u>.

1.     A Player's *per diem* while traveling with his team shall be paid at the standard *per diem* rates set forth by the General Services Administration. As of the execution of this CBA, the standard *per diem* rate is $55/day ($13 for breakfast; $14 for lunch; $23 for dinner; and $5 for incidentals).

2.     When a team is on the road for less than a full day, a partial per diem shall be paid, based upon the time of departure from or arrival in the Club's home city:

(a)     Departure after 9:00 a.m./arrival before 7:00 a.m., and the Club does not hold a practice, required meeting or any other event requiring a Player's attendance between 7:00 a.m. and 9:00 a.m., lasting more than thirty (30) minutes - no breakfast expense;

(b)     Departure after 1:00 p.m./arrival before 11:30 a.m., and the Club does not hold a practice, required meeting or any other event requiring a Player's attendance between 11:30 a.m. and 1:00 p.m., lasting more than thirty (30) minutes - no lunch expense;

(c)     Departure after 7:00 p.m./arrival before 5:30 p.m., and the Club does not hold a practice, required meeting or any other event requiring a Player's attendance between 5:30 p.m. and 7:00 p.m., lasting more than thirty (30) minutes - no dinner expense.

(d)     If a road trip is expected to last 3 days or less, the total trip per diem shall be paid in a lump sum at the time of departure.  If the trip is expected to last longer than 3 days, per diem may be paid in two (2) equal payments.

3.     A Club may arrange for prepared meals in lieu of paying the associated meal *per diems* if it chooses, provided that such meals are reasonably in line with the *per diem* level.  Meals provided at no charge by an airline shall not cause a reduction in the per diem allowance.  Per diem money lost by a Player will not be replaced.

B.     <u>Other Travel Expenses and Parking</u>.

1.     *Other Travel Expenses*.  For travel to the airport in connection with Club-required travel, or if traveling by means other than air, to the applicable station, each Club, in its sole discretion, will provide either (i) a team bus to the airport from the practice facility or stadium or (ii) will reimburse the Player within thirty (30) days for reasonable non-satellite parking, subject to submission of expense reports in accordance with the Club's rules and within thirty (30) days of when such expenses are incurred.

1883    2.  *Parking*. Each Club shall provide or arrange for parking for its Players at
1884         its home stadium and practice facility on match and practice days, without
1885         cost to the Players.

**Article 20.    Workers' Compensation**

1886

1887    A.    <u>Benefits.</u> Workers' Compensation (or equivalent benefits, if and as applicable)
1888    shall be provided by each Club for its Players in accordance with applicable Law and this
1889    Agreement. In any state where workers' compensation coverage is not compulsory or
1890    where a Club is excluded from a state's workers' compensation coverage, a Club will
1891    either voluntarily obtain coverage under the compensation Laws of that state or otherwise
1892    guarantee equivalent coverages to its Players. In the event that a Player qualifies for
1893    benefits under this section, such benefits will be equivalent to those benefits paid under
1894    the compensation Law of the state in which his Club is located.

1895    B.    <u>Rejection of Coverage</u>. Nothing in this Article is to be interpreted as preventing a
1896    Club that has the legal right to do so from rejecting coverage under the workers'
1897    compensation Law of its state or to otherwise extend coverage through an alternative
1898    product (e,g, on a risk-pooled basis) that may become available during the Term of this
1899    CBA, provided that such benefits will be equivalent to those benefits payable under the
1900    compensation Law of the state in which the Club is located.

1901    C.    <u>Offsets</u>. Where permitted by applicable Law, a Club may receive a
1902    reimbursement, credit, or offset against a workers' compensation award based on
1903    compensation paid (or otherwise delivered) by the Club to a Player while under an SPA;
1904    it being understood that any such amount received by a Club may not be included in the
1905    Club's Benefit Spend calculation under and pursuant to Article 18.A.

1906    D.    <u>Reporting of Covered Injuries</u>.  Pursuant to Article 10.A.4, each Player has the
1907    obligation to promptly notify the Club's coach, athletic trainer, or physician of any injury
1908    which is incurred (or aggravated) during the course of the Player's employment as a
1909    skilled soccer player with the Club (each, a "<u>Covered Injury</u>").  The applicable Club shall
1910    then report each such Covered Injury to its workers compensation carrier or insurance
1911    agent (as applicable, the "<u>Carrier</u>"), as required, regardless of whether such Club
1912    ultimately seeks to have the Carrier cover any associated claims or expenses.

1913    E.    <u>Medical Bills</u>.  Unless otherwise payable by a Carrier or other third party, should
1914    the Player suffer a Covered Injury and timely report such Covered Injury to his Club, his
1915    Club shall be responsible, except as provided in subsection F below, for payment of the
1916    Player's reasonable hospitalization, medical and dental expenses necessarily incurred as a
1917    result of such Covered Injury.  All treatment received by Players under this subsection
1918    shall be at the direction and prior approval of the Club and/or the Carrier, provided that
1919    any surgical or other invasive procedure shall be with the prior *written* approval of the
1920    Club and/or the Carrier.

1921    F.    <u>Choice of Surgeon</u>.  In the event that a Player requires a surgical or other invasive
1922    procedure, the Club shall use good faith efforts to ensure that at least two (2) surgeons are
1923    made available to the Player (it being acknowledged that the surgical options presented to
1924    the Player may be at the discretion of the Carrier and the Club cannot guarantee more
1925    than one (1) such option).  If the Player ultimately desires to have such procedure
1926    performed by a surgeon who has not been approved in writing by the Club and/or Carrier,

1927   as required by subsection E above, the Club shall not unreasonably withhold its consent
1928   to the procedure with the Player's desired surgeon; provided, however, that (i) any costs
1929   or expenses in connection therewith shall be borne entirely by the Player and (ii) the
1930   Player acknowledges that such election may result in the loss or reduction of coverage by
1931   the Carrier with respect to such Covered Injury (or any subsequent aggravations thereof).

1932                                                    **Article 21.**      **Circumvention**

1933           It is the intention of the parties that the provisions agreed to herein, including,
1934 without limitation, those relating to the Benefit Spend, be interpreted so as to preserve the
1935 essential benefits achieved by the parties to this Agreement. Neither the USLPA, the
1936 USL, nor any Club (or Club-Related Entity) or Player (or Person acting with authority on
1937 behalf of such Player), shall enter into any agreement, including, without limitation, any
1938 Standard Player Agreement, or undertake any action or transaction, including, without
1939 limitation, the assignment or termination of a Standard Player Agreement, which is, or
1940 which includes any term that is, designed to serve the purpose of defeating or
1941 circumventing the intention of the parties as reflected by all of the provisions of this
1942 Agreement.

1943 **Article 22.    Vacation and Time Off**

1944    A.    <u>Vacation</u>.

1945    1.    A Player signed to a multi-year SPA (including an SPA for which one or
1946          more options is exercised) shall be entitled to a minimum of six (6)
1947          consecutive weeks' vacation each year, to be taken only during the Off-
1948          Season between each of his Contract Years, at such times as may be
1949          approved by his Club; provided, however, that neither days devoted to
1950          national team duty nor days devoted to a Compulsory Tournament (which
1951          shall include the twenty-one-day training period prior to such competition
1952          for all purposes under this Article 22.A) shall be deemed a break in the
1953          continuity of a Player's vacation. Days devoted to national team duty shall
1954          be considered part of a Player's vacation time. Days devoted to
1955          Compulsory Tournaments, however, shall not count as vacation time in
1956          calculating the six-week entitlement.

1957    2.    Players on the same Club are not required to be granted the same
1958          consecutive six (6) weeks of vacation, provided, however, that the Club
1959          shall make good-faith efforts to accommodate Players' vacation-time
1960          requests.

1961    3.    Clubs may require Off-Season fitness or training regimens and remote
1962          reporting of such regimens even while a Player is on vacation, provided
1963          the exact time and place of such regimens are not actively organized or
1964          mandated by the Club.

1965    B.    <u>Time Off</u>.  Clubs shall make reasonable efforts to provide Players with at least
1966          one (1) day off per week and may not go fourteen (14) consecutive days without
1967          providing at least one (1) day off. Clubs must provide at least ten (10) days off every ten
1968          (10) weeks.  National team duty shall be considered time off for the purposes of this
1969          provision. Travel days will not be considered a day off. Days off granted to a Player's
1970          team while such Player is on vacation or leave shall be considered a day off for such
1971          Player.

1972    C.    <u>Bereavement</u>.  In the event of a death of an Immediate Family Member of a
1973          Player, the Player shall be entitled to a minimum of four (4) days leave, with pay, upon
1974          notice to the Club. Appropriate documentation of the death is to be furnished to the Club
1975          by the Player upon request.  Subject to applicable Law, the Club has no obligation to pay
1976          for any leave granted in excess of four (4) days.

1977    D.    <u>Family Leave</u>.  A Player may request leave from the Club for the birth of his child
1978          or the medical emergency of an Immediate Family Member.  The Club may require
1979          appropriate documentation to support the request for family leave prior to approval, not
1980          to be unreasonably withheld.  Upon approval, the Player shall receive four (4) days leave,
1981          with pay.  Subject to applicable Law, the Club has no obligation to pay for any leave
1982          granted in excess of four (4) days.

Case 3:23-cv-00017   Document 1-1   Filed 01/11/23   Page 69 of 136

1983 **Article 23.     Schedules and Calendar**

1984     A.    <u>Duration of League Season.</u>  Subject to any applicable Force Majeure provisions,
1985 the requirements of Article 22 (Vacation and Time Off) and the limitations set forth in
1986 this Article 23, there is no limitation on the length of the League Season provided that it
1987 falls within the Standard Compensation Period.

1988     B.    <u>Post-Season and Pre-Season Training</u>.

1989         1.    *End of Regular Season/Post-Season through November 30*. A Player may
1990 be required to train between such Player's team's final Regular Season or
1991 Post-Season match and November 30 if:

1992            (a)    Player's team has a Compulsory Tournament or a gated
1993 tournament or exhibition, in which case the Player may be required
1994 to report to training no earlier than five (5) days prior to the date of
1995 such match; or

1996            (b)    The Player's contract has been extended through the following
1997 season.

1998         However, such Players shall receive a minimum of three (3) consecutive
1999 days off including Thanksgiving, as determined by the Club in its
2000 discretion.

2001         2.    *Pre-Season Training Camp Start Date*. No Club may have its Players
2002 report to the Club more than eight (8) weeks prior to the date of the first
2003 match of the Regular Season (the "<u>Pre-Season Training Camp Start Date</u>")
2004 except as set forth in Article 23.B.3.

2005         3.    *Exceptions to Pre-Season Training Camp Start Date*. Subject to Article 22
2006 (Vacation and Time Off), the following are exceptions to Article 23.B.2:

2007            (a)    Compulsory Tournament Exception: For a Compulsory
2008 Tournament, official sanctioned FIFA tournament (e.g., a
2009 qualifying tournament for the FIFA Club World Cup), Players may
2010 be required to report to training no earlier than twenty-one (21)
2011 days prior to the start of such matches; or

2012            (b)    Non-Compulsory Tournament/Exhibition Matches: Clubs may
2013 play exhibition matches between November 30 and the Pre-Season
2014 Training Camp Start Date, provided that: (i) notice of the
2015 applicable match is given to the Players at least thirty (30) days in
2016 advance, and (ii) round-trip transportation is provided between the
2017 Player's Off-Season home and reporting location at the Club's
2018 expense; and (iii) the match is either gated or the broadcast rights
2019 thereto have been sold. If these requirements are met and the Club
2020 schedules exhibition matches or a tournament (other than a

| 2021 | | | Compulsory Tournament) during this time period, Players may be |
| 2022 | | | required to report to training no earlier than five (5) days prior to |
| 2023 | | | the start of such matches. |

2024     The parties' intent in permitting such matches and training is to
2025     enable Clubs to engage in meaningful competition and not to evade
2026     the requirement that Pre-Season training camp begin no more than
2027     eight (8) weeks prior to the first Regular Season match. Clubs shall
2028     not abuse this provision, and this stated intent, in scheduling
2029     matches and related training during the Off-Season.

2030  C.  <u>Number of Matches.</u>

2031    1.  The League Parties will not schedule a Player for more than three (3)
2032      matches in any seven (7) day period unless such schedule is reasonably
2033      unavoidable.

2034    2.  No Club may play a match within thirty-six (36) hours after the end of a
2035      prior match unless such schedule is reasonably unavoidable.

2036    3.  For avoidance of doubt, national team duty (including the senior and youth
2037      national teams or Olympic teams of any nation) shall not count toward the
2038      limitations in Article 23.C.1 or Article 23.C.2 above but may be otherwise
2039      subject to the limitations set forth in Article 11.B.

2040    4.  There is no limitation on the number of matches played between the Pre-
2041      Season Training Camp Start Date and the start of the Regular Season.

2042    5.  From the beginning of the Regular Season through December 23, each
2043      Club may play no more than fifty (50) matches, *excluding* all FIFA,
2044      CONCACAF, USSF, CSA, or other Compulsory Tournaments as well as
2045      any qualifying tournaments or play-in matches (e.g., U.S. Open Cup,
2046      Canadian Championship, Concacaf Champions League).

2047  D.  <u>League Discretion</u>: The USLPA acknowledges that, except as provided in this
2048  Article 23, League Parties have the right, in their sole discretion, to schedule matches
2049  involving the Players.

Case 3:23-cv-00017  Document 1-1  Filed 01/11/23  Page 71 of 136

**Article 24.    Grievance and Arbitration Procedure**

A.    <u>Scope/Nature of Dispute</u>.

   1.    Except as provided otherwise by this Agreement (including by Article 25), any dispute arising after the Effective Date between the USL or a Club, on the one hand, and a Player or the USLPA, on the other hand, and involving either of the following (each, a "<u>Grievance</u>") will be resolved exclusively in accordance with the procedures set forth in Article 24:

      (a)    the interpretation of, application of, or compliance with the CBA, the Standard Player Agreement (including any dispute concerning the validity of an SPA), or any other agreement between a Club and a Player (including any dispute concerning the validity thereof); or

      (b)    the interpretation of, application of, or compliance with any League or Club rules.

   2.    USL, the USL Clubs, and the USLPA on behalf of the Players hereby agree to utilize the grievance process set forth in this Article 24 as the sole and exclusive means to resolve any Grievance.  USL, the USL Clubs, and the USLPA (on behalf of each Player) hereby waives any right to bring any Grievance for resolution on the merits to any FIFA body or tribunal, including any rights pursuant to Chapter IX of the FIFA RSTP. Notwithstanding the foregoing, once a final decision, determination or award has been rendered pursuant to the process set forth in this Article 24, either USL or the Club, on the one hand, or the Player or USLPA, on the other hand, may immediately take such final decision, determination or award to the relevant FIFA body or tribunal or court of law having jurisdiction to be entered and enforced.

   3.    Any claims or disputes between a Player and a Club which are not Grievances shall be resolved pursuant to the procedures governing such claims or disputes or by private dispute resolution procedures if so affirmatively designated in the SPA between the Player and the Club.

B.    <u>Initiation</u>.  A Grievance may be initiated by a Player, a Club, USL, or the USLPA. A Grievance must be initiated within ninety (90) days from the date of occurrence or non-occurrence of the events upon which the Grievance is based, or within ninety (90) days from the date on which the facts of the matter became known or reasonably should have been known.  Any disputes eligible for this Grievance process shall be deemed waived by the grieving party if not initiated in accordance with the terms herein.

C.    <u>Filing/Notice</u>.  Notices given under any of Steps 1 through 3 (each, a "<u>Step</u>") below are required to be delivered to the adverse party: in (i) writing, in accordance with the requirements of the applicable Step, by e-mail, personal delivery, or nationally recognized overnight courier (with all fees prepaid) or certified or registered mail (in

each case, return receipt requested, postage prepaid); <u>and</u> (ii) telephone (including voicemail) with the other party.

D.    <u>Procedure</u>.

1.    **Step 1 – Discussion Between Player/Club**:  Any Player who believes that he has a justifiable Grievance shall first discuss and attempt to settle the matter with his Club's President or General Manager (or a designated representative of such President or General Manager).  If the matter is not resolved within three (3) days as a result of such discussions, a written notice of the Grievance shall be presented, either by the Player or the USLPA on such Player's behalf, in accordance with the requirements of this Article 24, to the Club's designated representative (i.e., the President, General Manager, or a designee of either), with a copy to the USL. Within seven (7) days following receipt of such notice, Club's designated representative shall advise the Player in writing (with a copy to the USLPA) of his or her decision, and shall furnish a copy of such decision to the USL.  If the decision of the Club's designated representative is not appealed to the Grievance Committee within seven (7) days of its receipt, the Grievance shall be considered settled on the basis of that decision and shall not be eligible for further appeal.

2.    **Step 2 – Appeal to Grievance Committee**:

(a)    Within seven (7) days after Player's receipt of the response from Club's designated representative, the Player may appeal such Grievance to the Grievance Committee, which shall consist of a representative appointed by USL and a representative appointed by the USLPA (the "<u>Grievance Committee</u>").  To appeal a Grievance under this Step 2, the appealing party must submit a written grievance to the USL and the USLPA, in a form or format to be agreed upon by the USL and the USLPA that contains the following:

(i)    Detailed facts upon which the Grievance is based, including the event, the date of the event, the aggrieved player or players (in case of grievance made by player or USLPA) or club (in the case of grievance made by club), and, if applicable, the written decision of Club's designated representative;

(ii)    References to the specific section or sections of CBA, Standard Player Agreement, or other agreement between the Club and Player alleged to have been violated;

(iii)    The relief requested; and

(iv)    The date that the Grievance is filed at Step 2.

2130          (b)     Within seven (7) days following such appeal to the Grievance
2131                   Committee the Club shall submit to the Player, the USLPA and the
2132                   USL a written statement of position which will set forth the Club's
2133                   position on the Grievance, including a factual response to the
2134                   Player's appeal and the reasons for the Club's position.

2135          (c)     Within fourteen (14) days following receipt of the appeal and the
2136                   statement of position, the Grievance Committee shall meet with the
2137                   parties to the dispute by videoconference on a mutually agreed-
2138                   upon date and time. During the Grievance Committee meeting, the
2139                   parties shall discuss with specificity the claims alleged in the
2140                   Grievance and discuss resolution and/or settlement of the
2141                   Grievance.

2142          (d)     If, as a result of the Grievance Committee Meeting, the parties are
2143                   unable to resolve the Grievance, the Grievance Committee will
2144                   schedule and conduct a Grievance Hearing in accordance with Step
2145                   3 below.

2146      3.     **Step 3 – Grievance Hearing**:

2147          (a)     Within seven (7) days following the Grievance Committee
2148                   Meeting, the Grievance Committee will meet again with the Parties
2149                   to set a date for a Hearing, discuss the witnesses and exhibits the
2150                   parties may deem necessary for such Hearing, and advise of any
2151                   other related deadlines or procedural requirements. At the Hearing,
2152                   the parties to the Grievance will have the right to present, by
2153                   testimony or otherwise, any evidence relevant to the Grievance. In
2154                   instances in which the parties agree that the material facts giving
2155                   rise to the Grievance are not in dispute, the Grievance Committee
2156                   shall have the authority to decide the merits of the case solely on
2157                   the written submissions of the parties. The Grievance Committee
2158                   may hold the hearing by video conference call under procedures
2159                   prescribed by the Grievance Committee. In-person hearings shall
2160                   take place in the city where the Club is located, unless otherwise
2161                   ordered by the Grievance Committee. In a dispute between the
2162                   USL and the USLPA, any in-person hearings shall take place at a
2163                   mutually agreed-upon, neutral venue (unless otherwise agreed).

2164          (b)     No later than twenty-one (21) days prior to the date set for the
2165                   Hearing (the "Discovery Deadline"), the parties will exchange and
2166                   provide the Grievance Committee with copies of all documents,
2167                   reports, and records (including, for the avoidance of doubt, any
2168                   witness statements) relevant to the Grievance and/or responsive to
2169                   requests from the opposing party. Any procedural disputes shall
2170                   be resolved by the Grievance Committee; in the event the
2171                   Grievance Committee is unable to reach a consensus, the parties

2172        may document their position as to the procedural dispute for the
2173        official record, and each member of the Grievance Committee shall
2174        include a description of his/her position in any decision ultimately
2175        recommended by such member. It is intended that witnesses appear
2176        at the Hearing.  If a witness is unavailable, the party offering the
2177        witness shall notify the other party and the Grievance Committee
2178        as soon as the unavailability of the witness is known.  The record
2179        shall be closed at the end of the Hearing unless the Grievance
2180        Committee orders otherwise.

2181      (c)  The Grievance Committee will either issue a joint decision
2182        resolving the Grievance or separate decisions recommending
2183        separate dispositions of the Grievance, together with the reasons
2184        for the recommended dispositions, in light of the whole record and
2185        upon the weight of the evidence presented.  If the Grievance
2186        Committee issues a joint decision it shall constitute a disposition of
2187        the Grievance that will be final and binding on the parties.  If the
2188        Grievance Committee issues separate decisions, the record of the
2189        Hearing, including the separate decisions will be submitted to the
2190        Impartial Arbitrator in accordance with Step 4.

2191      (d)  Except where prohibited, precluded or preempted by applicable
2192        Law, the parties hereby agree that the Grievance Committee (and
2193        the Impartial Arbitrator) shall be explicitly authorized to decide
2194        any statutory issues that may arise under Section 8 of the National
2195        Labor Relations Act or that, if proven, would form the basis for an
2196        unfair labor practice under such provisions.

2197    4.  **Step 4 – Impartial Arbitrator's Award:** The Grievance Committee will
2198      submit the record of the Hearing to the Impartial Arbitrator within three
2199      (3) days after the issuance of the separate decisions. The Impartial
2200      Arbitrator will review the record and issue an Award which adopts one of
2201      the two separate decisions issued by the Grievance Committee. The other
2202      separate decision will be considered a dissenting opinion.  The Impartial
2203      Arbitrator will have the authority to resolve any unresolved procedural
2204      disputes.  The Impartial Arbitrator will issue the Award within twenty-one
2205      (21) days of receiving the record.  The Impartial Arbitrator's Award will
2206      be final and binding on the parties.

2207    5.  **Substitution of Club with USL**: In the case of a Grievance of a Player (or
2208      USLPA, on behalf of a Player) against the USL (in lieu of a Club) or vice-
2209      versa, the same process shall apply, albeit with any reference to the Club
2210      replaced by a reference to the USL.

2211  E.  <u>Selection of Arbitrator</u>.  There will be one arbitrator, appointed jointly and
2212  confirmed in writing by the Parties, who shall serve for the duration of this Agreement
2213  (such individual, the "<u>Impartial Arbitrator</u>"); provided, however, that between December

2214 1 and 15 of any year, either Party may discharge the Impartial Arbitrator by serving
2215 written notice upon him or her and upon the other party.  The Parties shall thereafter
2216 agree upon (and confirm in writing) a successor Impartial Arbitrator within the following
2217 sixty (60) days or, failing such selection, the parties shall jointly request JAMS (or such
2218 other organization as the Parties may agree upon) to submit to the Parties a list of eleven
2219 (11) individuals, none of whom shall have, nor whose firm shall have, represented within
2220 the past five (5) years any professional athletes; agents or other representatives of
2221 professional athletes; labor organizations representing athletes; sports leagues, governing
2222 bodies, or their affiliates; sports teams or their affiliates; or owners in any professional
2223 sport, with a preference for (i) members of the National Academy of Arbitrators and/or
2224 (ii) individuals with experience in sports law. If the Parties cannot within seven (7) days
2225 from the receipt of such list agree to the identity of the Impartial Arbitrator from among
2226 the names on such list, they shall return said list, with up to five (5) names deleted
2227 therefrom by each party, to JAMS (or such other organization as the Parties may have
2228 agreed upon), which shall choose from the remaining name(s) on the list the identity of
2229 the Impartial Arbitrator.  For avoidance of doubt, nothing in this Agreement prohibits the
2230 parties from appointing the same individual to act as both the Impartial Arbitrator and the
2231 System Arbitrator.

2232 F. <u>Fees and Costs of Grievance Process</u>. All costs and expenses incurred in
2233 connection with the Grievance Process shall be borne by the party incurring such costs
2234 (including its own attorneys fees and costs and the costs and expenses of its witnesses
2235 and other representatives). The parties shall share equally any costs or fees of the
2236 Impartial Arbitrator.  The parties may agree to retain and share equally the costs of a
2237 stenographer to record the hearing transcript in advance of a Hearing. If the parties do not
2238 agree jointly to retain a stenographer, any party desiring a stenographic record shall make
2239 arrangements directly with a stenographer and shall notify the Grievance Committee and
2240 the other party of such arrangements in advance of the Hearing. The requesting party
2241 shall pay the cost of the record. The transcript must be made available to the Grievance
2242 Committee and to the other party for inspection, even if one party does not agree to pay
2243 for the transcript.  Any party wanting an interpreter shall make all arrangements directly
2244 with the interpreter and shall assume the costs of the service.  Other incidental expenses
2245 not expressly provided for in this Article 24, such as hearing room rental fees, if any,
2246 mutually agreed to in advance shall be borne equally by the parties.

**Article 25.      System Arbitration**

A.      <u>Scope/Nature of Dispute</u>.  Disputes between the USL and the USLPA which directly impact more than one Player or more than one Club will be resolved exclusively in accordance with the procedures set forth in this Article 25 (a "<u>System Arbitration</u>"). System Arbitrations may include disputes under Article 1 (Definitions), Article 4 (Duration of Agreement), Article 6 (Management Rights), Article 8 (Standard Player Agreement), Article 14 (Player Movement), Article 18 (Benefit Spend), Article 21 (Circumvention), Article 32.B.2 (Force Majeure), and any other disputes mutually agreed between the USL and USLPA. In the event of a disagreement between the USL and the USLPA, the System Arbitrator shall have exclusive jurisdiction to determine whether the System Arbitrator or the Impartial Arbitrator has jurisdiction to hear or resolve a particular dispute.

B.      <u>Initiation</u>.  System Arbitrations may only be initiated by the USL or the USLPA. A System Arbitration must be initiated within one (1) year from the date of occurrence or non- occurrence of the events upon which the dispute is based, or within one (1) year from the date on which the facts of the matter became known or reasonably should have become known. Any claims for relief arising out of disputes eligible for System Arbitration shall be deemed waived if not filed within such timeframe.

C.      <u>Filing/Notice</u>.  Neither the USL nor the USLPA may initiate a System Arbitration until and unless it has first discussed the matter with the other Party in an attempt to settle it. Either the USL or the USLPA may initiate a System Arbitration by providing notice to the other Party, with a copy of such written notice to be filed with the System Arbitrator. Notices given under this paragraph are required to be delivered to the adverse party and to the System Arbitrator: in writing, by e-mail, personal delivery, or nationally recognized overnight courier (with all fees prepaid) or certified or registered mail (in each case, return receipt requested, postage prepaid); and (ii) telephone (including voicemail) with the other party.

D.      <u>Selection of Arbitrator</u>.  There will be one arbitrator, appointed jointly and confirmed in writing by the Parties, who shall serve for the duration of this Agreement (such individual, the "<u>System Arbitrator</u>"); provided, however, that between December 1 and 15 of any year, either Party may discharge the System Arbitrator by serving written notice upon him or her and upon the other party. The Parties shall thereafter agree upon (and confirm in writing) a successor System Arbitrator within the following sixty (60) days or, failing such selection, the parties shall jointly request JAMS (or such other organization as the Parties may agree upon) to submit to the Parties a list of eleven (11) individuals, none of whom shall have, nor whose firm shall have, represented within the past five (5) years any professional athletes; agents or other representatives of professional athletes; labor organizations representing athletes; sports leagues, governing bodies, or their affiliates; sports teams or their affiliates; or owners in any professional sport, with a preference for (i) members of the National Academy of Arbitrators and/or (ii) individuals with experience in sports law. If the Parties cannot within seven (7) days from the receipt of such list agree to the identity of the System Arbitrator from among the names on such list, they shall return said list, with up to five (5) names deleted therefrom

2290    by each party, to JAMS (or such other organization as the Parties may have agreed upon),
2291    which shall identify the System Arbitrator from the remaining name(s) on the list.  For
2292    avoidance of doubt, nothing in this Agreement prohibits the parties from appointing the
2293    same individual to act as both the Impartial Arbitrator and the System Arbitrator.

2294    E.     <u>Hearing</u>.  Upon receipt of the notice of the dispute, the System Arbitrator will set
2295    a hearing date mutually agreed to by the Parties. At the hearing, the parties to the System
2296    Arbitration will have the right to present, by testimony or otherwise, any evidence
2297    relevant to the dispute. In instances in which the parties agree that the material facts
2298    giving rise to the System Arbitration are not in dispute, the System Arbitrator shall have
2299    the authority to decide the merits of the case solely on the written submissions of the
2300    parties. The parties may agree to hold the hearing by telephone or video conference call.
2301    In-person hearings shall take place in a neutral location to be agreed upon by the Parties.

2302    F.     <u>Discovery</u>.  No later than twenty-one (21) days prior to the date set for any
2303    hearing (the "<u>Discovery Deadline</u>"), each party will submit to the other copies of all
2304    documents, reports, and records (including, for the avoidance of doubt, any witness
2305    testimony) relevant to the dispute or reasonably requested by the other Party. It is
2306    intended that witnesses appear (either by phone or in-person, as applicable) at the
2307    arbitration hearing. If a witness is unavailable, the party offering the witness shall notify
2308    the other party as soon as the unavailability of the witness is known. Witnesses may
2309    testify by videoconference. The record shall be closed at the end of the hearing unless the
2310    arbitrator orders the contrary.

2311    G.     <u>System Arbitrator's Authority</u>.  The System Arbitrator shall make an award in
2312    light of the whole record and shall decide the case upon the weight of the evidence
2313    presented. The System Arbitrator shall interpret this Agreement and the SPA, and cannot
2314    add to, delete from, or modify this Agreement, the SPA, or any other applicable
2315    document.  The decision of the System Arbitrator is binding upon the parties involved
2316    and the parties to this Agreement.

2317    H.     <u>Fees and Costs of System Arbitration</u>. All costs and expenses incurred in
2318    connection with the Grievance process shall be borne by the party incurring such costs
2319    (including its own attorneys fees and costs and the costs and expenses of its witnesses
2320    and other representatives). The parties shall share equally any costs or fees of the System
2321    Arbitrator.  The parties may agree to retain and share equally the costs of a stenographer
2322    to record the hearing transcript in advance of a hearing. If the parties do not agree jointly
2323    to retain a stenographer, any party desiring a stenographic record shall make
2324    arrangements directly with a stenographer and shall notify the Grievance Committee and
2325    the other party of such arrangements in advance of the Hearing. The requesting party
2326    shall pay the cost of the record. The transcript must be made available to the Grievance
2327    Committee and to the other party for inspection, even if one party does not agree to pay
2328    for the transcript.  Any party wanting an interpreter shall make all arrangements directly
2329    with the interpreter and shall assume the costs of the service.  Other incidental expenses
2330    not expressly provided for in this Article 25, such as hearing room rental fees, if any,
2331    mutually agreed to in advance shall be borne equally by the parties.

2332

### Article 26. Savings Clause

2333        In the event that any provision hereof is found to be inconsistent with the Internal
2334 Revenue Code of 1986, as amended (or the rules and regulations issued thereunder), the
2335 National Labor Relations Act, or any other applicable Laws, then the Parties hereto agree
2336 to make such changes as are necessary to avoid such inconsistency and retain, to the
2337 extent possible, the intention of such provision.

**Article 27.    Interpretation; Choice of Law**

A.    <u>Integration, Entire Agreement</u>.  This Agreement, together with the exhibits hereto, and any letter agreements executed contemporaneously herewith, constitutes the entire understanding between the Parties.  Further, no understanding contained in this Agreement shall be modified, altered or amended, except by a writing signed by an authorized representative of both the League and USLPA.

B.    <u>Interpretation</u>.

    1.    The USL and USLPA recognize and acknowledge that there is and may continue to be (i) a collective bargaining relationship between USL Pro-2, LLC ("<u>League One</u>") and the USLPA, which is separate and distinct from the collective bargaining relationship between the USL and the USLPA.

    2.    The USL and USLPA agree that this Agreement shall be interpreted without reference: (i) to any past, present or future League One/USLPA collective bargaining agreement (or to any other past, present or future agreement between League One and the USLPA) or to any past, present, or future League One agreements (including its standard player agreement) (collectively, "<u>League One Agreements</u>"); (ii) to any of the provisions of such agreements or contracts; (iii) to the fact that a subject was not or is not covered by or included in any such agreements or contracts; and/or (iv) to any judicial, arbitral, or administrative decision interpreting any of such agreements or contracts.

    3.    The parties agree that they will make no reference to any of the League One Agreements, contracts or decisions referred to in Article 27.B.2 above, or to the fact that a particular provision was not or is not included in any such agreement or contract, or to any practice or policy of League One, in any arbitral, judicial, administrative, or other proceeding concerning the interpretation or enforcement of this Agreement, including, without limitation, a proceeding brought under Article 22.D or Article 24 of this Agreement. The Parties further agree that no such agreement, contract, provision (or absence of provisions), decision, practice, or policy may be relied upon by any decision maker in such proceedings.

C.    <u>Choice of Law</u>.  This Agreement (including the Standard Player Agreement, and all other Exhibits hereto and thereto) shall be construed and interpreted under, and shall be governed by, the Laws applicable to contracts made and performed in the State of New York, except where federal law may govern.

**Article 28.    Limitation of Liability**

A.    <u>No Consequential or Indirect Damages</u>.  In no event shall a Club, the League, the USLPA, or a Player (or any of their respective representatives) be liable for consequential, indirect, incidental, special, exemplary, punitive or enhanced damages, or lost profits or revenues from any Grievance (i.e., any claim meeting the criteria set forth in Section 24.A), regardless of (1) whether such damages were foreseeable and (2) whether or not it was advised of the possibility of such damages.

B.    <u>If Remedy Fails of Essential Purpose</u>.

1.    The limitation of liability provisions set forth in this Article 28 shall apply even if a Player's remedies under this Agreement or his SPA fail of their essential purpose.

2.    The USLPA, on behalf of the Players, acknowledges and agrees that the Parties entered into the Agreement in reliance upon the limitations of liability set forth in this Article 28, that the same reflect an allocation of risk between the Parties (including the risk that a contract remedy may fail of its essential purpose and cause consequential loss), and that the same form an essential basis of the bargain between the Parties.

**Article 29.    Other**

A.    <u>Headings and Organization</u>. The headings and organization of this Agreement are solely for the convenience of the Parties, and shall not be deemed part of, or considered in construing or interpreting, this Agreement.

B.    <u>Time Periods</u>.  Unless specifically stated otherwise, the specification of any time period in this Agreement shall include any non-business days within such period, except that any deadline falling on a Saturday, Sunday, or Federal Holiday shall be deemed to fall on the following business day.

C.    <u>Exhibits</u>. All of the Exhibits hereto (and the exhibits or addenda thereto) are an integral part of this Agreement and of the agreement of the Parties.

D.    <u>Mutual Drafting</u>.  This Agreement shall be deemed to have been mutually drafted and shall be construed in accord with its terms. No Party shall be entitled to any presumption or construction in such Party's favor as a result of any Party having assumed the primary burden of drafting any part of this Agreement.

E.    <u>Authorization</u>.  The USL represents that it has been duly authorized to enter into and execute this Agreement on behalf of itself and the USL Clubs. The USLPA hereby represents that it has been duly authorized to execute this Agreement on behalf of the Players.

F.    <u>Further Assurances</u>.  The USL, the USL Clubs, and the USLPA shall, upon the request of any party hereto, execute and deliver such further documents and instruments and take such other actions as are reasonably necessary and appropriate to implement and effectuate the provisions of this Agreement.

| 2412 | | **Article 30.** | **Notices** |

| 2413 | | Any notice to be given under the terms of this Agreement whose method is not otherwise |
| 2414 | | specified herein shall be given in writing by hand-delivery, first-class prepaid mail, or |
| 2415 | | email (with confirmation of transmission) (in each case, return receipt requested, postage |
| 2416 | | prepaid), addressed as follows or to such other persons or addresses as the Parties may |
| 2417 | | designate in writing from time to time: |

2418     A.     To the USL:

2419       USL Championship
2420       1715 N. Westshore Blvd., Suite 825
2421       Tampa, FL 33607
2422       Attn: Legal
2423       Email: Legal@uslsoccer.com
2424
2425     B.     To a USL Club:

2426       To the attention of the individual at the address and email address set forth on a
2427       list to be furnished by the League to the USLPA in advance of each Season (and
2428       as may be amended in writing from time to time thereafter)
2429
2430     C.     To the USLPA:

2431       USL Players Association
2432       c/o Segal Roitman, LLP
2433       33 Harrison Ave., 7th Floor Boston, MA 02111 Attn: Mr. Paul Kelly
2434       Email: uslplayers@gmail.com (with a copy to pkelly@segalroitman.com)

2435 **Article 31.    All-Star Game; National Team Matches**

2436   A.    <u>All-Star Game</u>.  If invited and deemed healthy and Fit by the Club-designated
2437   physician, the Player will practice and play for any League all-star or other showcase
2438   team, if any, and participate in any ancillary activities or competitions associated
2439   therewith.  A Player will be provided with (or reimbursed for, as applicable) travel and
2440   lodging, per diem (as set forth in Article 19.A) and a fee for appearing at and
2441   participating in any such League showcase or all-star game (and any ancillary or related
2442   activities).  Through the 2023 Season, such fee shall be one thousand dollars ($1,000)
2443   and, thereafter, such fee shall be one thousand one hundred fifty dollars ($1,150).

2444   B.    <u>National Team </u>Matches.  A Player participating in a national team match may not
2445   be required by the League or Club to participate in any match within forty-eight (48)
2446   hours of the national team match, if the national team match is played within
2447   CONCACAF, or within seventy-two (72) hours if the match is outside CONCACAF.  A
2448   Player may voluntarily waive this restriction.

**Article 32.    Soccer Camps**

A.    <u>Restrictions on Competing Activities</u>.  Each Club has a substantial interest in promoting youth and other competitive or recreational soccer within its respective territory (defined, for purposes of this CBA, as the area within fifty (50) miles of its home stadium).  Therefore, during the term of a Standard Player Agreement and, subject to the exceptions below, each Player agrees not to participate within the territory of any USL Club, in any fashion, with youth soccer clubs, soccer camps, or soccer clinics, or to engage in any related activity involving more than ten (10) players in any given day without the written consent of the Club in whose territory the activities are being conducted (which may be withheld in the reasonable discretion of the Club).  The foregoing shall not limit a Player's ability to continue activities in which he was involved prior to the effective date of his Standard Player Agreement; provided, however, that such activities: (i) do not detrimentally affect the Player's ability to perform his other obligations under his Standard Player Agreement; (ii) do not take place in the territory of any USL Club (unless the Player obtains the consent of that USL Club, which consent will not be unreasonably withheld or delayed; provided, however, that a Club's involvement in camps, clinics, or youth clubs provides a reasonable basis to withhold consent); and (iii) do not otherwise violate the terms of this Agreement or his SPA.

B.    <u>Additional Soccer Camp Opportunities</u>.

1.    A Player may be required to make Promotional Appearances at Soccer Camps (and, in each instance, the provisions of Article 12.F shall apply to all such Appearances).  As used herein, a "Soccer Camp" means any soccer (i) camp, (ii) clinic, or (iii) club, in each case sponsored or conducted by a Club or its licensee under a bona fide arrangement, or in which the Club or its bona fide licensee has a material financial interest.

2.    Additional Soccer Camp work (including supervisory work or work outside the scope of what would be included in a Promotional Appearance) may be the subject of a separate written agreement between the Club and the Player (a copy of which must be provided to the USL), but shall not be included in or made a part of the Player's Standard Player Agreement.  Absent such a separate written contract, additional Soccer Camp work may only be made available to the Player by the Club on a voluntary basis.

2482 **Article 33.    Force Majeure**

2483 A.    <u>Force Majeure Event</u>.  "<u>Force Majeure Event</u>" shall mean the occurrence of an
2484 event or condition, not within the reasonable control of the League (or a Club, if
2485 applicable), that in the League's reasonable discretion either:

2486     1.    makes it impossible for the League to perform its obligations under this
2487 Agreement; or

2488     2.    in and of itself, makes it economically impracticable for the League or a
2489 Club to perform its obligations under this Agreement (or the Standard Player
2490 Agreements);

2491     3.    results in substantial limitations on the ability of fans to attend matches; or

2492     4.    renders a Club unable (in the League's reasonable discretion) to conduct
2493 full-squad, competitive, on-field team activities in its territory (including the inability to
2494 play in Official Matches in its home stadium).

2495 A Force Majeure Event may also be declared by the League if it is reasonably foreseeable
2496 that the occurrence of the event or condition will result in the satisfaction of any of clause
2497 (1) through (4) above.  Force Majeure Events include (without limitation): wars or war-
2498 like action (whether actual, conventional or other, including, but not limited to, chemical
2499 or biological wars or war-like action); sabotage, terrorism; explosions; epidemics or
2500 pandemics (including of COVID-19); weather or natural disasters, including, but not
2501 limited to, fires, floods, droughts, hurricanes, tornados, storms or earthquakes; national or
2502 regional emergency; and any governmental order or action (civil or military).  However,
2503 for the 2021 Season only, the COVID-19 pandemic may not be deemed to satisfy any of
2504 clauses (1) through (3) above.

2505 B.    <u>Notice of Force Majeure Event</u>.  The League shall give notice of the Force
2506 Majeure Event to the USLPA, stating whether the Force Majeure Event is applicable to
2507 one or more Clubs or the League as a whole, and shall promptly convene with the
2508 USLPA to discuss the effects thereof.

2509 C.    <u>Compensation During Hiatus</u>.

2510     1.    As used herein, "<u>Hiatus Period</u>" means any period of time during which
2511 the League (in its reasonable discretion), due to a Force Majeure event, has (i)
2512 indefinitely postponed or suspended a Season or (ii) postponed or suspended a Season for
2513 a period of thirty (30) days or more.  The League shall promptly provide notice to the
2514 USLPA of (i) the start date of any Hiatus Period and (ii) the period of time the Hiatus
2515 Period is expected to continue.  The League shall also promptly convene with the USLPA
2516 to discuss the effects thereof.

2517     2.    From the 14th day of a Hiatus Period through the conclusion thereof, a
2518 Club may reduce the Salary of each of its Players to the greater of $2,000 per (30-day)
2519 month (*pro rata*) or 50% of the Player's monthly Salary (such amount, his "<u>Hiatus Pay</u>").

2520        3.      The applicable reduction in a Player's Salary may be applied by the Player's Club to each payment that is due or becomes due to such Player following the 14th day of the Hiatus Period (whether under the SPA that was in existence at the commencement of the Force Majeure Event or any subsequent SPA between the Player and the Club). Upon the conclusion of the Hiatus Period, the Players will again receive their unreduced Salary.

2526        4.      For the avoidance of doubt, a Club shall continue to provide the housing (or housing assistance) and health insurance to each Player during the Hiatus Period as otherwise required by their respective SPAs (except in such circumstances that the Player requests in writing to no longer have such housing and/or health insurance provided).

D.     <u>Compensation Upon Cancellation</u>.

1.     *Prior to April 1.*

(a)     If a Force Majeure Event occurs and due (in whole or in part) thereto, (i) the League ultimately cancels a Season (or the remainder of a Season) on or prior to March 31 or (ii) a Club is removed from the schedule (or the remainder of the schedule) on or prior to March 31, the Club shall pay a Player his Hiatus Pay from the date of such cancellation or removal through May 15.

(b)     Thereafter, a Club shall have no further obligation to provide the Player any remaining Base Compensation or other benefits for such Season, other than for relocation at the conclusion of the Season (if such was specified in the player's SPA).

2.     *On or After April 1.* If a Force Majeure Event occurs and due (in whole or in part) thereto, either:

(a)     the League ultimately cancels a Season (or the remainder of a Season) after March 31; or

(b)     the League concludes the Season prior to the later of (x) October 1 and (y) the date that is 30 days prior to the date the championship match had otherwise been scheduled; or

(c)     a Club is removed from the schedule (or the remainder of the schedule) after March 31; then

the Club shall pay a Player his Hiatus Pay for a period of forty-five (45) days following such cancellation/removal. Thereafter, a Club shall have no further obligation to provide the Player any remaining Base Compensation or other benefits for such Season, other than for relocation at the conclusion of the Season (if such was specified in the player's SPA). Furthermore, any option to extend a Player's SPA for the following season must be exercised within the same forty-five (45) day period; otherwise,

2558            such option shall be deemed to have been declined.

2559      E.     <u>Club, League, Player Rights Cumulative</u>.  Exercising any rights pursuant to this
2560   Force Majeure provision will not cause the USLPA, the Players, the League or a Club to
2561   relinquish any rights it may otherwise have had under the CBA or a Standard Player
2562   Agreement (including, for example, a Club's right to exercise options to extend a
2563   Player's SPA for one or more additional Seasons, except as such exercise deadlines are
2564   modified by subsection D.2 above).

2565      F.     <u>Season Extension</u>.  In the event that, due (in whole or in part) to a Force Majeure
2566   Event, a Season was unable to be completed prior to November 30, the League may elect
2567   to extend the SPAs of Players on applicable Clubs through the conclusion of the Season,
2568   which the League may extend no later than December 31 of the applicable calendar year.
2569   For the avoidance of doubt, the Standard Compensation Period would also be extended,
2570   in accordance with Article 8 (which extends the Standard Compensation Period to cover
2571   any period of time during which the Player is actually required by the Club to report for
2572   work).  The Parties shall negotiate in good faith over any other Force-Majeure related
2573   matters.

# EXHIBIT A

<u>Standard Player Agreement</u>

*Included on the following pages*

# STANDARD PLAYER AGREEMENT

League:             USL Championship (the "League")

Club Name:          _____ (the "Club")

Effective Date:     _____ (the "Effective Date")

Player Legal Name:  _____ (the "Player")

Date of Birth:      _____

SPA Type:           ☐ Guaranteed

                    ☐ Performance-Based

This Standard Player Agreement (this "SPA") is made as of the Effective Date by and between the Player and the Club (each a "Party" and, collectively, the "Parties"). In consideration for the mutual promises contained herein, the Parties agree as follows:

1. **DEFINITIONS; CONFLICTING TERMS**. Capitalized terms not otherwise defined in this SPA have the meaning ascribed to them in the Collective Bargaining Agreement entered into between the League (on behalf of the clubs) and the USL Players Association (on behalf of the players) (as amended, supplemented, or otherwise modified from time to time, the "CBA"). Notwithstanding anything to the contrary in this SPA, this SPA shall be deemed amended in such a manner as to require the parties to comply with all terms of the CBA and, in the event of any inconsistency between the terms of this SPA and the terms of the CBA, the provisions of the CBA shall control.

2. **TERM**.

   a. <u>Initial Term</u>. The Club agrees to employ the Player as a professional soccer player for an initial term beginning on the Effective Date and ending on November 30 of the season set forth in Addendum B, unless and until terminated in accordance with Section 12 (the "Initial Term"). The Initial Term and, once exercised, any Option Terms are collectively referred to as the "Term".

   b. <u>Option Term</u>.

      i. The Parties have agreed that the Club has a unilateral right to extend the Term of this SPA (each, an "Option") for those seasons (if any) set forth in Addendum B (each such period, an "Option Term"). The Player's compensation during each Option Term must be set forth in Addendum C (i.e., it cannot be left blank or subject to an "agreement to agree").

      ii. The Parties may not include more than two (2) Options and such Options, in the aggregate, may extend the Term for no more than three (3) years. Once an Option is exercised, this SPA shall be considered a "Guaranteed SPA" for such Option Term.

      iii. The Club may exercise an Option by sending a written notice, in the form or format required by the League, to the Player prior to the end of the Term (an "Option Notice").

## 3. CLUB OBLIGATIONS.

a. <u>Compensation</u>. In consideration for the Player's services as a professional soccer player, the Club shall compensate the Player as follows:

   i. <u>Salary</u>. For each Contract Year covered by this SPA, the Club shall provide the Player with the Salary set forth in Addendum C (except as such Salary may be modified in the case of a Force Majeure Event (in accordance with Article 33 of the CBA)). If the Club has one or more Options pursuant to Section 2.b, the Parties shall also include the Salary to be provided to the Player during such Option Term(s).

   ii. <u>Additional Compensation/Benefits</u>. In addition to the Salary, the Club shall provide the Player with such additional amounts or benefits (if any) as are listed on <u>Addendum C</u> according to the schedule(s) therein.

   iii. <u>Health Insurance</u>. If group health insurance is made available through the Club, the specific plan offerings, eligibility requirements and benefits shall be as set forth in the applicable summary plan description (which shall be provided to the Player).

   iv. <u>Intermediaries</u>. If the Player was represented by an agent or broker (an "<u>Intermediary</u>") in connection with his negotiation of this SPA with the Club, and the Club has agreed to pay the Intermediary (on the Player's behalf) any or all of the amounts owed by the Player, such amounts are included in Addendum C. Player acknowledges that such payments may be treated as "income" to the Player and that there may be tax implications for the Player arising out of such payments.

   v. <u>Minimum Base Compensation</u>. Throughout the Standard Compensation Period of each Contract Year covered by this SPA, the Club shall provide the Player with Base Compensation of no less than the Minimum Base Compensation set forth in Article 18.D of the CBA. For the Initial Contract Year, the Club certifies that it reasonably anticipates the Base Compensation of the Player during the Standard Compensation Period to be as set forth in Addendum D.

b. <u>Immigration/Eligibility</u>. The Club shall collect documentation from the Player demonstrating that the Player is lawfully entitled to work in the country in which the Club is based. If such documentation demonstrates that additional permissions are necessary from an immigration authority, Club shall be responsible for obtaining and maintaining such permissions (*e.g.*, a valid work visa) during the Term. If, despite commercially reasonable efforts, the Club is unable to secure or maintain such permissions, the Club may terminate this SPA upon notice to the Player without payment or penalty.

c. <u>Operation of the Club</u>. The Club shall operate a soccer team in the League in compliance with all applicable laws, regulations and those rules published by the League or its affiliates ("<u>League Rules</u>").

d. <u>Expenses</u>. The Club agrees to pay (either by direct purchase or by reimbursement to the Player, at the Club's election) all reasonable and necessary out-of-pocket expenses incurred in providing lodging, transportation, and meals for the Player while traveling to participate in away games or other required activities outside of the Club's home city. The Club also agrees to pay (either by direct purchase or by reimbursement to the Player, at the Club's election) any reasonable and necessary out-of-pocket expenses incurred in connection with Player's

Professional Player Contract       Page **2** of **32**
USL Championship                  _____    _____
                                                   Club       Player

Case 3:23-cv-00017    Document 1-1    Filed 01/11/23    Page 91 of 136

participation in promotional activities in which he is required to participate by the Club or League.

e. <u>Uniform and Equipment</u>. The Club shall provide or loan to the Player the uniform and equipment that are reasonably required for the Player to fulfill his obligations under this Agreement. Unless otherwise instructed by the Club, the Player shall only use such uniform and equipment for team training, games, and events. The Player shall not alter or disfigure items loaned or provided under this subsection. Upon request of the Club, the Player shall return any items loaned under this subsection within thirty (30) days. In the event that the Player does not return such items within such thirty (30) day period, the Club may deduct the replacement value from any compensation due to the Player.

## 4. **SERVICES**.

a. Pursuant to the terms herein, the Club hereby retains Player to render, and Player agrees to render, skilled services as a professional soccer player.

b. Player shall perform all of the duties that may be required of and from him pursuant to the terms of the CBA and this Standard Player Agreement, including that he be available and promptly report for and, to the best of his ability, fully participate in (in all cases, subject to the terms of the CBA): (i) all of the Club's training and practice sessions, workouts, meetings, and matches, (ii) any League all-star or other showcase competition and any ancillary activities or competitions associated therewith; and (iii) all other activities required under the CBA or this SPA, unless excused by the Club or League, as applicable.

## 5. **APPEARANCES AND PROMOTIONAL ACTIVITIES**.

a. <u>General</u>. The Player agrees and recognizes his duty to assist, upon the reasonable request of the League or Club (as applicable) in the promotion and marketing of the League, his Club, and the sport of soccer, including as set forth in this Section 5 (it being acknowledged, however, that this obligation is subject to the terms of the CBA, and more specifically that this duty does not include any obligation of the Player to promote the League, his Club, or the sport of soccer through any personal social media channels).

b. <u>Media Appearances</u>. Player shall cooperate with reasonable requests of television, radio, newspaper, magazine and other news media representatives and agrees to cooperate with the League and the Club, either separately or together, to be available for and participate in such news media photo sessions and interviews and other media Appearances as may reasonably be required.

c. <u>Promotional and Charitable Appearances</u>. Player agrees and recognizes his duty to assist in the promotion and marketing of the League, its Clubs, and the sport of soccer. Upon request by the Club or the League, Player shall be required to make Appearances for the primary purpose of promoting or marketing (a) the League, the Club and/or the sport of soccer and (b) charities, public services or other community services or events (each, a "<u>Promotional Appearance</u>"), in each instance subject to the terms set forth in Article 12.F of the CBA. Promotional Appearances may include (without limitation), youth organizational visits, award shows, projects and programs, skills shows, talks, speeches, autograph signings, post-match meet-and-greets, clinics, or hospitality or promotional events. For the avoidance of doubt, however, no such Appearance shall require the Player to endorse or to give a testimonial for any product or service.

d. <u>Commercial Appearances</u>. Subject to the limitations imposed by Article 12.F of the CBA, Player may be required to make Appearances for the primary purpose of promoting Commercial Affiliates or a commercial enterprise other than the League or their Club without additional compensation (each, a "<u>Commercial Appearance</u>").

e. <u>Bulk Autograph Signing</u>. Player may be required to participate in internal bulk autograph signing of items mandated by the Club or the League, provided that Player receives a minimum of twenty-four (24) hours' notice of any such bulk autograph signing.

## 6. CONDUCT.

a. The Player shall (in each case, subject to the terms of the CBA): (i) perform the services to the best of his ability; (ii) play soccer only for the Club and its assignees during the Term; (iii) be neatly and fully attired in public; (iv) conduct himself on and off the field according to a high standard of honesty, fair play, and sportsmanship; (v) conduct himself in compliance with all applicable laws and League Rules); and (v) not do anything that is materially detrimental or materially prejudicial to the best interests of the Club or the League.

b. The Club may establish, maintain, modify and enforce rules with which its players (including the Player) shall comply at all times, whether on or off the field; provided, however, that such rules are in writing, are reasonable, and do not violate the provisions of this SPA or the CBA. Subject to the provisions of the CBA, such rules shall be part of this SPA as fully as if herein written and shall be binding upon the Player.

c. The Club may discipline the Player for violation of the Club's rules and otherwise for just cause. The discipline to be imposed, if any, shall be considered and decided by the Club, who may terminate a SPA or impose other lesser discipline in lieu of termination at any time without further obligation on either party; provided, however, that: (i) any such discipline is reasonable in relation to the offense (or series of offenses, if applicable); (ii) if such discipline is monetary (e.g., a fine), such discipline is also reasonable in relation to the Player's compensation; and (iii) the schedule of fines (or other discipline) had been distributed or otherwise made available to the Player prior to the occurrence of the applicable violation.

d. If the Player is disciplined by the Club, he shall be given notice in writing, stating the amount of the fine, the duration of the suspension, and any other discipline (in each case, as applicable), and the reasons therefor.

**7. WITHHOLDING**. The Club shall deduct from any amounts due to the Player per this SPA any fines or penalties levied against the Player by USL or the Club unless (i) the fine is under appeal to the League or (ii) the USL's decision in connection with such fine or penalty is the subject of a Grievance. If such fine is due to caution accumulation, such amount may be deducted at the discretion of the Club. Any amounts withheld from the Player pursuant to this Section 7 shall be retained by the Club or the League.

## 8. PHYSICAL CONDITION.

a. <u>Medical Examination</u>.

i. The Club may, from time to time at its own cost, arrange for a Club-designated physician to conduct a medical examination of the Player (a "<u>Medical Examination</u>"), at such times as the Club reasonably deems advisable.

Professional Player Contract   Page **4** of **32**   _____ _____
USL Championship               Club     Player
Case 3:23-cv-00017  Document 1-1  Filed 01/11/23  Page 93 of 136

ii. In connection with any Medical Examination, the Player agrees to: (A) participate in and cooperate therewith; and (B) supply complete and truthful information.

iii. The Club may, from time to time, require that the Player fully and timely complete certain forms or questionnaires relating to the Player's medical history ("Medical Information Forms"). Player agrees to complete such Medical Information Forms truthfully and without material omissions and acknowledges that doing so is a material condition of this SPA.

iv. If and to the extent necessary to enable or facilitate the disclosure of medical information as provided for by this SPA or Article 10 of the CBA, the Player shall execute such individual authorizations as may be requested by the Club or as may be required by health care providers who examine or treat the Player.

b. Injury and Illness.

i. The Player agrees to use his best efforts to keep himself Fit. If the Player is not Fit, in the reasonable discretion of the Club's physician, the Club may require the Player to complete any rehabilitation or training activities that the Club's personnel (including the Club-designated physician) may specify.

ii. The Player agrees to promptly (i) notify the Club's coach, athletic trainer, or physician of any injury, illness, or medical condition which (a) may impair or otherwise affect, either immediately or over the course of this SPA, his Fitness or (b) was otherwise incurred (or aggravated) during the scope and course of the Player's employment with the Club including, but not limited to, travel with his team or on business requested by the Club and (ii) in the case of an injury, provide any additional information about the circumstances leading to the injury requested by the Club. The obligations of this paragraph depend on the Player's knowledge of the condition or injury and, with respect to clause (i)(a), its effect on his Fitness.

iii. The Club acknowledges that the Player does not breach this SPA solely by virtue of suffering an injury, illness, or condition (regardless of whether such injury, illness, or condition was suffered as a result of Player performing his obligations under this SPA). Notwithstanding the preceding sentence, the Player will be deemed to have materially breached this SPA in the event he suffers an injury, illness, or condition as a direct result of his breach of Section 9.b.

c. Fitness as Condition Precedent. If so designated by mutual agreement in Addendum E to this SPA, the validity of this SPA may be conditioned upon passing a Medical Examination (or the failure of the Club to notify the Player of the contrary within the applicable deadline), as further set forth in Addendum E and Article 10.C.3 of the CBA. Otherwise, for the avoidance of doubt, the validity of an SPA may not be conditioned upon passing a Medical Examination.

9. **OUTSIDE ACTIVITIES**.

a. Restrictions on Competing Activities. Each club in the League has a substantial interest in promoting youth and other competitive or recreational soccer within its respective territory (defined, for purposes of this SPA, as the area within fifty (50) miles of its home stadium). Therefore, during the term of this SPA, and subject to the exceptions below, Player agrees not to participate within the territory of any club in the League, in any fashion, with youth soccer

clubs, soccer camps, or soccer clinics, or to engage in any related activity involving more than ten (10) players in any given day without the written consent of the applicable club in whose territory the activities are being conducted (which may be withheld in the reasonable discretion of such club). The foregoing shall not limit Player's ability to continue activities in which he was involved prior to the effective date of this SPA; provided, however, that such activities: (i) do not detrimentally affect Player's ability to perform his other obligations under this SPA; (ii) do not take place in the territory of any club in the League (unless Player obtains the consent of such club, which consent will not be unreasonably withheld or delayed; provided, however, that a Club's involvement in camps, clinics, or youth clubs provides a reasonable basis to withhold consent); and (iii) do not otherwise violate the terms of this SPA or the CBA.

b. <u>Activities Involving Substantial Risk of Injury</u>. During the Term, Player shall not, without the written consent of the Club, engage in activities involving a substantial risk of bodily injury, including without limitation: (i) sky-diving, hang gliding, snow skiing, rock or mountain climbing (as distinguished from hiking), rappelling, and bungee jumping; (ii) fighting (*i.e.*, mixed martial arts; jujitsu), boxing, or wrestling; (iii) driving or riding on a motorcycle or moped; (iv) riding in or on any motorized vehicle in any kind of race or racing contest; (v) operating an aircraft of any kind; (vi) engaging in any other activity excluded or prohibited by or under any insurance policy which the Club procures against the injury, illness or disability to or of Player, or death of Player, for which Player has received written notice from the Club prior to the execution of this SPA; or (vii) participating in any match or exhibition of soccer, basketball, American football, hockey, lacrosse, or other contact sport. Player may, without written consent of the Club, participate, as an amateur, in golf, running, swimming, hiking, and other activities that (1) are non-contact and (2) do not involve a substantial risk of bodily injury, including off-season soccer training or activities consistent with the Club's off-season training regimen.

## 10. INTELLECTUAL PROPERTY.

a. <u>Recordings</u>. The League and Club may film, photograph, record or otherwise capture the Player and his Likeness in connection with the performance of his obligations under this SPA (including without limitation, participation in Pre-Season activities, exhibition matches, training sessions, Regular Season matches, Playoff matches, and appearances for or on behalf of the Club) (collectively, the "<u>Recordings</u>"). The Player, if provided reasonable notice, shall be available to have Recordings created, individually or with other players in the League, at such times or places as the League or the Club may reasonably designate. The League and the Club are the sole and exclusive owners of any and all rights in and to the Recordings.

b. <u>Publicity Rights</u>.

    i. The Player hereby grants to the Club and the League, separately and together, the right and authority to use, and to authorize others to use solely as described below, his Likeness (including any Recordings thereof) for any and all uses or purposes that publicize and promote the League, the Clubs or the sport of soccer in any way in any and all Marketing Materials (collectively, "<u>Publicity Rights</u>"), without regard to whether such Marketing Materials include sponsor identification. Without limiting the foregoing, this grant includes the right to use the Player's Likeness for the purpose of publicizing and promoting the following aspects of the League and/or any of its Clubs: brands, matches, ticket sales, match broadcasts and telecasts, programming focused on the League, one or more Clubs and/or their matches and events (e.g., coaches shows, highlight based shows, and behind-the-scenes programming), other League or Club-

related Media offerings (e.g., branded content segments featuring match footage and other programming enhancements), Media distribution platforms, official events and officially sanctioned awards programs (e.g., Golden Boot), and public service, charitable, or community oriented initiatives. League Parties may use the Player's Likeness individually pursuant to the foregoing and shall not be required to use the Player's Likeness in a group or as one of multiple players; provided, however, that such use by League Parties remains subject to Section 10.e.

ii. For purposes of clarity, the foregoing grant of rights includes the right and authority to use, and to authorize affiliates or business partners to use, after the Term any Recordings filmed, photographed, recorded or otherwise captured during the Term solely for the purposes described herein. However, Publicity Rights do not include the right to use the Player's Likeness in licensed consumer products, whether traditional or digital (e.g., video games, trading cards, apparel) (all of which are included in Section 10.d below), other than such products that constitute programming (as described above) or news and information offerings regardless of medium (e.g., DVDs, digital highlight offerings).

c. <u>Broadcast Rights</u>. The Player does not and will not contest during or after the Term of the CBA, and this hereby confirms his acknowledgment of, the exclusive rights of the League and clubs (i) to telecast, broadcast, or otherwise distribute, transmit or perform, on a live, delayed, or archived basis, in any and all Media, any League or Club matches or any excerpts thereof and (ii) to produce, license, offer for sale, sell, market, or otherwise distribute or perform (or authorize a third party to do any of the foregoing), on a live, delayed, or archived basis, any League or Club matches or any excerpts thereof, in any and all Media.

d. <u>Group Licensing</u>.

i. *Grant of Rights.* The Player hereby grants and assigns to the USLPA, for its use or further assignment or licensing, the exclusive rights to his Likeness as are set forth in the Group Licensing Agreement between the League and the USLPA (as it may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms, the "<u>Group License Agreement</u>"), the terms of which the Player understands in full and by which he agrees to be bound. The Player acknowledges that the USLPA has granted these rights to the League, with the understanding that the League may further sub-license or assign these rights without his further approval or consent. The Player acknowledges that the rights granted to the USLPA include, but are not limited to, the worldwide right to use or license in a group of three (3) or more Professional Players the Likenesses of all such Professional Players in connection with any product, brand, service, product line or other commercial use (including licensed merchandise) and any sponsorship, endorsement or promotion thereof, provided that such use is in combination with the use of any or all League or Club names, logos, trademarks, trade dress, uniforms or other form of League intellectual property (a "<u>Group Licensing Program</u>"). Such grant includes the right to make individual use, or license the individual use, of the Player's Likeness in a series, set, collectible or as part of a sequential product (e.g., trading cards, posters, pins, etc.) with three (3) or more Professional Players, provided that it is not in a manner that features, highlights or individually promotes such Player to a greater degree relative to the other Professional Players in any given application. The USLPA shall be considered a third party beneficiary of this provision for the purpose of enforcing the rights granted to it hereunder.

ii. *Further Assurances.*  The Player agrees to take such additional steps as the League or the USLPA may reasonably request in connection with the Group License Agreement, including but not limited to the execution of additional documents that may be necessary for the League or the USLPA to implement, confirm or enforce their rights under this Section 10.d.

iii. *Acknowledgements.*  The Player acknowledges that fees payable to the USLPA, specified in the Group License Agreement, constitute the entire consideration for rights granted in this Section 10.d. The Player further acknowledges that he has no claim or entitlement to any compensation, however denominated, arising from the League's or the Club's use or exploitation of such rights prior to the date of the Group License Agreement, including by any licensee or assignee.

e.   No Player Endorsement.  Notwithstanding anything to the contrary in Section 10.b or 10.d of this SPA, the foregoing grant does not confer, during or after the Term, any right or authority to use the Player's Likeness in a manner that constitutes any endorsement by the Player of a third-party brand, product or service ("Endorsement"). For purposes of clarity, and without limitation, it shall not be an Endorsement for Club or the League to use, or authorize others to use, including, without limitation, in a Group Licensing Program, in third-party advertising and promotional materials, footage and photographs of Player's participation in League or Club matches or events that do not unduly focus on, feature, or highlight, Player in a manner that leads the reasonable consumer to believe that Player is a spokesperson for, or promoter of, a third-party commercial product or service.

f.   Player Marketing Rights.

i. The Player shall not:

A. use the name or logo of the League or the Club for any purpose unless he shall have received the prior written consent and approval of the League or Club (as applicable, which may be withheld in their sole and absolute discretion); provided, however, that the Player shall have the right to use the Club's name for biographical purposes; or

B. unless he shall have received the prior written consent and approval of the League or Club (as applicable, which may be withheld in the their sole and absolute discretion), use or make any endorsements or commercial appearances, sponsor any products, consent to the use by any third party of any name, picture or likeness of the Player (a) in which he appears, either alone or with others, in any official Club uniform, in any attire which closely resembles or is substantially similar (so as to be confusingly similar) to any official Club uniform, or in any attire whatsoever bearing or displaying the marks and/or logos of either the League or any Club, or (b) in which he appears together with two (2) or more other members of the Club or League, regardless of their attire, or (c) in which he is identified as a member of the Club or League.

ii. In the event of any inconsistency between, on the one hand, any provisions of either this SPA or the CBA and, on the other hand, any sponsorship, endorsement or licensing agreement (including any agreement with regard to footwear) entered into, renewed, or otherwise extended by the Player during the term of this SPA, the provisions of this

SPA and the CBA shall control, and the Player shall be solely responsible for complying with such provisions.

g. <u>Apparel</u>.

    i. Except as specified in Section 10.g.ii or 10.g.iii below (and subject to the terms of the CBA), the Player shall wear and/or display only such footwear, clothing, equipment and other personal items as are endorsed by the League or the Club (and shall promptly obey and comply with any and all other reasonable guidelines and directives hereinafter issued by the League or the Club regarding apparel and/or equipment permitted or not permitted to be worn or utilized by members of the Club) at Club matches, practices or training camps, at clinics or other events sponsored or arranged by the Club or the League, at all Player appearances on behalf of the Club or the League, and/or while traveling with the Club.

    ii. The Player shall not display any logo upon or endorse, or agree to display any logo upon or endorse, any item of on-field equipment which is not produced by the League's or Club's official equipment supplier(s) except, in certain instances, for on-field footwear or goalkeeper glovewear, as set forth in 10.g.iii below.

    iii. The Player may wear manufacturer-logo-identified shoes or goalkeeper gloves on-field only if such manufacturer has been designated by the League as an authorized footwear or glove supplier, as applicable. If on-field shoes or goalkeeper gloves are (a) supplied by or on behalf of the Club (at no cost to the Player) and (b) the manufacturer of such footwear is adidas, Nike, Puma, or another reputable and professionally appropriate manufacturer approved in writing by the USLPA, then (c) the Player shall wear (and display the logo of) only the shoes or gloves supplied by the Club unless (x) he has a Qualifying Shoe or Glove Deal with a different manufacturer or (y) he has formally completed the opt-out process agreed upon between the League and the USLPA.

    iv. As used herein, "<u>Qualifying Shoe or Glove Deal</u>" means an exclusive, written agreement between a Player and an on-field shoe or goalkeeper glove manufacturer that (a) has been disclosed in the Player's SPA or (b) is entered into during a period of time in which the Club has not committed to providing the Player with on-field shoes or goalkeeper gloves, as applicable (without cost to the Player) consistent with the terms of Article 15.G.3 of the CBA. The Player represents that any current Qualifying Shoe or Glove Deal has been disclosed in Addendum F of this SPA (a "<u>Qualifying Shoe or Glove Deal</u>"). If the Player has a Qualifying Shoe or Glove Deal, he agrees to provide a copy of the duration/term provision and signature page of such Qualifying Shoe or Glove Deal upon request of the League or the Club.

    v. If the Player has a Qualifying Shoe or Glove Deal, he may enter into a subsequent exclusive, written agreement with a shoe or glove manufacturer, provided such agreement is entered into within thirty (30) days of the expiration or termination of the previous Qualifying Shoe or Glove Deal (at which point, such new agreement would also be deemed a Qualifying Shoe or Glove Deal). The Player agrees to notify the League and the Club of the new or renewed agreement within the same thirty (30) day period and, upon request, to provide a copy of the duration/term provision and signature page of such Qualifying Shoe or Glove Deal to the Club or the League, as applicable.

Professional Player Contract      Page **9** of **32**
USL Championship                                      Club        Player
Case 3:23-cv-00017   Document 1-1   Filed 01/11/23   Page 98 of 136

## 11. REPRESENTATIONS AND WARRANTIES.

    a.  Player hereby represents and warrants that:

        i.  he is not legally obligated, by contract or otherwise, to play soccer for any person or entity other than the Club;

        ii.  except as fully described in an addendum to this SPA, he does not, directly or indirectly, own any stock or have any other financial interest in any professional soccer club, other than receiving the Compensation due under Section 3 from the Club;

        iii.  his name as set forth in this SPA and in his signature to this SPA is his proper and legal name and is not a fictitious or assumed name;

        iv.  he is the owner of all rights granted hereunder or is fully authorized to dispose of such rights to the benefit of the Club and/or the League (as applicable) and, by virtue of this SPA (unless expressly and specifically otherwise set forth in this SPA), the Club owns his international registration and his playing rights, and neither he nor any third party has any rights therein or will attempt to assert any rights therein against the Club;

        v.  in the event Player was represented by an Intermediary during the negotiation of this SPA, the information of such Intermediary and any required payments to be made to such Intermediary in connection with this SPA are each completely and accurately included in Addendum J;

        vi.  he has all rights and permissions necessary to enter into this SPA and is not legally or contractually prohibited from doing so;

        vii.  any Medical Information Forms he has submitted to the Club prior to the execution of this SPA were completed truthfully and without material omissions and, to the Player's knowledge as of his execution of this SPA, the information submitted thereon remains accurate and without any material omissions and he knows of no injury, illness, or condition that renders, or will likely render, him physically or mentally unable to perform the playing services required under this SPA;

        viii.  except as set forth in Addendum F, he is not a party to any agreement which would require him to wear or in any way endorse any on-field product or would prevent him from wearing or endorsing any on-field product; and

        ix.  that (a) he has and shall maintain or (b) to his knowledge, would be able to obtain upon reasonable advance notice from his Club, a valid passport and is (or would be) able to undertake such international travel as may be required pursuant to this SPA.

    b.  The Club hereby represents and warrants that:

        i.  it has all rights and permissions necessary to enter into this SPA and is not legally or contractually prohibited from doing so;

ii. it has the power and authority to execute and deliver this SPA and to perform its obligations hereunder in accordance with the terms hereof, and all necessary corporate action to authorize the transactions contemplated by this SPA has been duly and effectively taken;

iii. this SPA is the valid and binding obligation of the Club, enforceable against it in accordance with its terms; and

iv. the signatory hereto has all necessary rights and authority to enter into this SPA on behalf of the Club.

## 12. TERMINATION.

a. <u>Performance-Based Contracts</u>.

i. If the SPA type is denoted as Performance-Based, the Club may unilaterally terminate this SPA at any time, in its sole and absolute discretion, between the Effective Date and the Contract Guarantee Date of the Initial Term. Any such termination shall be made effective only upon the conclusion of the waiver-wire period described in paragraph ii below. If this SPA is terminated other than for cause between the Effective Date and the Contract Guarantee Date of the Initial Term, his Base Salary shall be provided by the Club (a) for a minimum of forty-five (45) days and (b) for fourteen (14) days following the notice of termination. Thereafter, neither party shall have any further obligation to the other (except as are otherwise designated either in this SPA or the CBA as surviving such termination).

ii. For a period of three (3) full days following the termination of a Performance-Based SPA, other clubs in the League shall have the exclusive right to assume the Player's SPA; provided, however, that if another club in the League assumes the SPA, the SPA shall be considered Guaranteed for the remainder of its term. After the lapse of the 3-day waiver-wire period (i.e., 5:00 PM EST of the third day following the date of the waiver), the Player's right to sign with other teams shall be unrestricted.

b. <u>Termination by Club</u>. In addition to any other grounds for termination that are expressly set forth in the CBA or this SPA, this SPA may be terminated by the Club at any time without further obligation on the part of either party, upon written notice to the Player (with a copy to the USL and the USLPA), if the Player at any time engages in a material breach of the CBA or this SPA. Any such termination shall be subject to the Player's rights under the grievance procedures set forth in Article 24 of the CBA.

c. <u>Termination by Player</u>. The Player may terminate this SPA upon ten (10) business days' written notice of default to the Club (with a copy to the USL and the USLPA) if (i) the Club defaults in its obligation to pay the Salary set forth in Addendum C or fails to perform any other material obligation agreed to be performed by the Club under this SPA and (ii) the Club fails to remedy such default within the ten (10) business days, or to give notice of intent to arbitrate within seven (7) business days of the Player giving notice of such default in writing to the Club, USL, and to the USLPA. The Player shall have no right to terminate this SPA prior to the conclusion of the Term (including any Option Terms) other than as expressly set forth in the CBA or by mutual written agreement with the Club (and regardless of whether the Player may otherwise have had such right under FIFA's RSTP). In the event the Club disputes an assertion by the Player that it is in default of the obligations set forth in

Addendum C or that it has otherwise failed to perform any other material obligation under this SPA, and it is subsequently determined pursuant to the Grievance procedures set forth in Article 24 of the CBA that a default has occurred, the Club shall have five (5) business days from the date of such finding to remedy such default. During the pendency of any Grievance concerning the existence of a default, the Player's SPA shall remain in full force and effect, and all amounts shall continue to be paid in accordance with its terms.

d. <u>Buyout Right</u>. Subject to any limitations set forth in the CBA, prior to November 30, the Club may unilaterally terminate this SPA for the following Season(s), for any reason or for no reason, provided that it: (i) satisfied any obligations to the Player for the prior Season and (ii) pays the Player an amount equal to 50% of his base salary for each Guaranteed Contract Year remaining in this SPA (i.e., excluding any option terms), with at least half payable within fourteen (14) days of the exercising of such right and the remainder payable within sixty (60) days thereafter. The Club shall pay any reasonable costs of collection actually incurred by the Player. Upon the exercise of such buyout right, the Player's registration shall be promptly processed and released by the Club and/or the League (as the case may be).

## 13. ASSIGNMENT.

a. <u>Loans and Transfers Not Requiring Consent</u>.

  i. Subject to Addendum G, the Club may loan, trade or transfer the Player to another club in the League without the Player's consent; provided that (i) the Player's Salary remains the same and (ii) the Player's other benefits are materially similar. Notwithstanding the foregoing, if the Player is provided a housing stipend pursuant to his SPA, the stipend shall be reasonably increased or decreased based upon the market to which the Player is being relocated. A Player properly assigned hereunder shall continue to perform under and satisfy the obligations of this SPA as if it had been entered into by the Player with the assignee club instead of with the Club.

  ii. In the event that this SPA is assigned to any other club in the League, expenses associated with relocating to the assignee club shall be paid by the clubs, as set forth in Article 14.A.2 of the CBA.

b. <u>Loans and Transfers Requiring Consent</u>. The Club has the right to loan, transfer, assign and/or sell the rights to the Player's services to any professional soccer team or league; provided, however, that except as may be permitted by Section 13.a above, the Player must consent in writing to any such loan, transfer, assignment or sale. Except as otherwise agreed in writing between a Player and a Club, the Player shall be solely responsible for any relocation expenses incurred in connection with any such loan, transfer, assignment or sale.

## 14. APPLICABILITY OF GOVERNING BODY REGULATIONS.

a. This SPA is made subject to League Rules and the rules, regulations and policies of applicable governing bodies, including USSF and FIFA, except as such rules, regulations, and policies conflict with the terms set forth in this SPA or the CBA.

b. The Player hereby acknowledges and agrees that, subject to the terms of the CBA, the following provisions in the FIFA Regulations on the Status and Transfer of Players (including any applicable Annexes thereto) shall not apply to this Agreement:

Professional Player Contract       Page **12** of **32**
USL Championship                                     Club         Player
Case 3:23-cv-00017   Document 1-1   Filed 01/11/23   Page 101 of 136

i. Chapter III (Registration of Players), Article 10 (Loan of Professionals), Paragraph 1. The Player understands and agrees that, unless set forth in Addendum G, he may be loaned to another Club in the USL Championship with or without his consent thereto in accordance with the terms of Article 14 of the CBA.

ii. Chapter IV (Maintenance of Contractual Stability between Professionals and Clubs), Article 13 (Respect of Contract), Article 14 (Terminating a Contract with Just Cause), Article 15 (Terminating a Contract with Sporting Just Cause), and Article 16 (Restriction on Terminating a Contract During the Season). The Player understands and agrees that both the Club's and the Player's right to terminate this SPA are as set forth in this SPA and the CBA and waives any additional termination rights which may otherwise have been available pursuant to the Regulations (e.g., for "sporting just cause").

iii. Chapter IV (Maintenance of Contractual Stability between Professionals and Clubs), Article 18 (Special Provisions Relating to Contracts Between Professionals and Clubs), Paragraph 2. The Player understands and agrees that this SPA shall be for the Term, as set forth herein (which may be for less than one year and which shall include any extensions thereto as set forth in Addendum B).

iv. Chapter IV (Maintenance of Contractual Stability between Professionals and Clubs), Article 18 (Special Provisions Relating to Contracts Between Professionals and Clubs), Paragraph 4. The Player understands and agrees that, if set forth in Addendum E, this SPA is subject to a successful medical examination.

v. Chapter IX (Jurisdiction). The Player agrees that the sole and exclusive dispute resolution procedures available for resolving any Grievance are as set forth in Article 24 of the CBA. The Player therefore hereby waives any right to bring any Grievance for resolution on the merits to any FIFA body or tribunal, including any rights pursuant to Chapter IX of the FIFA RSTP. Notwithstanding the foregoing, once a final decision, determination or award has been rendered pursuant to the process set forth in Article 24 of the CBA, either the League or the Club, on the one hand, or the Player or USLPA, on the other hand, may immediately take such final decision, determination or award to the relevant FIFA body or tribunal or court of law having jurisdiction to be entered and enforced.

c. The Player also hereby acknowledges and agrees that the Club may seek training compensation and/or solidarity payments from clubs that the Player subsequently contracts with, and the Player expressly waives any right to challenge or dispute the Club's entitlement to such payments.

## 15. DISPUTE RESOLUTION.

a. <u>General</u>. The Parties shall resolve any Grievance exclusively in accordance with Article 24 of the CBA, as if such Article 24 was fully set forth herein.

b. <u>Waiver of Right to Trial</u>. By entering into this SPA, the Parties are waiving all rights to have a Grievance heard or decided by a jury or in a court trial. EACH PARTY FULLY UNDERSTANDS AND AGREES THAT THEY ARE GIVING UP CERTAIN RIGHTS IN CONNECTION WITH A GRIEVANCE THAT WOULD OTHERWISE BE AFFORDED

TO THEM BY CIVIL COURT ACTIONS, INCLUDING BUT NOT LIMITED TO THE RIGHT TO A JURY OR COURT TRIAL.

    c.   <u>Class Action Waiver</u>.  Without limiting the USLPA's right to assert a Grievance on behalf of a class of players, Player and Club expressly intend and agree that, with respect to any claim, dispute or proceeding between the Player and the Club, <u>regardless of whether it could be considered a Grievance or not</u>:

        i.   class action and collective action procedures shall not be asserted, and will not apply;

        ii.   each will not assert class or collective action claims against the other;

        iii.   each shall only submit their own individual claims and shall not bring claims against the other in any representative capacity on behalf of any other individual; and

        iv.   any claims by the Player will not be joined, consolidated, or heard together with claims of any other current or former player of the Club or other clubs in the League.

**16. UNIQUE SKILLS**.  The Player acknowledges that the services he is to provide under this Agreement are of a unique and special character, and acknowledges and agrees that (i) a material breach or threatened material breach by the Player of any of his obligations under this Agreement would give rise to irreparable harm to the Club for which monetary damages would not be an adequate remedy and (ii) if a material breach or a threatened material breach by the Player of any such obligations occurs, the Club will, in addition to any and all other rights and remedies that may be available to it at law, at equity or otherwise in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, and any other relief that may be available from a court of competent jurisdiction, without any requirement to prove actual damages or that monetary damages will not afford an adequate remedy.

**17. VALIDITY AND FILING.**

    a.   This SPA shall be valid and binding upon the Club and the Player immediately upon its execution, unless the Club and Player have agreed that the Player's Fitness is a condition precedent, in which case this SPA shall be valid and binding as set forth in Section 8.c.

    b.   The Club agrees to file a copy of this SPA, and/or any amendments thereto, with and as directed by the League as soon as practicable by email, but in no event may such filing be made more than forty-eight (48) hours after the execution of this SPA and/or its amendment(s).

**18. ASSUMPTION OF RISK AND RELEASE OF OTHER CLUBS IN THE LEAGUE.**

    a.   The Player acknowledges that he is an experienced soccer player and understands that dangers of personal injury are inherent in participating in soccer and soccer-related activities for the Club or the League. By entering into this SPA, the Player voluntarily and knowingly assumes all of the risks associated with playing professional soccer and with performing his obligations under this SPA (including but not limited to the risk of death, brain damage, or other personal injury from playing, practicing, training, traveling, fights, actions by fans and the media, conditions of the playing surface, and use or misuse of equipment).

    b.   The Player hereby releases and waives any and all claims he may have, or that may arise during the term of this SPA, against the Club, the League, every other Club in the League,

Professional Player Contract        Page **14** of **32**        _____    _____
USL Championship                                       Club      Player
Case 3:23-cv-00017   Document 1-1   Filed 01/11/23   Page 103 of 136

each of their respective Affiliates, and the directors, officers, owners, stockholders, trustees, partners, managers, members, and employees of the Club, the League, every other club in the League, and each of their respective affiliates, arising out of, or in connection with, and whether or not by negligence, (i) any injury suffered in the course of his employment, whether during soccer-related activities or otherwise; or (ii) any fighting or other form of violent and/or unsportsmanlike conduct occurring during the course of any practice, game, or other Club event (in all cases on or adjacent to the field or adjacent to any facility used for such practices or games). The foregoing shall not release a party from any grossly negligent (or more culpable) acts, nor shall the foregoing apply to any workers' compensation claim or any claim of medical malpractice against a Club-affiliated or Club-designated physician or other medical personnel.

**19. COSTS AND EXPENSES.** Except as otherwise set forth in this SPA or the CBA, all costs and expenses incurred in connection with this SPA (including any costs, expenses, or attorneys fees relating to a Grievance, regardless of the prevailing party) shall be paid by the Party incurring such costs and expenses.

**20. GOVERNING LAW.** This SPA (and all other Addenda hereto) shall be construed and interpreted under, and shall be governed by, the Laws applicable to contracts made and performed in the State of New York, except where federal law may govern.

**21. VENUE AND JURISDICTION**.

    a. Other than a Grievance (brought exclusively pursuant to Article 24 of the CBA), any legal suit, action, or proceeding arising out of or relating to this SPA between the Player and the Club shall be instituted in state or federal court, in each case located in the city and county where the Club is located, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. The parties irrevocably and unconditionally waive any objection to venue of any suit, action, or proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in any such court has been brought in an inconvenient forum.

    b. The exclusive choice of venue and jurisdiction in paragraph 21.a above do not preclude the bringing of any action by the parties or the enforcement by the parties of any judgment obtained in any such jurisdiction, in any other appropriate jurisdiction or the right of the parties to confirm or enforce any award in any appropriate jurisdiction.

**22. NATIONAL TEAMS.** The Club shall make the Player available on request of the Player's national association (e.g., USSF) for international games, FIFA and other international tournaments (including CONCACAF tournaments), and Olympic Games competition, including preparation, qualification and final tournament matches, in accordance with FIFA rules and regulations. Any divergent agreement between the Player and the Club is prohibited.

**23. ENTIRE AGREEMENT**. This SPA (including the Addenda hereto) and the CBA constitute the entire agreement between the Parties concerning the subject matter hereof and supersede any prior agreements, no other representations having induced either Party to execute this SPA. No amendment to this SPA shall be binding on either party unless it is mutually agreed to in writing.

**24. INTERPRETATION**. This SPA shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument

Case 3:23-cv-00017   Document 1-1   Filed 01/11/23   Page 104 of 136

to be drafted. The addenda referred to herein shall be construed with, and as an integral part of, this SPA to the same extent as if they were set forth verbatim herein.

**25. NO INCONSISTENT AGREEMENTS**.  Neither the Club nor the Player has entered, as of the date of the Party's execution of this SPA, nor shall either Party, on or after such date, enter into any agreement that (i) would have the effect of impairing the rights granted to the other Party or (ii) otherwise conflicts with the provisions hereof.

**26. WAIVER OF COLLEGE ELIGIBILITY**.  PLAYER UNDERSTANDS AND ACKNOWLEDGES THAT BY EXECUTING THIS SPA, HE WILL NO LONGER BE ELIGIBLE TO PLAY IN ANY NCAA, NAIA OR NJCAA UNIVERSITY OR COLLEGE ATHLETIC PROGRAM.

*Signature Page Follows*

**SIGNATURES**

By affixing their signatures below, Player and Club indicate their understanding of, and agreement to, all of the provisions of this SPA, including all Addenda and any other attachments.

_____     _____
Player's Signature                                                    Date


_____     _____
Authorized Club Representative's Signature                Date



**PARENT OR LEGAL GUARDIAN CONSENT**
[for players under the age of 18]

Player's parent(s) or legal guardian irrevocably consents to the performance and execution of this SPA (including all Addenda and attachments) hereto. Such consent shall be effective as to all provisions and shall be irrevocably given for the duration of this SPA. Player's parent(s) or guardian further agree to hold Club harmless for any injury suffered by Player during the term of this SPA.


_____     _____
Signature of Father/Guardian (circle one)            Date


_____     _____
Signature of Mother/Guardian (circle one)           Date

**ADDENDUM A**

**PLAYER INFORMATION** (for notice purposes)

Name (First/Middle/Last): _____

Current Address: _____

Telephone Number: _____

Email: _____


**CLUB INFORMATION** (for notice purposes)

Club Address: _____

Attn: _____

Telephone Number: _____

Email: _____

**ADDENDUM B**

Initial Contract Year: [_____]

Initial Term begins on the Effective Date and ends on November 30, [_____]

Number of Options: [_____]

First Option Term (if applicable): December 1, [_____] to November 30, [_____]

Second Option Term (if applicable): December 1, [_____] to November 30, [_____]

**ADDENDUM C**

Compensation

**A.** **Salary**.  The Club shall pay to Player the following Salary for each season during the Term (including any Option Terms).  In each instance, the Salary shall be paid (at minimum) through the Standard Compensation Period.  Salary shall be paid in accordance with the Club's standard payroll practices.  Any prorated amounts are to be based on a 30-day month.

| Contract Year # | Salary (monthly) | Payment Start Date | Payment End Date |
|---|---|---|---|
| Initial Contract Year | $ | | |
| Contract Year 2 | $ | | |
| Contract Year 3 | $ | | |
| Contract Year 4 | $ | | |
| Contract Year 5 | $ | | |
| Contract Year 6 | $ | | |

Any additional Salary or modifications to the Salary set forth in the chart above shall be set forth below, for such periods of time as set forth therein:

**B.** **Signing Bonus**.  The Club shall pay to the Player the following amount (if any) as a signing bonus.  If such signing bonus is payable in installments, the amount and timing of such installments shall also be set forth.  If no signing bonus is payable, please write "none".

Amount and Payment Schedule (if applicable):

C. **Housing Stipend**. The Club shall pay to Player the following amounts (if any) as a housing stipend for each season during the Term (including any Option Terms). In each instance, the housing stipend shall be paid (at minimum) through the Standard Compensation Period. Player acknowledges that such payments may be treated as "income" to the Player and that there may be tax implications for the Player arising therefrom. If no housing stipend is being provided, please leave blank.

| Contract Year # | Housing Stipend (monthly) | Payment Start Date | Payment End Date |
|---|---|---|---|
| Initial Contract Year | $ | | |
| Contract Year 2 | $ | | |
| Contract Year 3 | $ | | |
| Contract Year 4 | $ | | |
| Contract Year 5 | $ | | |
| Contract Year 6 | $ | | |

Any additional housing stipends or modifications to the housing stipends set forth in the chart above shall be set forth below, for such periods of time as set forth therein.

D. **Club-Provided Housing**. The Club shall provide the Player with the housing (if any) set forth below according to the schedule set forth therein. The type and character of the housing shall be clearly described (e.g., "one-bedroom, fully furnished apartment, without roommates; three-bedroom, fully furnished apartment with two roommates…") and, if the housing provider changes during the Term, the quality of the housing provided shall not be materially decreased. Player acknowledges that the value associated with such housing may be treated as "income" to the Player and that there may be tax implications for the Player arising therefrom. If no housing is being provided, please write "none".

E. **Health Insurance.** If group health insurance is made available through the Club, a summary of what the Club currently offers to contribute is as set forth below:

F. **Performance Bonus**. The Club shall pay to the Player the following amounts (if any) based on performance of the Player or the Club (attach additional pages if necessary). If no performance bonuses are payable, please write "none".

Performance bonuses shall be paid upon the following payment schedule:

Professional Player Contract      Page **21** of **32**
USL Championship      _____    _____
     Club      Player
Case 3:23-cv-00017    Document 1-1    Filed 01/11/23    Page 110 of 136

**G. Club Payments to Intermediary**.  If the Player was represented by an Intermediary in connection with his negotiation of this SPA with the Club, and the Club has agreed to pay the Intermediary (on the Player's behalf) any or all of the amounts owed by the Player, the Club's payment obligations are set forth below.  Player acknowledges that such payments may be treated as "income" to the Player and that there may be tax implications for the Player arising out of such payments.

**H. Transfer Consideration**.  If the Player is entitled to any payments in connection with the Club's loan, transfer or sale of the Player, such payments are set forth below.

**I. Other Compensation**. The Club shall provide the Player with the following additional compensation (including any personal transportation being provided to the Player, if any).  If no additional compensation is agreed upon, enter "none."  Please note the period of time during which additional benefits would be provided:

**ADDENDUM D**

<u>Club Certification – Base Compensation</u>

The Club hereby certifies that it reasonably anticipates the monthly Base Compensation payable to the Player during the Standard Compensation Period for the Initial Contract Year to be as set forth in the chart below.

In calculating (4) below, the total amount of such signing (or other guaranteed) bonuses shall be attributed evenly over the Standard Compensation Period throughout the term of the SPA (excluding any option years).

| Classification | Monthly Value during Standard Compensation Period of Initial Contract Year |
|---|---|
| (1)  Salary: | $ |
| (2)  Value of any housing or personal transportation (or the amount of any such stipend, if applicable): | $ |
| (3)  Value of any health insurance contributions (including to or on behalf of the Player's family): | $ |
| (4)  Applicable portion of any signing (or other guaranteed) bonuses, but specifically excluding any amounts paid by a Club to a Player's agents or representatives: | $ |
| **Total:** | $ |

_____          _____
Authorized Club Representative's Signature                    Date

**ADDENDUM E**

<u>Fitness as Condition Precedent</u>

---

**Instructions**: If the validity of the SPA is being conditioned upon the Player successfully passing a medical examination, the "Applicable" box should be checked and this Addendum E must be completed and executed. Otherwise, the "Not Applicable" box should be checked and the remainder of this Addendum E may be left blank.

---

☐ Applicable          ☐ Not Applicable

Club Name: _____

Player Legal Name: _____

The Club and the Player hereby agree that the Player must report for and submit to a Medical Examination (to be performed by one or more physicians designated by the Club) in accordance with the following:

(a) The Player must report for such Medical Examination at such times as follows: (i) for a Player under contract with another team at the time the SPA is signed, no later than the tenth (10th) business day following the championship game of each team's respective league; (ii) for a Player not under contract with another team at the time the SPA is signed, no later than the tenth (10th) business day following the execution of the SPA; (iii) for a Player outside the country at the time the SPA is executed for whom a visa is necessary to enter the country, no later than two (2) business days following the Player's entry into the Club's market on such visa (collectively, the "<u>Medical Deadline</u>")). However, with respect to (i) above, to the extent that the Player's current and prospective teams are both in the USL Championship, the Player and the new team will engage in best efforts to conduct the Medical Examination within ten (10) business days from the last day of the regular season or the date that both teams have been eliminated from the playoffs (whichever is later). All costs and expenses relating to the Medical Examination, including travel and lodging, shall be borne by the Club.

(b) Upon reporting, the Player shall supply all information reasonably requested of him, provide complete and truthful answers to all questions posed to him, and submit to all examinations and tests reasonably requested of him.

(c) The determination of whether the Player has passed the Medical Examination shall be made by the Club in its sole discretion, exercised in good faith, in consultation with one or more of the Club's physicians; and a Club shall have the right to determine in good faith that a Player has failed to pass the Medical Examination due to the risk of a future injury, illness or other health condition notwithstanding that the Player is currently able to perform as a skilled soccer player in the League.

(d) If the Player does not pass the physical examination, the Club shall promptly: (i) notify the Player (in any case, no later than two (2) business days following the Medical Deadline) and (ii) pay to the Player an amount equal to two (2) weeks Base Compensation.

(e) The Club's determination that the Player has passed the Medical Examination (or the failure of the Club to notify the Player of the contrary within two (2) business days following the Medical Deadline) shall be a condition precedent to the validity of the Contract. Accordingly, and without limiting the generality of the preceding sentence, until such time as a Player has passed the Medical Examination (or the two (2) business days have passed without notification to the contrary), he may not attend any regular training camp of the Club or participate in matches or organized practices with the Club.

(f) The Club shall not use these "Fitness as a Condition Precedent" provisions to renegotiate the terms and conditions of a SPA.

(g) There shall be no public disclosure of SPA signings subject to Medical Examinations unless and until the Player has either passed (or is deemed to have passed) the Medical Examination. There shall be no public disclosure of the results of Medical Examinations subject to these "Fitness as a Condition Precedent" provisions.


_____          _____
Player's Signature                                Date


_____          _____
Authorized Club Representative's Signature        Date

**ADDENDUM F**

Qualifying Shoe or Glove Deal

**Instructions**: If the Player has a Qualifying Shoe or Glove Deal, the "Applicable" box must be checked and this Addendum F must be completed and executed. Otherwise, the "Not Applicable" box must be checked and the remainder of this Addendum F may be left blank.

☐ Applicable          ☐ Not Applicable

Club Name: ▢

Player Legal Name: ▢

The Player represents that, as of the date of his signature below, he has entered into an exclusive, written agreement with an on-field shoe or goalie glove manufacturer, as set forth below:

**On-Field Shoe Manufacturer:**     ☐ Adidas

☐ Nike

☐ Puma

☐ Other: ▢

**Goalie Glove Manufacturer:**     ☐ Adidas

☐ Nike

☐ Puma

☐ Other: ▢

Start Date of Agreement: ▢

End Date of Agreement: ▢

_____          _____
Player's Signature                                                            Date

Case 3:23-cv-00017    Document 1-1    Filed 01/11/23    Page 115 of 136

**ADDENDUM G**

<u>Player Consent or Non-Consent to Loans, Trades and Transfers—Modifications to SPA Section 13.a</u>

> **Instructions**: One of the 3 check boxes must be selected.

> **Note**: Section 13.a of the SPA permits the Club to loan, transfer, or trade the Player to another club in the League without having to obtain the Player's consent. If the Player and Club agree that the Player's consent is required or that the Club's right to transfer the Player without his consent is subject to certain limitations, the first or second box (as applicable) should be checked. If no changes are being made to Section 13.a, the third box should be checked.

The Player and the Club agree that:

| | |
|---|---|
| ☐ | Section 13.a of this SPA is deleted in its entirety and replaced with the following: |
| | "The Club may not loan, trade or transfer the Player to another club in the League without the Player's written consent. Except as otherwise agreed in writing between the Player and the Club, the Player shall be solely responsible for any relocation expenses incurred in connection with any such loan, transfer, assignment or sale." |
| ☐ | the Club's right to loan, trade, or transfer the Player to another club in the League is as set forth in Section 13.a, but subject to the following additional restrictions: |
| ☐ | the Player may be loaned, transferred or traded within the League without his consent (and Section 13.a shall remain unmodified). |

**ADDENDUM H**

<u>Forum and Venue</u>

---

**Instructions**: If Section 21 of this SPA (Venue and Jurisdiction) is being superseded by this Addendum H, the "Applicable" box must be checked and this Addendum H must be completed and executed. Otherwise, the "Not Applicable" box must be checked and the remainder of this Addendum H may be left blank.

---

☐ Applicable     ☐ Not Applicable

Club Name: _____

Player Legal Name: _____

Recognizing the cost, privacy, and expediency benefits that can be provided through arbitration, the Player and the Club hereby agree as follows (which shall replace Section 21 of this SPA in its entirety):

(a)  Other than a Grievance (brought exclusively pursuant to Article 24 of the CBA), any legal suit, action, or proceeding between the Player and the Club shall be settled by arbitration administered by the Judicial Arbitration and Mediation Services (JAMS), in each case located in the County where the Club is located, and each party irrevocably submits to the exclusive jurisdiction of JAMS in any such suit, action, or proceeding. The parties irrevocably and unconditionally waive any objection to venue of any claim, action, or proceeding in such forum and irrevocably waive and agree not to plead or claim that any such claim, action, or proceeding brought before JAMS in the County where the Club is located has been brought in an inconvenient forum.

(b)  The exclusive choice of venue and jurisdiction in paragraph (a) above do not preclude the bringing of any action by the parties or the enforcement by the parties of any judgment obtained in any such jurisdiction, in any other appropriate jurisdiction or the right of the parties to confirm or enforce any award in any appropriate jurisdiction.

(c)  By entering into this Addendum H, the Parties are waiving all rights to have their claims heard or decided by a jury or in a court trial. EACH PARTY FULLY UNDERSTANDS AND AGREES THAT THEY ARE GIVING UP CERTAIN RIGHTS OTHERWISE AFFORDED TO THEM BY CIVIL COURT ACTIONS, INCLUDING BUT NOT LIMITED TO THE RIGHT TO A JURY OR COURT TRIAL.

_____          _____
Player's Signature                                              Date

_____          _____
Authorized Club Representative's Signature               Date

**ADDENDUM I**

Please use this Addendum I to communicate additional terms and conditions to this SPA.

In case of any conflict or inconsistency between the terms or conditions set forth in this Addendum I and the terms or conditions found elsewhere in this SPA or the CBA, the terms and conditions found in the CBA or elsewhere in this SPA shall control.

## ADDENDUM J

### Intermediary Information

> **Instructions**: One of the two check boxes must be selected. If the first box is selected, this Addendum J must be completed and executed. If the second box is selected, the remainder of this Addendum J may be left blank.

☐ I retained an Intermediary to represent me in connection with the negotiation of this SPA.

☐ I acknowledge that I have had the opportunity to be represented by an Intermediary in connection with the negotiation of this SPA, but that I have chosen not to retain one.

**Intermediary Contact Information**

Intermediary Agency: [                ]

Intermediary Name (First/Middle/Last): [                ]

Address: [                ]

Telephone Number: [                ]

Email: [                ]

**Questions**

As of the Effective Date, is the Intermediary a FIFA-licensed Player Intermediary?
Yes ☐   No ☐

Was the Intermediary involved in the negotiation of this SPA on behalf of the Player?
Yes ☐   No ☐

Is the Intermediary an owner, officer, employee, consultant, or representative of a team in the League?
Yes ☐   No ☐

If Yes, which team? Team Name: [                ]

*Certification Page Follows*

**Player Certification**

I, _____ (Player's Name), certify that I have retained the above listed Intermediary to represent me. The representation shall remain in effect until either my Intermediary or myself communicates otherwise in writing to the League and the Club. I understand and acknowledge that, unless otherwise provided in Addendum C, I am solely responsible for any costs associated with the compensation of my Intermediary. I further understand and acknowledge that the League and the Club may communicate with me by communicating with my Intermediary.


_____        _____
Player's Signature                                Date

# PLAYER REGISTRATION INFORMATION
### *\*\*All Fields Required\*\**

**Basic Information**

Player Name: [          ]

Player Height: [          ] , [          ] "

Player Weight: [          ] lbs

Player Email: [          ]

Player Phone: [          ]

Place of Birth:
☐ USA
☐ Canada
☐ Other, specify: [          ]

Citizenship (Country):
☐ USA
☐ Canada
☐ Other, specify: [          ]

**Last Amateur / Professional Club** (college inapplicable)

Club: [          ]

League: [          ]

State: [          ]

Country: [          ]

**USL League Two (f/k/a the "PDL")**

Has Player ever played in USL League Two?   ☐ Yes   ☐ No

If yes, please list the last club played for: [          ] Year   [          ] Club

**Social Media**

Twitter Handle: @ [          ]          (if inapplicable, please write "none")

Instagram Handle: @ [          ]          (if inapplicable, please write "none")

**This "Dues or Agency Fee Deduction Authorization Card" has been included as a courtesy to the USLPA.**

**Submission Instructions**:

If the Authorization Card is executed contemporaneously with the SPA, Clubs should transmit the executed card to the League along with the SPA.

However, if not executed contemporaneously with the SPA, executed forms should be returned directly to the USLPA at: admin@uslplayers.org

USL PLAYERS ASSOCIATION
Dues or Agency Fee Deduction Authorization Card

I hereby authorize and direct the Club to deduct from my pay uniform dues or fees in the amounts fixed by the USL Players Association in accordance with the provisions of the USLPA Constitution and By-Laws and to remit such deducted dues to the USLPA in accordance with the bargaining agreement (CBA) between the United Soccer League and the USLPA. This authorization extends to my current USL club and to any USL club for whom I may play in the future.

This authorization is voluntarily made in order to facilitate payment of my fair share of the USLPA's costs of representing me for the purpose of collective bargaining. Where the payment of dues or agency fees may be lawfully required as a condition of employment the deductions shall be made without regard to my current or future membership in the USLPA.

This authorization shall be irrevocable for a period of one year from the date I signed this card (below) or until I am no longer employed by a club in the USL Championship, whichever occurs sooner, without regard to my membership status. I agree that this authorization shall be automatically renewed and irrevocable for successive one-year periods unless revoked by written notice to my then-current Club and the USLPA within the ten (10) day period prior to the anniversary of this authorization. I understand that the deductions authorized are not deductible as charitable deductions under federal income tax law.

Printed Name: _____     Signature: _____

Current Club: _____     Date: _____

# EXHIBIT B

<u>Medical Information Release</u>

*Included on the following pages*

Version: October 25, 2021

# AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION

Consistent with the terms of the Collective Bargaining Agreement between the USL Players Association and the USL Championship (the "League"), I hereby authorize my employer club, any subsequent club in the League to which my playing services may be loaned or assigned, and their respective successors (collectively, the "Club") to use and/or disclose all of my Medical Information, as provided for below:

1. **This authorization applies to all Medical Information about me**. As used in this authorization: "Medical Information" means all medical and/or Medical Information about me including, but not limited to, all past, present or future: health, medical or surgical records; medical or health questionnaire(s); information relating to any injury, sickness, disease, condition, medical history, or medical, mental, or clinical status, or diagnosis, treatment or prognosis; clinical or treatment notes or reports; fitness to play determinations; test results (including, but not limited to, the results of neuropsychological testing); laboratory reports, x-rays or diagnosis imaging results; and data relating to any testing or medical study.

2. I authorize all physicians, hospitals, laboratories, pharmacies, clinics, and other health care providers (including, but not limited to, all trainers), who have or may have any Medical Information about me, to use and/or disclose all that Medical Information about me to doctors, athletic trainers, or other medical staff ("Medical Staff") of the Club or who have a formal relationship with the Club (collectively, the "Club Medical Staff"), and I authorize the Club Medical Staff to receive such Medical Information.

3. I authorize the use and disclosure of my Medical Information as follows:

   (a)    to the Club Medical Staff;

   (b)    to the Club Medical Staffs of other clubs in the League in connection with a contemplated player acquisition (whether via signing, trade, loan or transfer);

   (c)    to the Club's workers' compensation insurance carrier and to Club-personnel as needed to process workers' compensation claims or otherwise assess or offer benefits;

   (d)    to the following individuals, but only to view (and not receive) Medical Information, and only to the extent it might affect my on-field performance: the Club's coaching staff, technical director, and senior Club officials who have a reasonable need to be made aware of such Medical Information;

   (e)    to other relevant personnel of the Club, the League, or a governing body (e.g., the United States Soccer Federation) as may reasonably require such information in connection with any dispute resolution process;

   (f)    to such other individuals or entities as reasonably required to effectuate

Medical Information Release                Page **1** of **3**

any purposes or provisions of the Collective Bargaining Agreement between USL and the USL Players Association or my Standard Player Agreement (provided such individuals or entities agree to keep such information confidential); and

    (g)    to such other individuals or entities as may be reasonably required to comply with applicable law.

2.    I further authorize the use and disclosure of the following information for public relations purposes:

    (a)    for injuries sustained during the course of my employment as a skilled soccer player with the Club, including, but not limited to, travel with my team or on business requested by the Club:

        (i)    the nature of the injury,

        (ii)    the prognosis and the anticipated length of recovery from the injury, and

        (iii)    the treatment and surgical procedures undertaken or anticipated in regard to the injury; and

    (b)    for any other medical and/or health condition that prevents me from rendering services to his Club:

        (i)    the fact that a medical and/or health condition is preventing me from rendering services to the Club, and

        (ii)    the anticipated length of my absence from the Club.

4.    I understand that any of my Medical Information that is disclosed in accordance with this authorization form might be redisclosed by the recipient of that information and may no longer be protected by federal health care privacy laws and rules.

5.    This authorization is effective until the date on which my employment with the Club is terminated.

6.    I understand that my treatment, payment, enrollment, or eligibility for benefits (if any) will not be conditioned on whether I sign this form.

7.    I understand that I have the right to revoke this authorization at any time, but that my revocation will not be effective to the extent that any of the classes of persons or entities I have authorized to use and/or disclose and/or receive my Medical Information have already acted in reliance upon this authorization. My revocation must be in writing and be sent to the principal business address of the Club. I further understand that my right to revoke this authorization shall not serve to excuse any failure by me to comply with the provisions of any individual contract covering my employment with the Club as a

Case 3:23-cv-00017   Document 1-1   Filed 01/11/23   Page 125 of 136

professional soccer player to which I am (or may be) a party, or any other agreement that may govern the terms and conditions of my employment as a soccer player in the League.

8.  I acknowledge that I have received a copy of this authorization and that a copy of this authorization shall be considered as effective and valid as the original.




Signature: _____

Printed Name: _____

Date: _____

**EXHIBIT C**

<u>Benefit Confirmation Form</u>

*Included on the following pages*

Version: October 25, 2021

## Benefit Confirmation Form

**Instructions**:  If a Player is being loaned, traded, or transferred from one USL Championship club (the "Transferring Club") to another USL Championship club (the "Receiving Club") without the Player's consent, the Clubs must fill out and certify through this form that, aside from his Salary (which shall remain unchanged), the Player's other benefits are materially similar.

**Clarifications**:

1.  The Player's benefits need not be identical to be materially similar (e.g., if the Transferring Club provided health insurance, the Receiving Club could instead provide the Player with a stipend towards the purchase of health insurance which would result in him having reasonably similar out-of-pocket costs as those he had at the Transferring Club).

2.  If the Player is provided a housing stipend pursuant to his SPA, the stipend shall be reasonably increased or decreased based upon the market to which the Player is being relocated.

## Benefit Confirmation Form

Player Legal Name: [blank] (the "Player")

Transferring Club: [blank]

Receiving Club: [blank]

In connection with the loan, transfer, or trade of the Player from the Transferring Club to the Receiving Club, the Receiving Club hereby acknowledges and agrees that, from the effective date of such loan, transfer or trade, it shall provide the Salary and other benefits and compensation set forth in the Standard Player Agreement between the Player and the Transferring Club, as if such Standard Player Agreement had been entered into by the Player with the Receiving Club instead of with the Transferring Club, except as set forth below.

1. If the Player is provided a housing stipend pursuant to his SPA, the stipend shall be reasonably increased or decreased by the Receiving Club based upon the market to which the Player is being relocated. In accordance with the foregoing, any modifications to the housing stipends set forth in the SPA are as set forth below:

2. To the extent that any of the other benefits set forth in Addendum C (or Addendum H, if applicable) are being replaced or modified (in each case, with the Player continuing to receive materially similar benefits), such replacements or modifications are as set forth below:

3. If the Player currently receives health insurance coverage as part of a group plan offered through the Transferring Club, the Receiving Club shall provide the following materially similar benefits to the Player (e.g., the Receiving Club could provide the Player with a stipend towards the purchase of health insurance coverage which would result in him having reasonably similar out-of-pocket costs as those he had at the Transferring Club):

**Transferring Club**

By: _____

Name: _____

Title: _____

**Receiving Club**

By: _____

Name: _____

Title: _____

**Acknowledged by Player:** _____

**EXHIBIT D**

<u>USLPA Check-Off Authorization Form</u>

*Included on the following pages*

**This "Dues or Agency Fee Deduction Authorization Card" has been included as a courtesy to the USLPA.**

**Submission Instructions**:

If the Authorization Card is executed contemporaneously with the SPA, Clubs should transmit the executed card to the League along with the SPA.

However, if not executed contemporaneously with the SPA, executed forms should be returned directly to the USLPA at: admin@uslplayers.org

USL PLAYERS ASSOCIATION
Dues or Agency Fee Deduction Authorization Card

I hereby authorize and direct the Club to deduct from my pay uniform dues or fees in the amounts fixed by the USL Players Association in accordance with the provisions of the USLPA Constitution and By-Laws and to remit such deducted dues to the USLPA in accordance with the bargaining agreement (CBA) between the United Soccer League and the USLPA. This authorization extends to my current USL club and to any USL club for whom I may play in the future.

This authorization is voluntarily made in order to facilitate payment of my fair share of the USLPA's costs of representing me for the purpose of collective bargaining. Where the payment of dues or agency fees may be lawfully required as a condition of employment the deductions shall be made without regard to my current or future membership in the USLPA.

This authorization shall be irrevocable for a period of one year from the date I signed this card (below) or until I am no longer employed by a club in the USL Championship, whichever occurs sooner, without regard to my membership status. I agree that this authorization shall be automatically renewed and irrevocable for successive one-year periods unless revoked by written notice to my then-current Club and the USLPA within the ten (10) day period prior to the anniversary of this authorization. I understand that the deductions authorized are not deductible as charitable deductions under federal income tax law.

Printed Name: _____     Signature: _____

Current Club: _____     Date: _____

**EXHIBIT E**

<u>Contract Modification Examples</u>

*Included on the following pages*

Version: October 25, 2021

## Contract Modification Examples

Pursuant to CBA Article 8.R.5, the following sets forth examples of how 2021 (or prior) SPAs are to be modified in the event that (a) their 2022 payment terms do not comply with the Minimum Base Compensation requirements and (b) the Club and Player have been unable to agree on how the payment terms should be modified to come into compliance.

If a box is checked in the preexisting SPA for payment to start on the "Required Report Date" or to end on the date of the Club's "Last Game," the payment start or end date is referenced below as "variable."

For the avoidance of doubt, however, and as more fully set forth in CBA Article 8.R.5, these examples are inapplicable to an SPA which includes each of the following elements:

(a) a monthly payment start date on or prior to February 1;
(b) a payment end date on or later than November 30; and
(c) Base Compensation during the Standard Compensation Period that equals or exceeds the Minimum Base Compensation

## Example 1:

2021 Contract Terms:  The SPA calls for the Player to be paid a salary of $6,000/month, with variable payment start and payment end dates.  The SPA does not include any housing obligations.

2022 Modification Process:  In order to determine the expected compensation for 2022, the variable payment start date is replaced with February 15, the payment end date is replaced with October 15, then that time period (8 months) is multiplied by his monthly compensation ($6,000/month).  The expected compensation of $48,000 is then divided by 10 months, to come up with revised monthly compensation of $4,800/month.

2022 Revised Contract Terms:  The modified SPA now calls for the Player to be compensated $4,800/month, with a payment start date of February 1 and a payment end date of November 30.

## Example 2:

2021 Contract Terms:  The SPA calls for the Player to be paid $1,000/month and to be provided housing (valued at $1,000/month), each from January 1 through December 31.

2022 Modification Process:  The Compensation payable to the Player is $2,000/month * 12 months = $24,000.  This amount would be divided by 10 months to determine his new monthly Compensation of $2,400/month.

2022 Revised Contract Terms:  The Player would be provided housing (valued at $1,000) and a salary of $1,400/month from February 1 through November 30.  For avoidance of doubt,

the revised SPA terms would no longer include any Compensation (including housing) in January or December (although the Club may continue to provide housing during such period if it so chooses).

**Example 3:**

2021 Contract Terms:  The SPA calls for the Player to be paid $1,000/month and to be provided housing (valued at $500/month), each from January 1 through December 31.

2022 Modification Process:  The Compensation payable to the Player is $1,500/month * 12 months = $18,000.  This amount would be divided by 10 months to determine his new monthly Compensation of $1,800/month.  As this amount is less than the Minimum Base Compensation, his Compensation would be increased to $2,200/month.

2022 Revised Contract Terms:  The Player would be provided housing (valued at $500) and a salary of $1,700/month from February 1 through November 30.  For avoidance of doubt, the revised SPA terms would no longer include any Compensation (including housing) in January or December (although the Club may continue to provide housing during such period if it so chooses).

**Example 4:**

2021 Contract Terms:  The SPA calls for the Player to be paid a salary of $2,000/month, with a variable payment start date and a fixed payment end date of December 31.  The SPA does not include any housing obligations.

2022 Modification Process:  In order to determine the expected compensation for 2022, the variable payment start date is replaced with February 15, and the expected payment period (10.5 months) is multiplied by his monthly compensation ($2,000/month).  The expected compensation of $21,000 is then divided by 10 months, to come up with revised monthly compensation of $2,100/month.  As this amount is less than the Minimum Base Compensation, his Compensation would be increased to $2,200/month.

2022 Revised Contract Terms:  The modified SPA now calls for the Player to be compensated $2,200/month, with a payment start date of February 1 and a payment end date of November 30.  For avoidance of doubt, the revised SPA terms would no longer include any Compensation in December.

# EXHIBIT F

<u>Form of Club Certification – Player Base Compensation</u>

*Included on the following page*

Version: October 25, 2021

<u>Club Certification – Base Compensation</u>

The Club hereby certifies that it reasonably anticipates the monthly Base Compensation payable to the Player during the Standard Compensation Period for the _____ Contract Year to be as set forth in the chart below.

In calculating (4) below, the total amount of such signing (or other guaranteed) bonuses shall be attributed evenly over the Standard Compensation Period throughout the term of the SPA (excluding any option years).

| Classification | Monthly Value during Standard Compensation Period of Initial Contract Year |
|---|---|
| (1) Salary: | $ |
| (2) Value of any housing or personal transportation (or the amount of any such stipend, if applicable): | $ |
| (3) Value of any health insurance contributions (including to or on behalf of the Player's family): | $ |
| (4) Applicable portion of any signing (or other guaranteed) bonuses, but specifically excluding any amounts paid by a Club to a Player's agents or representatives: | $ |
| Total: | $ |

_____      _____
Authorized Club Representative's Signature          Date